```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                             FORT WORTH DIVISION

 3
     CHARLES "CHAD" CAIN, III,      )    4:20-CV-442-O
 4        Plaintiff,                )
     v.                             )
 5                                  )
     ALEDO INDEPENDENT SCHOOL       )    Injunction Hearing
 6   DISTRICT, FRED COLLIE, and     )
     DR. SUSAN BOHN,                )
 7        Defendants.               )    September 23, 2020

 8
                     BEFORE THE HONORABLE REED C. O'CONNOR
 9                      United States District Judge
                           In Fort Worth, Texas
10

11   FOR THE PLAINTIFF:              MR. WILLIAM J. DUNLEAVY
                                     Law Offices of
12                                      William J. Dunleavy
                                     825 Market Street
13                                   Building M, Suite 250
                                     Allen, TX 75013
14                                   972-247-9200
                                     bill@williamjdunleavy.com
15
     FOR THE DEFENDANTS:             MS. BRIDGET ROBINSON
16                                   Walsh Gallegos Trevino Kyle &
                                        Robinson P.C.
17                                   PO Box 2156
                                     Austin, TX 78768-2156
18                                   512-454-6864
                                     brobinson@wabsa.com
19
     COURT REPORTER:                 MR. DENVER B. RODEN, RMR
20                                   United States Court Reporter
                                     5124 Breezewind Lane
21                                   Fort Worth, Texas  76123-6012
                                     drodenrmr@sbcglobal.net
22                                   Phone:  (214) 907-0760

23

24        The above styled and numbered cause was reported by
     computerized stenography and produced by computer.
25
```

1      (September 23, 2020.)

2          **THE COURT:**  All right.  Now we are here in case No.

3  4:20-CV-442, Charles Chad Cain, III, versus Aledo Independent

4  School District.

5          Mr. Dunleavy is here.  Ms. Robinson is here.  So I've

6  read through your response and your reply and I think that

7  since there are still restrictions on Mr. Cain, we need to go

8  forward.

9          So with that said, you can call your first witness.

10          **MR. DUNLEAVY:**  Yes, Your Honor.  Plaintiff calls

11  Fred Collie.

12          **THE COURT:**  Mr. Collie come up, please.

13      (Witness sworn by the Court.)

14          <u>**FRED COLLIE, PLAINTIFF WITNESS,**</u> was sworn

15              <u>DIRECT EXAMINATION</u>

16  BY MR. DUNLEAVY:

17  Q.  Mr. Collie, will you please state your name?

18  A.  Fred Collie.

19  Q.  And you there the Chief of Police, I believe, at the Aledo

20  Independent School District?

21  A.  Yes, sir.

22  Q.  You issued the criminal trespass warning to Chad Cain on

23  September 24, 2019?

24  A.  Yes, sir.

25  Q.  And if you look in that binder you set up there, that

1  trespass warning is Exhibit 1.  Is that correct?

2  A.  Yes, sir.

3  Q.  And then on the next tab, Exhibit 2, that's the e-mail by

4  which you sent the trespass warning; correct?

5  A.  Yes, sir.

6  Q.  Why did you issue the trespass warning to Mr. Cain?

7  A.  I was directed to do so by Dr. Susan Bohn.

8  Q.  Now, you gave some interrogatory answers in this case,

9  didn't you?

10  A.  Yes, sir.

11  Q.  I'm going to ask you to flip the page to Tab 13 -- I'm

12  sorry -- Tab 14.  Those are your interrogatory answers.  Is

13  that right?

14  A.  Yes, sir.

15  Q.  I'm trying to get to the right page here in my binder.  So

16  if you will change -- If you will turn to page 10 in those

17  interrogatory answers that are Exhibit 14.  Interrogatory

18  No. 4 asks:  State Defendant's reasons for issuing the

19  criminal trespass warning to Plaintiff on September 24,

20  including all facts upon which Defendant contends he had

21  probable cause and/or reasonable suspicion to issue the

22  criminal trespass warning.  You got that; correct?

23  A.  Okay.  Yes, sir.  I have page 14.

24  Q.  That's your answer.  You understood you are the Defendant

25  in this question, Interrogatory No. 4?

1   A.  We're on page 14?

2   Q.  On page 10 of Exhibit 14.

3   A.  Okay.  Page 10.  Sir, as I look at page 10, I don't see

4   the verbiage in which you -- That was confusing.  I'm sorry.

5   Q.  Yes.  Let me do it this way.  The area I'm talking about

6   is there on the screen.

7   A.  This screen is not coming on.

8         THE COURT:  Just walk up and show him.

9   BY MR. DUNLEAVY:

10  Q.  Right at the bottom of the page.  Interrogatory No. 4.

11  A.  Yes, sir.  I have that now.

12  Q.  In answer to that question to state your reasons for the

13  trespass warning, then on the next page, page 1, you gave us a

14  whole host of reasons, information that you said you relied on

15  to issue the trespass warning; correct?

16  A.  Yes, sir.

17  Q.  But that's not true, is it?

18  A.  I don't understand your question.

19  Q.  All those reasons you stated in Interrogatory Answer 4

20  about why you issued the trespass warning, that's -- those are

21  not true.  Those are not things you relied on to issue the

22  trespass warning; correct?

23  A.  Those are things that went into my conversation with

24  Dr. Bohn, so they are absolutely true.

25        MR. DUNLEAVY:  Object.  Nonresponsive.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  I'm sorry, Your Honor.

3              THE COURT:  Wait for the next question.

4    BY MR. DUNLEAVY:

5    Q.  You did not rely on anything besides Dr. Bohn telling you

6    to issue the trespass warning; correct?

7    A.  Ultimately, in issuing the criminal trespass warning, that

8    is correct.

9    Q.  So, when you listed all the things in Interrogatory No. 4

10   in answer to what did you rely on, all those things are things

11   Susan Bohn relied on; correct?

12   A.  I can't say what Susan Bohn relied on.  I can tell you the

13   information that I directed to Dr. Bohn.

14   Q.  But in terms of Interrogatory No. 4, you are saying -- and

15   you relied on a bunch of things when, in fact, you were told

16   to issue the trespass warning not based on your own decision

17   but based on what your boss told you to do; correct?

18              MS. ROBINSON:  Objection, Your Honor.  That is a

19   mischaracterization of the statement.  The response itself

20   specifically says the defendants, plural, issued Plaintiff a

21   criminal trespass warning to insure the safety of students and

22   then the narrative answer.

23              THE COURT:  Okay.

24              MS. ROBINSON:  He is mischaracterizing the question

25   and the response.
```

1      **THE COURT:**  If you understand the question, you can

2  answer the question.

3  A.  Please repeat the question, sir.

4  Q.  Go back to page 10, please.  The first two words.  State

5  Defendants.  Did you understand Defendant was you,

6  Fred Collie?

7  A.  I've never understood that I was a defendant in this case.

8  Q.  I'm sorry?

9  A.  I've never understood I was a defendant in this case and

10  it's quite possible that I misunderstood the question and I've

11  told you what I have done with that question, sir.

12  Q.  Okay.  So would you disavow that answer now, based on you

13  didn't understand it?

14  A.  I will not --

15      **MS. ROBINSON:**  Objection, Your Honor.  That's

16  misleading.

17      **THE COURT:**  Overruled.  He -- Let him answer.

18  A.  No, sir, I will not.

19  Q.  Okay.  So if that's still your answer, wouldn't you agree

20  that Susan Bohn directed you and that you didn't have those

21  independent reasons to issue the trespass warning?

22  A.  I would not agree with that, sir.

23  Q.  Okay.

24  A.  That's a mischaracterization and incorrect.

25  Q.  I'm going to ask you to actually flip to Exhibit No. 1.

1   Back to No. 1.  Where in Exhibit No. 1 does it say Chad Cain

2   made a threat?

3   A.  It's implied in the fact that your client had cause to

4   snip the amount of fear among the parents and staff for the

5   safety of students, staff, and parents.  So that's implied.

6   The word "fear" was not used.

7           **MR. DUNLEAVY:**  Object.  Non-responsive.

8   A.  Pardon me.  The word "threat" was not used but fear being

9   a result of Mr. Cain's threat.

10          **MR. DUNLEAVY:**  Object.  Non-responsive.

11          **THE COURT:**  Overruled.  What you just said there was

12  no threat but it was implied and then fear was the result of

13  his threat.  So how is that -- If there's no threat, but it's

14  something that is applied -- So is the fear the result of the

15  post and what people read into the post?

16          **THE WITNESS:**  The fear was the result of the threats

17  that people interpreted from his posts.  People were saying

18  they were scared to go to football games.  They were scared

19  for the staff.  They were scared for their children.  They

20  were stared to let their children walk home.  They thought

21  Mr. Cain might approach him.  People referred to him as

22  unhinged, disgruntled.

23          **THE COURT:**  They say all of that based upon what he

24  posted on his *Facebook* page?

25          **THE WITNESS:**  Posted on the *Facebook* page and not

1    that one threat, Your Honor, or not that one action, but other

2    actions in which he had engaged such as surreptitiously

3    recording the secretary and then releasing that, the picture

4    of the secretary of students on line.  That's an example of --

5    and it was -- as I mentioned, Mr. Dunleavy, he doesn't like to

6    hear it, but it was a totality of the circumstances, Your

7    Honor.  It wasn't just one simple thing.  Again, people were

8    genuinely scared.  I mean, just ten days ago.

9            THE COURT:  Okay.  Go ahead and let him ask you

10    another question.

11            THE WITNESS:  Okay.

12    BY MR. DUNLEAVY:

13    Q.  I heard the answer and I understand the Court heard the

14    answer.  But in terms of that post that's Exhibit 1, can we

15    agree you did not use the word "threat" in that post?

16    A.  We can agree that I did not use the word "threat."  Yes.

17    Q.  And what you said as -- in the trespass warning as the

18    reason for the trespass warning is since your meeting with

19    Mr. Cain on September 23rd, 2019, and this is the quote, "You

20    have engaged in further conduct publicly on social media that

21    has caused a significant amount of fear among our parents and

22    staff for the safety of our students, staff and parents on

23    campus, and at district events."  That's the reason for the

24    trespass warning; correct?

25    A.  The reason for the trespass warning was your client's

1  threatened behavior that caused the fear amongst the citizens.

2  Again, your client was referred to as unhinged, disgruntled,

3  people were scared to let their children walk home from

4  school.  People that that he approached them at football

5  games.

6  Q.  Mr. Collie, did you write any of that in the trespass

7  warning?

8  A.  No, I did not.

9  Q.  I'm going to ask you to direct your attention to Exhibit

10  No. 5.  Now, Exhibit No. 5, that's a trespass warning that you

11  issued to Randy Dixon on the 23rd of February, 2018; correct?

12        MS. ROBINSON:  Your Honor, I object to information

13  regarding individuals who are not a party to this proceeding

14  as it is protected sensitive information regarding those

15  individuals.

16        THE COURT:  Okay.  Overruled.

17  BY MR. DUNLEAVY:

18  Q.  Mr. Collie?

19  A.  Yes, sir.

20  Q.  That's a trespass warning, Exhibit No. 5, that you issued

21  to Randy Dixon; correct?

22  A.  Yes, sir.

23  Q.  And in your trespass warning to Mr. Dixon, you said,

24  "Because of your aggressive and threatening behavior, you are

25  no longer authorized to be physically present on any Aledo ISD

 1   property absent prior approval by a school or district

 2   administrator."  Did I read that directly?

 3   A.  That's correct.

 4   Q.  So you told Mr. Dixon he had a trespass warning because he

 5   made a threat; correct?

 6   A.  Yes, sir.

 7   Q.  Okay.  I'm going to ask you to direct your attention to

 8   Exhibit 26.  Exhibit 26 is a trespass warning you issued to

 9   Aaron Smith on September 20, 2019; correct?

10        **MS. ROBINSON:**  Your Honor, I object again.  Deals

11   with another individual whose information is sensitive and --

12        **THE COURT:**  Overruled.

13   A.  Yes, sir.

14   Q.  And this was issued just three days before the trespass

15   warning -- Excuse me -- four days before the trespass warning

16   to Chad Cain; correct?

17   A.  It is.  It was, yes, sir.

18   Q.  And there you say to Mr. Smith, "Your recent posts on

19   *Facebook* are threatening to an Aledo ISD student and indicate

20   your propensity towards violence."  Did I read that correctly?

21   A.  Yes, sir.

22   Q.  Okay.  So you told Mr. Dixon and you told Mr. Smith they

23   got trespass warnings because they had made threats; correct?

24   A.  Yes.

25   Q.  And you did not tell Mr. Cain in his trespass warning that

1  he had made a threat; correct?

2  A.  I informed Mr. Cain that he had fomented fear or caused

3  fear --

4        THE COURT:  Did you use the word "threat"?

5        THE WITNESS:  I did not, Your Honor.

6  BY MR. DUNLEAVY:

7  Q.  So on September 24, 2019, you knew how to issue a trespass

8  warning that told somebody you made a threat or you've engaged

9  in threatening conduct, didn't you?

10 A.  I could have.

11 Q.  You knew how to do that, didn't you?

12 A.  Right.  Yes.

13 Q.  But you didn't do that with Mr. Cain; correct?

14        THE COURT:  Well, he's already answered that.

15        MR. DUNLEAVY:  Yes, Your Honor.

16 BY MR. DUNLEAVY:

17 Q.  Let me ask you to direct your attention to Exhibit No. 4,

18 Mr. Collie.  What is Exhibit No. 4?

19 A.  It was a post by Mr. Cain.  I believe it was the evening

20 of the 23rd after he and I had visited at 9:03 p.m. on a

21 community website.

22 Q.  Okay.  And when you had that visit on September 23rd with

23 Mr. Cain, you did not issue him a trespass warning that day;

24 correct?

25 A.  No, sir.  I told him he could have everything he wanted.

 1    He was asking for certain --

 2            **THE COURT:**  Hold on.  Hold on.  That's correct;

 3    right?

 4            **THE WITNESS:**  That is correct.

 5    **BY MR. DUNLEAVY:**

 6    Q.  And whatever you told him and whatever he told you is on

 7    the body cam or video from your body camera; correct?

 8    A.  Yes, sir.

 9    Q.  And after that meeting you were expecting that Mr. Cain

10    would act reasonably; correct?

11    A.  Yes.

12    Q.  What was -- What did he have to do to act reasonably?

13    A.  Quit threatening people and fomenting fear in the

14    community.

15    Q.  What people did he threaten?

16    A.  Mary Neil, her husband, and her child.

17    Q.  Where is that threat?

18    A.  The totality of his posts constituted a threat.

19            **MR. DUNLEAVY:**  Object.  Nonresponsive.

20            **THE COURT:**  Overruled.

21    **BY MR. DUNLEAVY:**

22    Q.  Which posts?

23    A.  What --

24            **THE COURT:**  How did he threaten them, these three

25    individuals?  Describe the threat.

1          THE WITNESS:  This -- Well, what turned it into a

2    school shooting --

3          THE COURT:  Describe the threat.  You've said that he

4    had threatened these three individuals.  Tell me how he

5    threatened these three individuals.

6          THE WITNESS:  They -- They were in fear because of

7    this post, Your Honor, for their safety.  Ms. Neil even --

8          THE COURT:  Well, what -- What he did say in the post

9    that made them fear for their safety?

10          THE WITNESS:  He was speaking about school shootings

11    and --

12          THE COURT:  So it's this *Facebook* post, the Aledo ISD

13    bullying --

14          THE WITNESS:  I would say that that was the tipping

15    --

16          MS. ROBINSON:  Your Honor, I have the exhibits with

17    the post included.  I have a copy for the Court and for

18    opposing counsel.

19          THE COURT:  Okay.

20          THE WITNESS:  Should I continue to answer, Your

21    Honor?

22          THE COURT:  Yes.

23          THE WITNESS:  I would say that was the tipping point.

24    But it was, as I mentioned before, the totality of the

25    circumstances.

1        THE COURT:  I understand the totality of the

2  circumstances.  But in your answer to counsel you said he had

3  threatened these three individuals.  Do you -- Is that -- Did

4  I hear that correctly?

5        THE WITNESS:  That's what I said so far.

6        THE COURT:  And as it relates to those three

7  individuals, what was his threat to them?

8        MS. ROBINSON:  Your Honor, here are the notebooks

9  starting with Exhibit 1 and then Exhibits 2 and 3 and some

10  following are the posts, if you all would like to go through

11  those, Your Honor.

12        THE COURT:  I just want you to answer my question.

13        THE WITNESS:  As far as a -- It was their

14  interpretation, their understanding that they were being

15  threatened.

16        THE COURT:  Okay.  And what I'm asking is:  What is

17  it?  And take a look.  What is it or where is it that he

18  threatened them?

19        THE WITNESS:  It -- Again, it's -- It started, the

20  tipping point, when a certified police officer mentions

21  shootings.

22        THE COURT:  And is that -- Is that your counsel's

23  Exhibit No. 1?  Defendant's Exhibit No. 1?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Okay.  Anything else that threatened

1    those three individuals?

2         THE WITNESS:  They feel threatened because he was

3    posting a minor child's name online and they thought that

4    their child would be in danger as a result of his

5    irresponsible posts.

6         THE COURT:  Okay.  So his posting of their child's

7    name.  Then Defendant's Exhibit No. 1.  What else?  If there's

8    anything else.

9         THE WITNESS:  Then --

10        THE COURT:  But those three?

11        THE WITNESS:  Yes.

12        THE COURT:  Those three?

13        THE WITNESS:  Right.  And then that morning, the

14   morning of the -- The morning of the 21st I received other

15   information about the person's fear and their response.

16        THE COURT:  About those from --

17        THE WITNESS:  About his behavior on *Facebook*.  Yes,

18   sir.

19        THE COURT:  Directed toward one of those three, the

20   child, or his two parents?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  And what -- Is that in here?  That

23   there's another post about them?

24        THE WITNESS:  I'm sorry.  I don't understand the

25   question, Your Honor.

1          THE COURT:  You said you received other

2    information --

3          THE WITNESS:  Well, other information, as an example,

4    if -- The e-mails that I received on the 23rd and 24th and --

5    Let's see this.

6          MS. ROBINSON:  Those documents are contained within

7    Exhibit 3.

8          THE WITNESS:  I'm sorry?

9          MS. ROBINSON:  Those documents are contained within

10   Exhibit 3.

11         THE COURT:  There's an e-mail, the first page is

12   Exhibit 3 from Mary Neil on September 23 to you.

13         THE WITNESS:  Yes.  Yes, sir.  Where she expressed

14   her strong concern.  And I would have to go through, and I'm

15   willing to do that, Your Honor.  She included his e-mail in

16   that post and other interactions and -- are in that post and

17   concluded that she was -- that she concluded that was the

18   threat and that she felt threatened.  And as I mentioned also,

19   Your Honor, there were other communications which I received

20   where people referred to him as unhinged, disgruntled, and --

21   Let's see.  Unhinged.  Disgruntled.  They were very

22   concerned -- Your Honor, I --

23         THE COURT:  No, okay.  Let me turn it back over to

24   you, Mr. Dunleavy.

25         MR. DUNLEAVY:  Your Honor, I just wanted to ask

1    Mr. Collie --

2    **BY MR. DUNLEAVY:**

3    Q.  On Exhibit 1 -- on Defendant's Exhibit No. 1 in that

4    packet, is it your testimony, Mr. Collie, that Exhibit 1 is a

5    threat of or it's a statement that expresses a serious intent

6    to inflict harm on the Neils?

7    A.  You're not going to like this, Mr. Dunleavy, but I'm going

8    to tell you, it was the totality of the circumstances.

9    Q.  I'm sorry.  Did you say "yes" or "no"?

10         **THE COURT:**  He said no -- You said "no" as Exhibit 1

11   but it's the totality -- you believe because of the totality.

12         **THE WITNESS:**  It's the totally of the circumstances.

13   **BY MR. DUNLEAVY:**

14   Q.  From the whole packet of documents that your lawyer just

15   handed you, can you pull out a single document that is a

16   statement, a post, an e-mail from Mr. Chad Cain that threatens

17   the Neils?

18   A.  No, I cannot.

19   Q.  Because he didn't threaten the Neils, did he?

20   A.  He did.

21         **MS. ROBINSON:**  Objection.  That's misleading and a

22   misimpression.

23         **THE COURT:**  Overruled.

24   A.  He did threaten the Neils, sir.

25   Q.  Okay.  What did he threat then them with?

1    A.  They were concerned with --

2         **THE COURT:**  What did he threaten to do to them, I

3    guess, is the question.

4         **THE WITNESS:**  He did not -- They were concerned that

5    he was going to do physical violence to them, approach their

6    child.

7    **BY MR. DUNLEAVY:**

8    Q.  What did Mr. Cain say that would have made any reasonable

9    person think he was threatening physical violence of a child

10   based on your investigation as the chief of police?

11   A.  Again, all of the posts taken together in a totality of

12   the circumstances, the manner in which your client was

13   fomenting fear in the community -- Sir, there had been a

14   school shooting at a football game just ten days before.

15        **MR. DUNLEAVY:**  Object.  Nonresponsive, Your Honor.

16        **THE COURT:**  Overruled.

17   **BY MR. DUNLEAVY:**

18   Q.  Mr. Collie, can you tell me any words that Mr. Cain said.

19   I'm not asking what people concluded or what they inferred or

20   what they thought or what they felt.  I'm asking you:  Can you

21   tell us words that Mr. Cain said to anybody that you as a

22   peace officer in Texas concluded was a threat?

23   A.  Not specific words.

24   Q.  Okay.

25   A.  The totality of the circumstances.

1  Q.  Okay.  And this post from Defendant's Exhibit 3 or this

2  e-mail from Mary Neil, you got that before your meeting with

3  Mr. Cain; correct?

4  A.  Yes, sir.

5  Q.  And at the time of your meeting with Mr. Cain you had

6  nothing to say he had done anything that violated any Texas

7  law; correct?

8  A.  That's correct.

9  Q.  And we asked you at the deposition -- I asked you at the

10  deposition why didn't you cite him for assault by threat or

11  terroristic threat and your answer was, "I couldn't meet the

12  elements of the offense."  Correct?

13  A.  That's correct.

14  Q.  And you couldn't meet the elements of the offense to cite

15  Mr. Cain nor could you meet the elements of any offense to

16  arrest Mr. Cain; correct?

17  A.  That's correct.

18  Q.  And so you issued the trespass warning both because

19  Susan Bohn told you and because you knew you could not cite

20  Mr. Cain and you could not arrest Mr. Cain for any conduct;

21  correct?

22  A.  No.

23  Q.  Okay.  What did Mr. Cain do that was illegal?

24  A.  You asked me a two part question, sir, and the first part

25  of your question and answer was "yes."  The second part of

 1   your question was "no," so that makes the total answer to your

 2   question "no."  If you would like -- I don't want to tell I

 3   how to ask questions --

 4          THE COURT:  He's basically saying he had no

 5   information to arrest your client, so he would agree with you

 6   on that.  But what he disagrees with you is on his discussions

 7   with the superintendent and the reason for the warning.

 8          MR. DUNLEAVY:  Yes, Your Honor.

 9   BY MR. DUNLEAVY:

10   Q.  Now, I will get back to the question I just asked and that

11   is:  What did Mr. Cain do that was illegal?

12   A.  Nothing that I'm aware of, sir.

13   Q.  The trespass warning was issued under the Penal Code;

14   correct?

15   A.  It was.

16   Q.  Not under the Educational Code; correct?

17   A.  That's correct.

18   Q.  And issuing that trespass warning under the Penal Code is

19   taking law enforcement penal action against Mr. Cain, isn't

20   it?

21   A.  It is not.

22   Q.  You've talked about posting a child's name and likeness on

23   social media.  That is not illegal, is it?

24   A.  Questionable, but not illegal; right.

25   Q.  Now, let me ask you to direct your attention to

1  Exhibit 23.  Do you recognize Exhibit 23?

2  A.  I turned to the wrong -- This big book or the little book?

3  Q.  The big book.

4  A.  I have Exhibit 23, the photograph?

5  Q.  Yes.  Do you recognize that as a picture off of the ISD

6  website?

7  A.  I think so.

8  Q.  On the Aledo website you all post pictures of children;

9  correct?

10         MS. ROBINSON:  Objection, Your Honor.  That is a

11  completely different thing.  Directory information regarding

12  students including their names and images are permissible for

13  school districts to release if there is a consent, but it's

14  only as to honors and awards, not purposes of disciplinary

15  action.

16         THE COURT:  It's overruled.

17  BY MR. DUNLEAVY:

18  Q.  The district posts pictures of children on their website;

19  correct?

20  A.  With their parent's consent, yes, sir.

21  Q.  And on page 24 there's more pictures of children with

22  their names; correct?

23  A.  Yes, sir.

24  Q.  And on page 25 or Exhibit 25, more pictures of children

25  with their names; correct?

1  A.  Yes, sir.

2  Q.  And in those pictures the district is honoring those

3  children; correct?

4  A.  It appears so.  Yes, sir.

5  Q.  And your issue is with Mr. Cain's post of a picture or

6  likeness of a child is Mr. Cain was calling him a bully;

7  correct?

8  A.  I don't have an issue with -- with that.  I mean, he

9  can -- he can say that.  But the fact was his parent did not

10  consent to that and the only thing I care about is the fear in

11  the community, sir.  He can post all he wants.  He just needs

12  to not stir up fear in the community and make people generally

13  afraid of his threats.

14  Q.  Mr. Collie, Mr. Cain doesn't need consent to post a

15  picture on *Facebook*, does he?

16  A.  It's questionable.  No.  No, he doesn't.  It's

17  questionable though.

18  Q.  So you are critical of Mr. Cain for his conduct; correct?

19  A.  I -- Other people were critical.

20       **MR. DUNLEAVY:**  I object.  Nonresponsive.

21       **THE COURT:**  Are you critical of this --

22       **THE WITNESS:**  I believe he shouldn't have done it,

23  but I understand that he has a right to do so.

24  BY MR. DUNLEAVY:

25  Q.  Are you critical of Mr. Cain?

1   A.  I don't think so it rises to critical.  I think it's just

2   kind of sparing.

3   Q.  Then why did you issue the trespass warning?  Is that not

4   criticism?

5   A.  Sir?

6   Q.  Is that not criticism of Mr. Cain?

7   A.  It was the totality of the circumstances, not simply

8   because he posted a child's name.  Mr. Cain has every right to

9   be on the internet.  I have no problem with that.

10  Q.  Mr. Collie, you have sworn out, you said in your

11  deposition, probable cause affidavits; correct?

12  A.  Yes.

13  Q.  Can you state any articulable facts that would support an

14  arrest or a citation for any offense related to threats

15  regarding Mr. Cain?

16  A.  No, sir.  We've already concluded that.

17  Q.  So you have no articulable facts of any threat by

18  Mr. Cain; correct?

19  A.  No.

20  Q.  No, that's not correct?

21  A.  No, you're asking -- you are asking -- like in the

22  deposition, you are asking two part questions.  You said --

23  You have asked about threat and arrest or -- and then you say

24  because I didn't arrest him because of a threat that there was

25  threat and that's unequivocally not true.  His threat fomented

1    fear in the community and people were generally scared.

2    That's -- All I care about is protecting the students,

3    faculty, and staff of Aledo ISD.  He is scaring people.

4    That's all -- All I ask is that he doesn't do that.

5    Q.  Does Aledo ISD have the authority to regulate the *Facebook*

6    pages in the Aledo ISD community?

7    A.  Absolutely not.  Nor do we want to.

8    Q.  Do you have any articulable facts to support the trespass

9    warning?

10   A.  Yes.

11   Q.  What are they?

12   A.  That -- I think Dr. Bohn would be better, since it was her

13   direction, but my understanding of some of the information

14   that went into her decision, which I gave her, that Mr. Cain,

15   because of his posts and actions had fomented fear in the

16   community, that we were receiving feedback from the community

17   that your client was disgruntled, unhinged.  People were

18   fearful, worried about going to a football game.  I had a

19   person call me and wanted to hire extra security for a

20   football game.  A middle school football game they wanted to

21   hire two officers because of Mr. Cain's behavior.

22          So, again, he, through his actions, through his

23   threats, he fomented fear in the community and that's what we

24   responded to.

25   Q.  So the trespass warning then was based on other people's

1   perceptions of his conduct and his words.  Is that correct?

2          **MS. ROBINSON:**  Objection.  Mischaracterization of

3   earlier testimony.

4          **THE COURT:**  Overruled.

5          **MR. DUNLEAVY:**  Your Honor, I --

6          **THE COURT:**  He can answer if he can.

7   A.  Other people's understanding -- Again, their fear.  Not

8   simply their perceptions.  No one said, "I think Mr. Cain's a

9   bad guy.  People said, "Mr. Cain's disgruntled.  We are

10  fearful" -- or not fearful -- "that he was unhinged, that he

11  fomented fear."  That was their interpretation of his

12  behavior.

13  Q.  So I think you just answered it right there at the end.

14  It was other people's interpretation of Mr. Cain's behavior;

15  correct?

16  A.  That -- that -- That went into it, yes.

17  Q.  Now, your investigation, to the extent you investigated,

18  was precipitated by Susan Pennington's e-mail to you; correct?

19  The -- The Exhibit 3?

20         **MS. ROBINSON:**  Objection.  There's not a

21  Susan Pennington, Your Honor.

22         **THE COURT:**  So Defendant's Exhibit 3?

23         **MR. DUNLEAVY:**  I'm sorry, Your Honor.  Yes.  And I'll

24  put it on the screen.

25         **THE COURT:**  And that's the Neil's e-mail?

```
 1          MR. DUNLEAVY:  Yes, Your Honor.
 2   BY MR. DUNLEAVY:
 3   Q.  Mary Neil is Mary Pennington; correct?
 4   A.  Yes.  Yes, sir.
 5   Q.  And she was an Aledo ISD employee at this time back in
 6   September 2019; correct?
 7   A.  Yes, sir.
 8   Q.  And she also was the mother of the boy who assaulted
 9   Mr. Cain's son; correct?
10   A.  Yes, sir.
11   Q.  And the Aledo ISD Police Department forwarded an assault
12   case to the Parker County District Attorney, didn't you?
13   A.  We did.
14   Q.  And then the district employee whose son was charged with
15   assault asked you to do an investigation of posts by the
16   victim's father; correct?
17   A.  Your timeline is incorrect, sir.  We hadn't forwarded that
18   case by then, to my knowledge.  I could find out when we
19   forwarded the case, but I don't believe the case had been
20   forwarded to the D.A. by the 24th.  I don't think it had been
21   forwarded over there.
22   Q.  I understand you didn't forward the case by the 24th, but
23   at the time you got Ms. Neil's e-mail, Mr. Cain had sworn out
24   a complaint at the Aledo ISD Police Department against
25   Ms. Neil's son, Ms. Pennington's son; correct?
```

1    A.  I know there was -- My lieutenant did the investigation,

2    I -- But perhaps.  I -- I don't recall the exact complaint, so

3    I can't say "yes" or "no."  But perhaps.

4    Q.  When someone makes a complaint or when a witness gives you

5    a statement, as a trained investigator, don't you want to

6    examine the individual who is giving you the statement or

7    making the complaint what their motives are, what their biases

8    are?

9    A.  I -- I tend to believe parents and I tend to believe

10   victims, sir.  I don't -- I try not to question victims.  I

11   tend to believe victims.

12   Q.  So is that, no, you don't evaluate the credibility of

13   witness --

14   A.  It's not a question I can answer with "yes" or "no," sir.

15            THE WITNESS:  Do I have to, Your Honor?

16            THE COURT:  Do you as an investigator when you

17   investigate a crime make a determination make a determination

18   of the credibility of witnesses --

19            THE WITNESS:  Yes, sir.

20            THE COURT:  -- and even victims and defendants?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Do you weigh everyone's credibility?

23            THE WITNESS:  Yes, sir.  When I investigate a crime.

24   BY MR. DUNLEAVY:

25   Q.  So when you were talking to Mr. Cain about him stirring up

 1   a hornet's nest, you told him or asked him, "Stay off
 2   *Facebook*," correct?
 3   A.  Yes, sir.
 4   Q.  And you did that after Mary Pennington asked you to do
 5   something about Mr. Cain's posts on *Facebook*; correct?
 6   A.  There were other posts other than Mary Pennington's.
 7   Q.  But I'm just talking about the timing.
 8   A.  Okay.  Yes, sir.
 9   Q.  When you talked to Mr. Cain on the afternoon of September
10   23rd, that was after Ms. Pennington or Ms. Neil had e-mailed
11   you on the morning of the 23rd to ask you to do something
12   about Chad Cain's posts; correct?
13   A.  Yes, sir.
14   Q.  And you did something about Chad Cain's posts, didn't you?
15   You issued the trespass warning.
16   A.  Again, I know what you are trying to do, sir.  The
17   totality of the circumstances.  It wasn't just because of this
18   post.  It was the fear that your client fomented in the
19   community through his threatening behavior.
20   Q.  It wasn't just the post, but it certainly included the
21   post; correct?
22   A.  It certainly included the post.  Yes, sir.
23   Q.  And you needed to tamp down the hornet's nest on *Facebook*,
24   according to what your told Mr. Cain at that meeting?
25   A.  It's my job to make sure --

1      **THE COURT:** Did you tell him that at the meeting?

2      **THE WITNESS:** Perhaps. I don't have a -- Do you have

3 a transcript of our -- Perhaps.

4 BY MR. DUNLEAVY:

5 Q. So I think on the 23rd, I think you -- you've already

6 said, I believe, that you didn't issue the trespass warning

7 that day, your didn't arrest, you didn't cite because you

8 didn't have any information that day to take any action;

9 correct? The day you met with Mr. Cain.

10 A. When I met with Mr. Cain, I thought everything was fine.

11 He left. I told him he could get everything he wanted and he

12 left. In fact, I went to my boss and said, "We're fine."

13 Q. And then all of his speech on *Facebook*, that was off

14 campus; correct?

15 A. I assume so, yes. I don't know where --

16 Q. And that *Facebook* cite is not run by Aledo ISD; correct?

17 A. It is not.

18 Q. It's not school site; correct?

19 A. No, sir.

20 Q. Aledo ISD has no power or authority over any of those

21 *Facebook* sites that Chad Cain was on; correct?

22 A. That's correct.

23 Q. Mr. Cain did not disrupt a board meeting; correct?

24 A. He did not.

25 Q. Mr. Cain did not disrupt any school activity; did he?

1    A.  Yes, he did.

2    Q.  What activity did he disrupt?

3    A.  A middle school football game.  Again, people were

4    fearful.  The middle school football game that was happening

5    that evening, people again were fearful that your client was

6    going to approach them.  And, again, for a grown man to call

7    me crying and fearful of your client's behavior for people to

8    call me and/or a person to call me and ask me to put two

9    officers at a -- or to hire two officers for an away football

10   game, that was a result of Mr. Cain's behavior.

11   Q.  So this disruption you are talking about was before the

12   football game the folks calling you and telling you that they

13   are afraid; correct?

14   A.  No.  It would have been a disruption at the football game.

15   That was the -- that was -- what the fear was, sir.

16   Q.  What --

17   A.  And --

18   Q.  What did Mr. Cain do at the football game to disrupt the

19   football game?

20   A.  Nothing.  We gave him the criminal trespass warning.  He

21   couldn't go there.

22   Q.  And so you did the criminal trespass warning to prevent a

23   disruption of the football game?  Is that what you are saying?

24   A.  I did -- I talked to -- You would have to ask Dr. Bohn,

25   but one of the things that we were concerned about was the

1   safety of our students, faculty, and staff.  Mr. Cain's post

2   as a result of his behavior of -- People felt threatened and

3   that's -- that's why it was done.  This could have been fixed.

4   All he would have had to do is come in --

5          THE COURT:  Hold on.  Hold on.  So did you give the

6   criminal trespass warning to him to prevent any disruption at

7   the football game?

8          THE WITNESS:  Yes, sir.  That was a result.

9          THE COURT:  Ask your next question.

10  BY MR. DUNLEAVY:

11  Q.  So although you had no articulable facts to take any

12  arrest action or citation action, you, essentially, did a

13  preventative detention by telling Mr. Cain to stay home?

14  A.  Sir, the criminal trespass warning in nowhere does it

15  constitute a detention.  You made that up out of whole cloth.

16  It doesn't constitute a detention.

17         THE COURT:  Okay.  So he takes issue with you using

18  the term "detention."

19  BY MR. DUNLEAVY:

20  Q.  Preventative exclusion.  You took action to prevent him --

21  to exclude him.

22  A.  I -- yes, sir.

23  Q.  Preemptively exclude him from that activity; correct?

24  A.  Dr. Bohn took action.  Yes, sir.

25  Q.  But you issued the trespass warning; correct?

1  A.  At her direction.

2  Q.  And based on what people said was in their heads, they are

3  fearful, they think he's going to do something; correct?

4  A.  Based on the fear that he had fomented in the community

5  through his threats.  Yes, sir.

6  Q.  So were these folks who were in fear or were impacted by

7  this disturbance, were they on campus?

8  A.  I don't think they were when they --

9  Q.  So they were in fear and disturbed off campus; correct?

10  A.  Well, they were also in fear for their students and the

11  staff that were on campus.

12  Q.  Did any of the kids tell you they were in fear?

13  A.  I didn't interview any kids, so no.

14  Q.  Okay.  So let's stick with the parents.  The parents were

15  off campus and they had this fear in their head off campus;

16  correct?

17  A.  Fear for their children which was on campus which is --

18       THE COURT:  I think -- I get it.  They're off campus.

19  Their children are on campus.  He wants to focus on that and

20  you focus the -- I understand what's happening.

21  BY MR. DUNLEAVY:

22  Q.  The criminal trespass warning that you issued to Chad

23  Cain, you said in your deposition, that lasts forever;

24  correct?

25  A.  Theoretically, yes.

1   Q.   Now, you understand, because you were on the e-mail from

2   Ms. Robinson yesterday, she sent a letter saying "we're going

3   to lift it in part"; correct?

4   A.   Yes.

5   Q.   I think you started to say in one of the answers you just

6   gave or just started to give something that was similar to

7   what Ms. Robinson said last week in court.  You weren't here

8   for that.  But she said last week that she thought that the

9   trespass warning should have gone away or would have gone away

10  a long time ago if only Mr. Cain had given assurances to the

11  district or some sort of deescalation.  Is that your position

12  as the chief of police?

13  A.   Absolutely.  If Mr. Cain had walked -- came in, visited

14  with Dr. Bohn, this could have been fixed, as an example with

15  Mr. Dixon, as you mentioned.  So, yeah, this could have been

16  fixed easy.

17  Q.   And when was that information communicated to Mr. Cain,

18  that all he needs to do to fix this is come in and see

19  Susan Bohn, deescalate, and give assurances and the trespass

20  warning will just go away?

21  A.   I think a reasonable, prudent person, especially a police

22  officer, would understand that.  But those exact words were

23  never issued.  But a prudent person would understand that,

24  sir.

25  Q.   Okay.  But in all that verbiage in that question -- in the

1  answer to the question you said those words were not used;

2  correct?

3  A.   Those words were not used.

4  Q.   So you got the letter on September 30 from me that is in

5  your book at Exhibit 35; correct?

6  A.   Let me get to Exhibit 35, sir.   Yes, sir.

7  Q.   And did you respond to that to tell me that Mr. Dunleavy

8  -- Let's back up.   We've met before, haven't we, Chief Collie?

9  A.   Yes, we have.

10  Q.   And you've been a witness in cases that I've handled for

11  people you used to work with at the Dallas County Constable's

12  Office; correct?

13  A.   For and against, yes, sir.

14  Q.   So --

15  A.   Well, I'm sorry.   No, I was never --

16  Q.   You --

17  A.   I never testified as a witness.   I came to a hearing to be

18  a witness, but never testified as a witness --

19  Q.   And we met then at that civil service hearing; correct?

20  A.   Yes, sir.   I believe we'd met before at Edwards civil

21  service hearing.

22  Q.   Yes, sir.   So when you got my letter, did you have the

23  thought, Gee, I just need to let Chad Cain's lawyer know,

24  somebody I know, somebody I've met, not saying we're friends,

25  I haven't seen you in years, but here is a letter from a

1    lawyer, somebody I've met, and I just need to let him know
2    that all his client needs to do is deescalate or give
3    assurances.  Did you communicate that information to me?
4    A.  I did not.
5    Q.  Did you think indicate to Susan Bohn, Hey, I know this
6    lawyer.  Just reach out to him.  He will talk to his client.
7    Any conversation with Susan Bohn about maybe we should
8    communicate to Chad Cain that he just needs to deescalate or
9    give us assurances?
10   A.  Well, sir, you had already proved you are unreasonable in
11   your e-mails prior to this your letter.
12   Q.  He proved --
13   A.  You proved you were unreasonable.
14   Q.  Excuse me.  He proved he was unreasonable because he
15   continued to post on *Facebook* after you told him to get off
16   *Facebook*; correct?
17             THE COURT:  He was talking about you.
18             THE WITNESS:  I was talking about you, sir.
19             MR. DUNLEAVY:  Oh, I was being unreasonable?  Okay.
20   Sorry.
21             THE COURT:  Hang on.  Hang on a second.  Go ahead.
22   BY MR. DUNLEAVY:
23   Q.  So you concluded that it wasn't -- it didn't make sense to
24   communicate that information because Chad Cain's lawyer was
25   unreasonable?

1   A.  Well, again, when you -- When I get a letter from a lawyer

2   that is carbon copied to the superintendent and all the board

3   members, I turn that letter over to my superintendent and

4   ultimately lawyers and I follow their advice, so, no, I did

5   not.  But I think we looked at some of -- at the e-mails

6   before that you had already engaged in ad hominem attacks on

7   me, for some unknown reason, so -- I mean, why would I think

8   that I could call you after you had engaged in ad hominem

9   attacks?

10  Q.  And so you concluded that I was not going to be reasonable

11  so it wasn't worth sending the information to Chad Cain

12  through me or to him --

13  A.  Well, I --

14  Q.  Hold on.

15  A.  Okay.

16  Q.  That he just needed to deescalate or make assurances?

17  A.  I tried to get that to and through his sergeant.  I hope

18  that his sergeant would do it, but, apparently, he didn't.

19  Q.  When you say "deescalate," what does that mean?

20  A.  Just say -- As an example, just assure people say, Hey,

21  look, you may have misunderstood my post.  I did not mean any

22  harm to anybody.  Two sentences would have fixed the whole

23  thing.

24          THE COURT:  Do you all have water down there?

25          MR. DUNLEAVY:  No, Your Honor.

```
 1   BY MR. DUNLEAVY:
 2   Q.  With regard to the trespass warning, that trespass warning
 3   before yesterday would prevent Mr. Cain from being present at
 4   football games; correct?
 5   A.  Correct, sir.
 6   Q.  And other sporting events; correct?
 7   A.  Yes, sir.
 8   Q.  And concerts?
 9   A.  Yes, sir.
10   Q.  Theater performances?
11   A.  Anything that on -- that utilized the campus, yes, sir.
12   Q.  Meet the Teacher Night?
13   A.  That's something that could have been arranged.
14   Q.  But the trespass warning prohibits him from going to Meet
15   the Teacher Night without making some sort of arrangements;
16   correct?
17   A.  For him being on the school grounds.  However, that
18   arrangement was offered in the warning.
19   Q.  The trespass warning you issued prohibits Mr. Cain from
20   going to Meet the Teacher Night without prior arrangements;
21   correct?
22   A.  That's correct.
23   Q.  And the trespass warning issued by you prohibited Mr. Cain
24   from going to board meetings; correct?
25            MS. ROBINSON:  Objection, Your Honor.  That's a
```

1    misstatement.  That's un-clarified and repetitive.

2         THE COURT:  Overruled.

3    A.  Mr. Cain was never exempted from my board meeting.

4    Q.  Does the trespass warning say you can't go to any

5    activities or participate in any events or go to school

6    property at all except board meetings?

7    A.  That would be pretty verbose, but let me looked at that.

8    The final paragraph.  Any meeting at a campus or -- will be

9    prearranged and approved and will be held off campus at the

10   Aledo ISD Central Administration Building where we hold board

11   meetings.  You may schedule meetings through Aledo ISD

12   Principal Mandy Musselwhite or Aledo ISD Deputy Superintendent

13   Lynn McKinney.  And then the previous paragraph:  I am writing

14   to inform you that you no longer are authorized to be

15   physically on any Aledo ISD property or any Aledo ISD event

16   absent prior written approval by a school or district

17   administrator.

18   Q.  Okay.  So the board meetings are held at a district

19   building; correct?

20   A.  Yes, sir.

21   Q.  And Mr. Cain was excluded from all district buildings;

22   correct, by your trespass warning?

23   A.  Yes.

24   Q.  Okay.  Let me direct your attention to Exhibit 3.  That's

25   Plaintiff's Exhibit 3.  Are you there?

 1    A.   Is that this big one or --

 2    Q.   In the book.

 3    A.   Yes, sir.  I'm at Exhibit 3.  Yes, sir.

 4    Q.   And Plaintiff's Exhibit 3 is an e-mail from Joy Moore to

 5    William Dunleavy and Bridget Robinson.  Do you see that?

 6    A.   Yes, sir.

 7    Q.   Do you know who Joy Moore is?

 8    A.   I do.

 9    Q.   She is a lawyer for the Aledo ISD School District;

10    correct?

11    A.   Yes, sir.

12    Q.   Do you see the numbered paragraphs about halfway down?

13    A.   Yes, sir.

14    Q.   So number three says the district agrees to allow Mr. Cain

15    to attend Aledo ISD board meetings -- and I should say it's

16    AISD board meetings -- given that Mr. Cain provides notice to

17    the district of when he intends to attend.  Moreover, Mr. Cain

18    may schedule meetings with the campus administration and

19    assistant superintendent McKinney.  Did I read that correctly?

20    A.   It appears so.  Yes, sir.

21    Q.   So Joy Moore on October 1 authorized Mr. Cain to go to

22    board meetings; correct?

23    A.   As you just read.  Yes, sir.

24    Q.   Okay.  And she put some restrictions on him going to board

25    meetings, didn't she?

1    A.  Yes, sir.

2    Q.  So do other parents at the district or do citizens in the

3    greater community of Aledo, do they have to get permission

4    from campus administers or district administrators to attend

5    the board meetings?

6            MS. ROBINSON:  Objection.  Mischaracterization.

7            THE COURT:  Overruled.

8    A.  If they've been issued a criminal trespass warning, yes.

9    Q.  But distinguishing between Mr. Cain and others who have

10   criminal trespass warnings and everybody else on the planet,

11   everybody else on the planet can go to the board meeting if

12   they want without having to coordinate in advance; correct?

13   A.  Yes.

14   Q.  Now, you said that you were trying to get Mr. Cain to

15   deescalate through his sergeant; correct?

16   A.  When I visited with the sergeant, yes.

17   Q.  And that would have been around the time of the trespass

18   warning, September of 2019; correct?

19   A.  Shortly thereafter, yes, sir.

20   Q.  And then when Mr. Cain did not deescalate or give

21   assurances, then you and others at the Aledo ISD School

22   District made a formal complaint against Mr. Cain with his

23   employer, City of Fort Worth Police Department; correct?

24   A.  I don't think that I ever intended to make a formal

25   complaint.  I called over there to advise them what had

1   happened.

2   Q.  Let me direct your attention to Exhibit No. 7.

3          THE COURT:  What does this have to do about the

4   issues of today, the likelihood of success on the merits and

5   the other factors?  You see what I'm saying?

6          MR. DUNLEAVY:  Yes, Your Honor.  Your Honor, I'll --

7          THE COURT:  I mean, I understand that he's mad that

8   they called his work and tried to harm him at work and perhaps

9   that is appropriate for damages --

10          MR. DUNLEAVY:  And, Your Honor, the point is I want

11   to talk about the deescalation.

12          THE COURT:  Okay.

13   BY MR. DUNLEAVY:

14   Q.  Mr. Cain did not deescalate; correct?

15   A.  No, he has not.

16   Q.  And at a board meeting on December 4 of 2019, he told the

17   board that he would continue to fight; correct?

18   A.  I wasn't at that board meeting, sir.

19   Q.  Fair enough.

20   A.  I can't testify.

21   Q.  Now, you were here in the courtroom, Chief, when the young

22   lawyer got sworn in; correct?

23   A.  Yes.

24   Q.  And before you were a police officer you were a -- you

25   served in the Army; correct?

1    A.  Yes, sir.

2    Q.  And so for virtually your entire life you have held

3    positions where as a soldier in the Army and as a police

4    officer you've had to swear to support and defend the

5    Constitution of the United States; correct?

6    A.  Yes.

7    Q.  And you understand that part of that Constitution is the

8    First Amendment right to free speech; correct?

9    A.  Yes.

10   Q.  And you're a government official; correct?

11   A.  Yes.

12   Q.  And as a government official your interests are served

13   when you follow the law; correct?

14   A.  Of course.

15   Q.  And your interests are not served when you do something

16   illegal; correct?

17   A.  That's correct.

18   Q.  Now, I want you to assume for a moment, just assume a

19   hypothetical, that nothing that Mr. Cain posted, nothing he

20   said was illegal, and none of it warranted the trespass

21   warning.  If Judge O'Connor were to conclude that the trespass

22   warning was illegal, you as a government official, as a

23   certified peace officer, as someone who is sworn to support

24   and defend the Constitution and uphold the laws of the State

25   of Texas, you would want that illegal trespass warning, if

1    Judge O'Connor concluded that, you would want that lifted;

2    correct?

3            MS. ROBINSON:  Objection.

4            THE WITNESS:  May I ask a question?

5            MS. ROBINSON:  It assumes facts not in evidence.

6            THE COURT:  I am going to sustain the objection.  I'm

7    going to sustain the objection.  I don't want him opining on

8    legal issues that I have to decide.  He's here to answer

9    factual questions about what happened and so ask him a factual

10   question of what happened.

11           THE WITNESS:  May I say something, Your Honor?

12           THE COURT:  I'm sorry?

13           THE WITNESS:  May I say something?

14           THE COURT:  Well, just answer the questions.

15   BY MR. DUNLEAVY:

16   Q.  Chief Collie, your interests would not be harmed if you

17   were told to stop acting illegally, agreed?

18           MS. ROBINSON:  Objection.

19           THE COURT:  Overruled.

20   A.  I didn't act --

21           THE COURT:  No, I -- just if --

22           THE WITNESS:  If I were told to stop acting

23   illegally, in a vacuum, my interests would not be harmed.

24   BY MR. DUNLEAVY:

25   Q.  And if government employees act illegally, the

1  government's interests are harmed; correct?

2          MS. ROBINSON:  Objection, Your Honor.  That's outside

3  the purview of this witness' personal knowledge.

4          THE COURT:  If.  If.

5          MR. DUNLEAVY:  Your Honor, I don't have a

6  representative from Aledo ISD to talk about their interests.

7  I've got two witnesses --

8          THE COURT:  Well, I think -- If what you are saying

9  is if what they've done is unlawful then their interests are

10  not harmed, I think that's almost self-explanatory, if not

11  self-explanatory.

12          MR. DUNLEAVY:  And, Your Honor, I guess part of it

13  is -- and I know we're not in front of a jury -- my experience

14  is, you know, I get told you didn't prove it beyond a

15  reasonable doubt, so -- I'm sorry --

16          THE COURT:  No, move off of these.  I think I can

17  answer these questions.

18          THE WITNESS:  My actions were investigated.

19          THE COURT:  I'm sorry?

20          THE WITNESS:  My actions were investigated.

21          THE COURT:  I can't hear you.

22          THE WITNESS:  My actions were investigated by the

23  Texas Rangers and said they weren't illegal.

24          THE COURT:  Okay.

25  BY MR. DUNLEAVY:

1    Q.  Chief Collie, you would agree that if someone's First

2    Amendment rights are taken away or infringed, for even a small

3    amount of time, that would be a harm?

4              MS. ROBINSON:  Again, Your Honor.  I object to this

5    as being outside the scope of the witness' personal knowledge

6    and it calls or a legal conclusion as well.

7              THE COURT:  Okay.  Move on to something else.

8    BY MR. DUNLEAVY:

9    Q.  Would you agree the public interest is served by

10   government officials following the law?

11   A.  Yes, sir.

12   Q.  And the government -- The public interest is not served

13   when governments and officials don't follow the law?

14             MR. DUNLEAVY:  Pass the witness, Your Honor.

15                    CROSS-EXAMINATION

16   BY MS. ROBINSON:

17   Q.  Good morning, Chief Collie.

18   A.  Good morning, ma'am.

19   Q.  Chief Collie, in your testimony to Mr. Dunleavy, I thought

20   I heard you describe Defendant's Exhibit No. 1 and Defendant's

21   Exhibit -- the smaller notebook -- as either a tipping point

22   or the straw that broke the camel's back or something to that

23   extent.  Did I hear that correctly?

24   A.  I referred to it as a tipping point, ma'am.

25   Q.  What did you mean by that?

1   A.   That that -- With the totality of the circumstances that

2   caused -- People were fearful ahead of time.  He -- Had

3   this -- Had this post not happened, the following morning

4   people wouldn't have been --

5           MR. DUNLEAVY:  Objection, Your Honor.  Speculation.

6           THE COURT:  Don't speculate on what people might or

7   might not do.

8   A.   I want to make sure I answer your question, ma'am.  Could

9   you repeat it?

10  Q.   Sure.  You are describing that there were a lot things

11  that happened before this post; it's not this post in a

12  vacuum.  Is that what I understand?

13          MR. DUNLEAVY:  Objection.  Leading.

14          THE COURT:  Overruled.

15  A.   I've gone and I've said this a hundred times.  My advice

16  to Dr. Bohn was not predicated on any one action.  My

17  device -- My advice, which I hoped informed her decision, was

18  predicated on the totality of the circumstances and the fear

19  in our community because of Chad Cain's actions.

20  Q.   Did you think that it was appropriate for a police officer

21  to be referring to mass school shootings and that if

22  administration is bullying the parents will it happen here in

23  Aledo?

24  A.   No.  It -- It wasn't.  School shootings -- Again, ten days

25  before there had been a shooting at a football game.

1   Q.  Tell me about that incident, Chief.

2           MR. DUNLEAVY:  Objection, Your Honor.  Relevance.

3           THE COURT:  Overruled.

4   A.  At -- Ten days before that, over at Eastern Hills High

5   School in Fort Worth, there was a little league football game

6   where parents got into an argument and a shooting broke out.

7   Fortunately, no one was killed, but people were injured.  And

8   that happened, I mean, just ten days before that.  Also, I

9   mean, we had had almost 30 shootings, school shootings -- over

10  30 school shootings that year where people were killed and

11  injured and just 18 months before that Santa Fe happened where

12  ten people were killed.  People are very sensitive to any

13  question about school shootings and it shouldn't have been

14  brought up.  It shouldn't have factored into the equation.

15  Q.  As a police officer himself, albeit for a different police

16  department, did Chad Cain carry a weapon and ammunition up to

17  the school?

18          MR. DUNLEAVY:  Objection, Your Honor.

19          THE COURT:  Overruled.

20  A.  I saw Chad Cain only in civilian clothes.  I do not know

21  if he had a concealed weapon at the time.  He would have

22  lawfully been authorized to have a concealed weapon.  I never

23  personally observed Chad Cain with a weapon.

24  Q.  Do police officers have access to firearms?

25  A.  Yes, ma'am.

1    Q.  Do police officers have access to ammunition?

2    A.  Yes, ma'am.

3    Q.  So in discovery responses when we asked Chad Cain whether

4    he owned or had --

5           MR. DUNLEAVY:  Your Honor, I'm going to object to

6    that request for admission.  That was under Texas state rules

7    where it's a matter of discovery and making objections.  That

8    was objected to.  It's never been ruled upon and this is an

9    issue of Texas procedural law where a denial has to be made

10   to -- to avoid a deemed admission.

11          THE COURT:  I understand.

12          MR. DUNLEAVY:  That's not --

13          THE COURT:  I understand.  Overruled.

14   BY MS. ROBINSON:

15   Q.  In response to admissions to Mr. Cain, when asked whether

16   he owned or had access to firearms and he stated he denied

17   that request, is that accurate?

18   A.  It could not be accurate, no.

19   Q.  Is it truthful?

20   A.  It could not be truthful, no.

21   Q.  Is there any way that a law enforcement officer does not

22   have access to firearms and ammunition?

23   A.  Not at -- Not a serving law enforcement officer, no,

24   ma'am.

25   Q.  Were you allowed to prevent Mr. Cain, an officer with the

1   Fort Worth Police Department, from coming onto the Aledo ISD

2   campuses in his uniform carrying loaded firearms and other

3   weapons?

4   A.  Not absent of -- Not in the abstract or absent the

5   criminal trespass warning.  No, ma'am.

6   Q.  So if the criminal trespass warning had not been

7   issued would there have been --

8          MR. DUNLEAVY:  Objection.  Calls for speculation.

9          THE COURT:  Overruled.

10  BY MS. ROBINSON:

11  Q.  Would there have been any way, in the absence of a

12  criminal trespass warning, to stop Chad Cain from coming to

13  the football game that very night in uniform carrying a loaded

14  firearm and other weapons?

15  A.  No, ma'am.

16  Q.  Now, let's look at some of the things that you said had

17  happened before Exhibit No. 1.  If you will look at Exhibit

18  No. 2.

19  A.  In which notebook, ma'am?

20  Q.  In the small notebook.  We will only be using the small

21  numbered notebook.

22  A.  Okay, ma'am.

23  Q.  On that first page that's marked Defendant's Exhibit 141.

24  A.  Yes, ma'am.

25  Q.  Did Mr. Cain previously make reference to the point behind

1    his post being to give others ammo to go to the schools?

2    A.  Yes, ma'am.  That's what it says.

3    Q.  On the following page, 143, was there a post from Mr. Cain

4    saying -- First, he deleted the name of the student, but then

5    he put his name back in the post, meaning the name of the

6    student.

7    A.  Yes, ma'am.  That's what it says there.

8    Q.  Did you think that was appropriate conduct by a parent?

9    A.  No.

10   Q.  Did you think it was appropriate conduct by a law

11   enforcement officer?

12   A.  Absolutely not.

13   Q.  Is there a difference between having consent from parents

14   to post student's names and images for the purposes of awards

15   or graduation details or other honors as opposed to posting

16   their names in connection with disciplinary consequences or

17   calling students a bully?

18            MR. DUNLEAVY:  Objection.  Leading.

19            THE COURT:  Overruled.

20   A.  Yes, there is, and no parent would have approved his

21   surreptitious recording of their children.

22            MR. DUNLEAVY:  Object, Your Honor.  Calls for

23   speculation or he is giving speculation.

24            THE COURT:  Yes.  Don't speculate.

25            THE WITNESS:  Yes, sir.

1          THE COURT:  Just answer the question.

2    BY MS. ROBINSON:

3    Q.  Is there a difference between --

4    A.  Yes, ma'am, there is.

5    Q.  What is that difference?

6    A.  Approval by a parent, by a guardian, that -- and that --

7    just the essence the parents have approved.

8    Q.  Have any parents given consent for their student's names

9    or images to be posted in connection with disciplinary

10   consequences or claims of bullying?

11          MR. DUNLEAVY:  Objection.  Calls for speculation,

12   Your Honor.

13          THE COURT:  Answer if you know.

14   A.  Not to my knowledge, ma'am.

15   Q.  Did Ms. Neil tell you whether she gave consent for

16   Chad Cain to post the name of her son?

17          MR. DUNLEAVY:  Objection.  Calls for hearsay.

18          THE COURT:  Overruled.

19   A.  Yes, it's -- it's in the evidence, ma'am.  She -- She was

20   very disheartened with Mr. Cain's post.

21   Q.  Now, look at the following page, page 147, in Exhibit 2.

22   Is that a post in which Chad Cain claimed that the school was

23   protecting Ms. Neil's son and the punishment was based on his

24   mom and football?

25          MR. DUNLEAVY:  Objection.  Leading.  This post speaks

1    for --

2           THE COURT:  Overruled.

3    A.  I'm sorry.  Would you repeat the question, ma'am.

4    Q.  Yes.  On page 147 of Exhibit 2.

5    A.  Yes, ma'am.

6    Q.  Did Mr. Cain state that he was so mad earlier because of

7    the information I found out and how the school is protecting

8    this kid with the punishment based on his mom and football?

9    A.  That's what he wrote and it was ridiculous.

10   Q.  And that was in response to one of the many complaints

11   about Chad Cain's posting of the information regarding the

12   other student?

13   A.  Yes, ma'am.

14   Q.  And he even posted witness statements regarding the

15   altercation between his son and the other student.  Is that

16   correct?

17          MR. DUNLEAVY:  Objection.  Leading.

18   A.  And the nurse statement.  Yes, ma'am.

19   Q.  Did he say in the post on page 147:  No excuses.  I made a

20   mistake, in response to the parent's complaint?

21          MR. DUNLEAVY:  Objection.  Leading.

22          THE COURT:  Overruled.

23   A.  It's -- It's right there.  It says -- The last two

24   sentences:  No excuses.  Period.  I made a mistake.  Period.

25          MR. DUNLEAVY:  Your Honor, could I get a running

1    objection to the leading when she asks him what the posts say?

2         THE COURT:  Yes.

3    BY MS. ROBINSON:

4    Q.  Did Chad Cain ever tell you when you gave him an

5    opportunity to meet with you to discuss some of these posts

6    that he had made a mistake and he was not excusing his own

7    conduct?

8    A.  No, ma'am.

9    Q.  As a matter of fact, didn't he double down and say he had

10   every right to say what he wanted?

11   A.  I believe so.  Yes, ma'am.

12   Q.  And even in discovery didn't Mr. Cain say that he had

13   every right to say what he wanted to say in the *Facebook*

14   posts?

15   A.  Would you be kind enough to point me to that exhibit,

16   ma'am?

17   Q.  Yes, sir, I will.  In Response For Requests For Admissions

18   No. 6 in which he was asked when posted the name of the other

19   student at the school his son attended that he alleged was

20   involved in the incident alleged in the assault on social

21   media, he wouldn't admit that he did it, although it's clear

22   he did it, instead he just says he was exercising his free

23   speech rights; correct?

24   A.  That's my understanding.  Yes, ma'am.

25   Q.  And during the two -- or not just one, but two board

1    meetings Mr. Cain has attended, didn't he also say he did it

2    and he was going to continue to do it?

3    A.  I was not at those board meetings, but it's my

4    understanding after the fact.

5          **MR. DUNLEAVY:**  Objection, Your Honor.  Calls for

6    hearsay or the response is hearsay.

7          **THE COURT:**  Yes.  Sustained.

8    **BY MS. ROBINSON:**

9    Q.  Now, when you met with Mr. Cain, did he say anything about

10   the fact that he recognized that there was anything at all

11   inappropriate with his posts?

12   A.  No, ma'am.

13   Q.  Did you give him an opportunity to say that?

14   A.  As we were discussing it, he could have.  Yes, ma'am.

15   Q.  Explain to me what you were referencing about his filming

16   on campus and the disruption on campus.

17   A.  Well, prior to our meeting, he had come in to the front

18   office, the lobby area of the middle school, and kind of had

19   his phone like this and he was surreptitiously recording and

20   then asking the secretary questions and then recording.

21   Q.  When you said he had his arms like this, you are

22   indicating his arms were folded over his chest?

23   A.  Yes, ma'am.  Kind of folded, but where the phone shoot out

24   or where the camera could be seen and he could film.

25   Q.  And he was surreptitiously recording?

1    A.  Yes.

2    Q.  Did he also post that video to social media?

3    A.  He did.

4    Q.  Did that cause a disruption?

5    A.  Yes, ma'am.

6    Q.  What kind of disruption?

7    A.  The parents of the children that work in the office were

8    very concerned and they didn't want their -- their children's

9    images being posted on *Facebook* by Mr. Cain.

10   Q.  So the parents of the students whose images were actually

11   posted complained?

12   A.  I believe so.  Yes, ma'am.

13   Q.  And other parents complained?

14   A.  Yes, ma'am.

15   Q.  If we continue looking at the post, Exhibit No. 2, page

16   149, the follow-up page.  What does that post say, Chief

17   Collie?

18   A.  It's terrible that the illegal daily buzz removed my post

19   about the bully whose mom was a school teacher who got her son

20   off with an extremely light punishment.  This is obviously an

21   issue that needs to be address by the school district.  Hope

22   you all parents don't stand down and allow this to continue to

23   happen.  Police officers, firefighters, nurses, doctors, and

24   just about every other profession are held accountable these

25   days.  Teachers and employees of the school district should be

1    as well.

2    Q.  Did you consider it appropriate for a police officer to be

3    posting information calling another student a bully?

4    A.  No, ma'am.  That's not appropriate.  He should know

5    better.

6    Q.  Looking at the following page.  Did one of his posts state

7    on page 140 --

8    A.  I'm sorry.  Could you repeat the question?

9    Q.  Yes.  If you look at the following page --

10   A.  Yes.

11   Q.  Page 150.

12   A.  Yes, ma'am.

13   Q.  Can you read the section of the post that's circled?

14   A.  Yes, ma'am.

15        **MR. DUNLEAVY:**  Your Honor, objection.  The post

16   speaks for itself.

17        **THE COURT:**  Overruled.

18   A.  I would have never known what this punishment was or his

19   mom was a teacher if it wasn't for this post.  If the parent

20   doesn't want their child's name out there, then they should

21   teach their child right from wrong and if the school district

22   doesn't want posts like this, they should take the appropriate

23   actions and not turn a blind eye when a parent's an employee

24   of the district.

25   Q.  Was that referencing Ms. Neil?

1   A.  Yes, ma'am.

2   Q.  Would you look at the following page, page 153.  Did

3   another parent post in response to Chad Cain to meet the bully

4   after school, bend him over, and give him the -- editorial

5   comment here my apology for profanity -- ass whooping he

6   needs.  If his parents interfere, give them -- again apologies

7   for the profanity -- an ass whooping as well, then post it.

8   Was that one of the responses from some of these posts from

9   Chad Cain that we've been examining?

10  A.  Yes, ma'am.  And the in evidence needs was capitalized

11  which indicates that more attention should be paid or the

12  person is yelling there, so -- he assumed that people need.

13  Q.  Did Chad Cain ever disagree with this post or ask this

14  poster to remove it?

15  A.  Not to my knowledge, ma'am.

16  Q.  Do you consider this an example of a parent and a law

17  enforcement officer --

18          **MR. DUNLEAVY:**  Objection.  Leading.

19          **THE COURT:**  Overruled.

20  **BY MR. DUNLEAVY:**

21  Q.  Chief Collie, do you consider Exhibit 2, page 153, an

22  example of a parent of a student at Aledo ISD and a sworn law

23  enforcement officer inciting violence and others to do harm

24  against a specific student and that student's parents?

25  A.  Yes, ma'am.

1    Q.  If you look at the following page of Exhibit 2, page 155.

2    Is there a post there that is redacted because the school

3    district produced it and we cannot disclose personally

4    identifiable information without a court order that shows the

5    name of this student blacked out and then following that

6    blacked out redaction says blank is a name my son mentioned to

7    me and that name is nowhere in this post?

8    A.  Yes, ma'am.  That's what it says.

9    Q.  Was that post in response to some of the complaints about

10   the fact that Mr. Cain had previously posted the name of the

11   student?

12   A.  Yes.

13   Q.  And then he posted the name of the student yet again after

14   people had complained about it; correct?

15   A.  Yes, ma'am.

16   Q.  If you look at the following page, Defendant's 160.  Is

17   that a post about which people complained to you regarding

18   Chad Cain's posting of mass school shootings caused by

19   bullying and will it happen in Aledo?

20   A.  Yes, ma'am.

21   Q.  Did you get a lot of complaints about all of these posts,

22   including the one we're looking at here on page 160, Chief

23   Collie?

24   A.  Several complaints.  Yes.

25   Q.  Now, did Aledo ISD ever contact *Facebook* and these other

1    social media posts and request that Chad Cain be prohibited

2    from posting these types of posts in which student's names

3    were included, there were references to violence, there were

4    references to school shootings or anything else?

5    A.   No, ma'am.  Not of which I'm aware of.

6    Q.   Were those actions taken by the social media companies on

7    their own without any direction from Aledo ISD?

8            MR. DUNLEAVY:  Objection.  Calls for speculation as

9    to what those companies might have done and what they relied

10   on.

11           THE COURT:  Do you know if anyone --

12           THE WITNESS:  Yes, sir.  But it's not the company.

13   It's the person that kind of referees, for lack of a better

14   word, the -- the --

15           THE COURT:  The page.

16           THE WITNESS:  -- the page.  And it's -- Yeah.  And so

17   that -- I don't know who the people are, but I believe they

18   removed it.

19           MR. DUNLEAVY:  Objection, Your Honor.  If he doesn't

20   know who the people are, how can he know what they did or what

21   they thought?

22           THE COURT:  Overruled.

23   BY MS. ROBINSON:

24   Q.   It wasn't Aledo ISD that prohibited him from continuing to

25   post this information, was it?

1    A.  We wouldn't do that.

2    Q.  And you didn't do that, did you?

3    A.  No, ma'am.

4    Q.  If you look at the following page, Defendant's 161.

5    Plaintiff was referencing with a whole lot of laughing to the

6    point of crying emojis that the Cowboys lost and Aledo ISD

7    still had him in *Facebook* jail; correct?

8    A.  That's what he wrote.

9    Q.  Aledo ISD didn't have him in *Facebook* jail though, did

10   they, Chief Collie?

11   A.  No, ma'am.

12   Q.  Aledo ISD had absolutely no control over what *Facebook*

13   decided as far as what were appropriate posts and what should

14   be removed, did you?

15   A.  No, ma'am.

16   Q.  Does it look like to you from the seven -- pardon me --

17   eight laughing to the point of tears emojis that Mr. Cain

18   thought all of this was funny as opposed to thinking that it

19   was really serious, that people were upset about these posts,

20   and were fearful of him and potential violence?

21   A.  The posts would indicate that.  Yes, ma'am.

22   Q.  If you look at Exhibit 3, Chief Collie, is page No. 615 in

23   Exhibit 3, one of the complaints you received regarding

24   Ms. Neil's concern that her family and her son were being

25   targeted by Mr. Cain?

1   A.   Yes, ma'am.

2   Q.   And are the redactions in that now the redactions to

3   delete her son's name as he is a minor student?

4   A.   Yes, ma'am.

5   Q.   Explain why you thought that these concerns were valid and

6   warranted.

7   A.   I'm sorry?  I couldn't hear your last word, ma'am.

8   Q.   Did you think the concerns expressed to you regarding the

9   fear instilled in the individuals who complained to you were

10  valid and warranted?

11  A.   Yes, ma'am.

12  Q.   Will you explain why you thought their fears and concerns

13  were valid and warranted?

14  A.   Based on Mr. Cain's behavior -- And again, ma'am, whenever

15  we get a complaint like that or concern like that, you -- I

16  start with it's true and then work back from there.  I don't

17  doubt victims.

18  Q.   Looking at the documents in Exhibit 3 where there are

19  several communications to you with attachments that were

20  forwarded to you of different posts, was it clear from the

21  information you were receiving as well as the posts that were

22  attached that the people who were expressing fears and

23  concerns and thought there was the potential for violence

24  thought that based on many social media posts, not just one

25  post?

1  A.  Yes, ma'am.

2  Q.  And those social media posts that some of them referenced

3  are, indeed, attached to the documents in Exhibit No. 3;

4  aren't they?

5  A.  Yes, ma'am.

6  Q.  They don't all just reference the school shooting post; do

7  they?

8  A.  No, ma'am.

9  Q.  Were some of the posts in Exhibit No. 3 and some in

10  Exhibit 2 that we've already reviewed posts that had already

11  been made when you met with Chad Cain?

12  A.  Yes, ma'am.  Many of them were.  Yes, ma'am.

13  Q.  Were those the posts that you were talking to Mr. Cain

14  about to try to explain to him why people were fearful and why

15  they thought violence might break out due to his posts and his

16  behavior?

17  A.  Yes, ma'am.

18  Q.  After you had that meeting with Mr. Cain, you said that

19  you thought everything was resolved?

20  A.  Yes, ma'am.

21  Q.  Why did you think that?

22  A.  At the meeting, he seemed very reasonable and then we had

23  what I will call a cop-to-cop encounter.  We talked about some

24  common people that we knew, that he knew from where I -- from

25  Arlington, which I knew, and I thought everything was just

1    fine.  Again, he asked for several things and everything he

2    asked for I said done, done, done.  So I thought he was

3    satisfied at the end and I even went so far as to go to my

4    boss and say, He's fine.  He's satisfied.

5    Q.  Was that meeting part of your attempt to get Mr. Cain to

6    deescalate his behavior?

7    A.  It was.

8    Q.  Did he deescalate his behavior?

9    A.  He did not.

10   Q.  As a matter of fact, did he escalate it afterwards?

11   A.  Yes, ma'am.

12   Q.  And was one of his escalations his posting about mass

13   school shootings here at Aledo ISD?

14   A.  Yes, ma'am.

15   Q.  If we continue looking at Exhibit No. 3, did you continue

16   to receive yet more complaints from citizens in the community

17   expressing fear that Mr. Cain was threatening to engage in

18   violence?

19   A.  Yes, ma'am.

20   Q.  If you would look at page 726 in Exhibit 3.  Are some of

21   those handwriting notes your own, Chief Collie?

22   A.  The -- Yes, ma'am.  The note on the far right side is

23   mine.

24   Q.  Tell us about the meeting that led to you making the note

25   on page 726.

1   A.  A woman came in.  Asked to see me.  Very distraught.

2   Crying.  Physically crying.  And she said that she was

3   concerned for her safety.  I -- I -- She wanted to remain

4   anonymous and -- because she feared for safety if she were to

5   report anything.  That was my understanding of what she said.

6   She said she had their son at the middle school.  I told her

7   we are aware of the situation and we are addressing the issue.

8   I also told her that Mr. Cain had been issued a criminal

9   trespass warning.

10  Q.  The meeting with this particular individual was the

11  morning following the issuance of the criminal trespass

12  warning.  Is that correct?

13  A.  Yes, ma'am.

14  Q.  Had there been the exact same fears and concerns about

15  people thinking Mr. Cain was going to come up to the school

16  district for a football game and engage in violence before the

17  criminal trespass warning was issued?

18  A.  Yes, ma'am.

19  Q.  Explain --

20      THE COURT:  Let me just ask you about this page here.

21  The handwriting, is that your handwriting or someone else's

22  handwriting?  This is page 726?

23      MS. ROBINSON:  Yes, Your Honor.  It's only the

24  handwriting at the top right that's distinctly different from

25  the other handwriting.

```
 1              THE COURT:  So that is your handwriting?
 2              THE WITNESS:  Yes.  Where it has my initials and my
 3    badge number.  Yes, sir.
 4              THE COURT:  And then whose handwriting is the other
 5    one's?
 6              THE WITNESS:  Mary Neil's.  Pennington's.
 7              THE COURT:  Mary Neil Pennington.
 8              MR. DUNLEAVY:  Your Honor, we would object to this.
 9    We asked -- I asked at deposition whose these was and the
10    answer from both was we don't know and --
11              THE COURT:  Is that correct?  Did you not know during
12    the deposition?
13              THE WITNESS:  Your Honor, I don't recall and -- I
14    don't recall if I said that, but I do know that this is
15    Ms. Pennington's.
16              THE COURT:  And how do you know that?
17              THE WITNESS:  It -- Because it -- I believe it was
18    attached to an e-mail, but that's my understanding.
19              THE COURT:  So it's your understanding?
20              THE WITNESS:  Yes, sir.  I -- May I retract that?  I
21    can't say I know that, but that is my understanding.
22              THE COURT:  All right.  Okay.  Overruled.
23    BY MS. ROBINSON:
24    Q.  So explain to me what Ms. Neil was telling you about her
25    concerns that she, her son, and her son's father were being
```

 1  targeted by Mr. Cain and could be the subject of violence from

 2  Mr. Cain.

 3      MR. DUNLEAVY:  Calls for hearsay, Your Honor.  We

 4  could have Ms. Neil readily, but --

 5      THE COURT:  Overruled.

 6  A.  Yeah.  It's -- She said that Mr. Cain had expressed anger,

 7  frustration in both his posts and his comments on the post and

 8  she was especially concerned because he was both in the

 9  military and is a peace officer so it's -- She referred to his

10  ongoing behavior and his status as both a member of the

11  military and a peace officer which also concerned her because

12  of that behavior.

13  Q.  Did you share Ms. Neil's concerns?

14  A.  Not specifically.  No, ma'am.

15  Q.  In what way?

16  A.  Well, I -- Do I have -- Or did I share it with somebody

17  else?

18  Q.  Oh, I apologize.  You're right.  That was a poorly worded

19  question.  I did not mean share with other people.  Let me

20  rephrase that.  Did you agree with Ms. Neil's conclusion that

21  she, her son, and her son's father could potentially be the

22  subject of violence from Mr. Cain?

23  A.  Yes, ma'am.  Anything that threatens the safety and

24  security of Aledo ISD students, faculty, or staff is my

25  concern.  I start with yes and work from there.  It's my job.

1   Q.  Why did you think that her concerns that she, her son, and

2   her son's father could be a subject of violence was a valid

3   concern?

4   A.  Because of Mr. Cain's post on *Facebook* and the fact that

5   Mr. Cain was a peace officer, he does have the ability to

6   carry it out, but he posts on *Facebook*, he appears

7   disgruntled, he appears unhinged, and he appears angry.  So

8   all of those things combined would lead a prudent person to

9   fear for her safety and fear for her child's safety.

10  Q.  So you thought it was very reasonable that she was

11  concerned that Mr. Cain might engage in violence against her

12  and her son?

13  A.  Yes, ma'am.

14  Q.  Did you also think that there was a reasonable chance that

15  Mr. Cain would engage in violence against Ms. Neil, her son,

16  the minor student, and/or his father?

17  A.  Yes, ma'am.  There is a reasonable chance and the people

18  were generally in fear of -- of his threatening behavior.

19  Q.  Well, I understand that you thought his behavior was

20  threatening; correct?

21  A.  Yes, ma'am.

22  Q.  And you had other people telling you they thought his

23  behavior was threatening; correct?

24  A.  Yes, ma'am.

25  Q.  And you thought that they were right, that his behavior

1    was threatening?

2    A.  Yes, ma'am.

3    Q.  Did you think that those threats could reasonably be

4    carried out by Mr. Cain and he could engage in violence

5    against Ms. Neil, the minor student, and that student's

6    father?

7    A.  He could have.  Yes, ma'am.

8    Q.  Did you think that it was a reasonable possibility that he

9    was going to do so at the football game that very night?

10   A.  That was the main concern.  Yes, ma'am.

11   Q.  That has happened at other school districts?

12   A.  Yes, ma'am.

13   Q.  In fact, multiple times?

14   A.  I'm sorry?

15   Q.  How often has there been a school shooting or was there a

16   school shooting that you're aware of just in that one school

17   year of 2019-2020?

18   A.  At least 32.

19   Q.  And those were just the ones that you're aware of?

20   A.  Yes, ma'am.

21   Q.  Now, when you have as a law enforcement officer a

22   reasonable belief that someone is making threats and has the

23   ability to carry through on those threats and instigate

24   violence against other students or parents, what are you

25   required to do to try to protect them?

1   A.  I do whatever it takes to protect our students and, again,

2   I -- I went to my direct supervisor, Dr. Susan Bohn, and I

3   gave her my best advice and she made the decision to exclude

4   Mr. Cain from the events at the school where he might cause

5   harm or people were scared that he might cause them harm.

6   Q.  Did you agree with Dr. Bohn's conclusion that the criminal

7   trespass warning was appropriate and necessary?

8   A.  My signature wouldn't be on the document if I didn't.

9   Q.  Is that why you signed it?

10  A.  Yes, ma'am.

11  Q.  And when you say you gave her your best advice, did you

12  tell her that it was your conclusion that he was making

13  threats, had a propensity to engage in violence, and was

14  specifically targeting this student and his parents?

15  A.  We wouldn't have done it otherwise.  Alls we wanted to do

16  is protect people.

17          MR. DUNLEAVY:  Object.  Nonresponsive.

18          THE COURT:  Overruled.

19  BY MS. ROBINSON:

20  Q.  If you look at Defendant's Exhibit No. 5 where Mr. Cain

21  was complaining to one of the school district employees about

22  the altercation between his son and another student.  Is

23  Mr. Cain's concern in Exhibit No. 5 that he did not think the

24  other student got a significant enough punishment on the

25  football team?

1   A.  Yeah.  This is all about football.  Yes, ma'am.

2   Q.  Is there anything in Exhibit No. 5 where Mr. Cain said

3   anything about being concerned about his own son or about his

4   free speech rights?

5   A.  No, ma'am.

6   Q.  It was all about wanting the other student punished more

7   in football?

8   A.  Yes, ma'am.

9   Q.  And then is Exhibit No. 7 a response in which Mr. Cain was

10  told that he needed to clarify that it was Mr. Cain who was

11  proposing not pursuing criminal charges if the other student

12  would be given additional consequences that was not a

13  suggestion from the administration?

14  A.  That's -- That's my understanding from what Coach Wood

15  wrote.  Yes, ma'am.

16  Q.  So, basically, Chad Cain said, I'm going to file criminal

17  charges against the boy who was involved in the altercation

18  with my student, with my son, but if you will punish him more,

19  I won't?

20  A.  That's what it says.  Yes, ma'am.

21  Q.  By the way, Chief Cain [sic] do the nurse's notes indicate

22  anywhere -- and you can see them at Exhibit No. 8 -- that Chad

23  Cain 's son was ever unconscious?

24       MR. DUNLEAVY:  Your Honor, objection.  Relevance.

25  We -- We know there was an injury and assault, but --

1          THE COURT:  Yeah.  What is the relevance of that?

2          MS. ROBINSON:  Your Honor, this has to do with

3    Mr. Cain's credibility, because he has continued to insist in

4    this and, in fact, has filed --

5          THE COURT:  Okay.  Well, I think I will testify.  So

6    why are you asking him that?

7          MS. ROBINSON:  He is aware because one of his

8    officers was one of the first responders and the notes --

9          THE COURT:  Okay.  Well -- If he is relying on other

10   evidence, he doesn't know firsthand.  So we have someone here

11   you can ask firsthand, so --

12         MS. ROBINSON:  Yes, Your Honor.

13   BY MS. ROBINSON:

14   Q.  Chief Collie, when you were discussing the criminal

15   trespass warning with Mr. Dunleavy, you said it didn't

16   specifically say you can come and talk to us about whether

17   you're really trying to threaten people and you are going to

18   initiate violence.  But if you look at Defendant's Exhibit

19   No. 18 in the notebook, didn't you specifically note in the

20   criminal trespass warning that he could talk to school or

21   district administrators and have meetings arranged and

22   approved to meet with administrators?

23   A.  Yes, ma'am.

24   Q.  Did Mr. Cain ever take that invitation that he could meet

25   and discuss these issues to schedule another meeting with you

1    or Dr. Bohn or any other administrator to discuss the fact

2    that he now is claiming he wasn't trying to threaten the Neils

3    and their son?

4    A.   I can only answer for myself, ma'am, and the answer is,

5    no, I can't answer for Dr. Bohn or any other administrator.

6    Q.   Did Chad Cain ever use the "Ask Susan" button on the

7    website to talk to Dr. Bohn about it?

8    A.   Not to my knowledge, ma'am.

9    Q.   When you met with Mr. Cain, did he ever say word one about

10   I think there's been a mistake, I'm really not intending all

11   of these posts cumulatively or otherwise to be a threat?

12   A.   He did not, ma'am.

13   Q.   Did he ever say anything about the fact that he wouldn't

14   engage in violence against the student who was involved in the

15   altercation or that student's parents?

16   A.   He did not, ma'am.

17   Q.   Did he ever offer not to bring loaded weapons up to the

18   school district?

19   A.   He did not.

20   Q.   Did he ever say anything about, Hey, you have

21   misunderstood me.  I'm not making a threat to engage in

22   violence?

23   A.   That would be nice, but no, ma'am.

24   Q.   Did he say anything like that alluding to that or that you

25   could even infer that maybe in his mind he wasn't making a

1  true threat against an individual or group of individuals?

2  A.  No, ma'am.  Seems like he jumped right to engagement.

3  Q.  If you will look at Exhibit 19 on No. 3 that Mr. Dunleavy

4  was reading from earlier, it didn't require that Mr. Cain have

5  permission to attend a board meeting.  It just said, Mr. Cain

6  may attend board meetings if he provides notice of when he

7  intends to attend; correct?

8  A.  Correct.  And he attended two board meetings.

9  Q.  But he didn't say anything in those board meetings about

10  not making a true threat or trying to engage in violence, did

11  he?

12  A.  I can't testify to that, ma'am.  I wasn't there.

13  Q.  Would you have been informed in your position as the

14  person who issued the criminal trespass warning that Mr. Cain

15  had told the board at either of the two board meetings he

16  attended that he did not intend his -- all of these

17  communications to be threats and that he did not intend to

18  engage in violence?

19       MR. DUNLEAVY:  Object, Your Honor.  Calls for

20  speculation.  The witness has already said he doesn't know.

21       THE COURT:  Yes.  Has anybody informed you of that?

22       THE WITNESS:  No, ma'am -- Pardon me, Your Honor.

23  No, sir.

24  BY MS. ROBINSON:

25  Q.  Would you have been informed?

1      THE COURT:  He already said that, so ask a question

2  he hasn't already answered.

3  BY MS. ROBINSON:

4  Q.  When you were talking earlier about disruption on campus

5  and at the football game, there was not a disruption at the

6  football game because a criminal trespass warning was in

7  effect and Mr. Cain did not attend.  Is that correct?

8      MR. DUNLEAVY:  Objection.  Calls for speculation.

9      THE COURT:  Do you know?

10  A.  I know that Mr. Cain didn't cause a disruption because we

11  precluded him from being there, ma'am.

12  Q.  But there had been disruption on campus prior to that;

13  correct?

14      MR. DUNLEAVY:  Objection, Your Honor.  That

15  mischaracterizes the prior testimony.  I --

16      THE COURT:  Overruled.  Do you know?

17  A.  The fear that he generated because of his actions.  Yes,

18  ma'am.

19  Q.  Now, going back to Exhibit No. 1, the post that says the

20  census -- and I believe he means "consensus" -- is that most,

21  if not all, mass school shootings were caused from bullying.

22  If this were true, society is getting worse.  Will it happen

23  here in Aledo if this school administration keeps bullying the

24  parents by pulling out the broom for the bullies.  Think about

25  that parents.  Did you'll think that was a true threat?

 1   A.   Yes.   And completely inappropriate for a police officer to

 2   write.

 3   Q.   Did you take this one post in an a vacuum or were you

 4   considering all of the posts, the meeting with Mr. Cain, all

 5   of the parents and citizens who complained to you, all of the

 6   information they had submitted --

 7        THE COURT:   Okay.   He has already said he took it in

 8   the totality of the circumstances, so let's get to it the

 9   point.

10   BY MS. ROBINSON:

11   Q.   Did you issue the criminal trespass warning based merely

12   on this one post?

13   A.   I used to criminal trespass warning at the direction of

14   Dr. Susan Bohn, so no, ma'am.

15   Q.   And when you gave her your advice that you thought it was

16   warranted, did you think it was based merely on one post?

17   A.   No, ma'am.

18   Q.   Did you think Exhibit No. 1 was a criticism of the school

19   administration or did you think it was a threat?

20   A.   It's a threat.

21   Q.   Why did you think it was a threat and not a criticism of

22   the school administration?

23   A.   He -- Again, he mentioned the school shootings and he

24   mentioned bullying and if he goes -- he goes on down and talks

25   about getting on another site, which he did get on, it doesn't

 1  really address or -- anything to the school administration.

 2  Q.  Would you have issued a criminal trespass warning because

 3  Mr. Cain or anyone was criticizing you or other school

 4  officials?

 5  A.  It happens every day.  No, ma'am.

 6  Q.  Have people criticized you in the past?

 7  A.  Unfortunately, yes, ma'am.

 8  Q.  Have they criticized other school officials?

 9  A.  I'm sorry.  I didn't hear the question.

10  Q.  Have other school officials been criticized?

11  A.  Yes, ma'am.  Daily.

12  Q.  Do you issue criminal trespass warnings for those

13  behaviors?

14  A.  Only when -- No, ma'am.

15  Q.  Does that have anything to do with the criminal trespass

16  warning that was issued in this case?

17  A.  No, ma'am.

18  Q.  Have criminal trespass warnings been rescinded in the

19  past?

20  A.  Always.

21  Q.  So as long as there's some indication that there is not a

22  potential for violence or whatever the issue is for which

23  you're trying to protect the safety of staff, students, and

24  the community, will the criminal trespass warning be

25  rescinded?

1    A.   Yes.   My only concern is the safety of our --

2         THE COURT:   Okay.   That's the answer.   Ask your next

3    question.

4    BY MS. ROBINSON:

5    Q.   So when Mr. Dunleavy was asking you if it's in effect

6    forever, that's only if there's no indication that the

7    threatening behavior is -- has been relaxed or that there's

8    not a threat of violence?

9    A.   Right.   Well, once people prove they're no longer a

10   threat, we welcome them back on campus, welcome them back into

11   the fold.

12   Q.   You would have done that in this case?   Would you have --

13   A.   Of course.   Well, again, I would have recommended it, but

14   at that -- this point, it's -- it's Dr. Bohn's decision, so we

15   would have to ask her, ma'am.

16   Q.   Currently though, Aledo ISD is exercising COVID-19

17   precautions and parents are not allowed on campus anyway;

18   correct?

19   A.   No parents are allowed on campus right now, ma'am.

20   Q.   So even without the criminal trespass warning, Mr. Cain,

21   like all other parents, would not be allowed on campus because

22   of the COVID precautions?

23   A.   He would not be allowed into buildings.   Yes, ma'am.

24   Q.   Chief Collie, what is your educational background?

25   A.   I have a Bachelor of Science in criminal justice from the

1  University of Texas at Arlington; I have a master of public

2  administration -- pardon me -- bachelor of science criminal

3  administration from the University of Texas at Tyler; master

4  of public administration from University of Texas in

5  Arlington.  I have a master of homeland security from the U.S.

6  Naval Post Graduate School in Monterrey.

7  Q.  What certifications and licenses do you hold, Chief

8  Collie?

9  A.  I hold a master peace officer license and I hold a -- a

10 school district -- school base law enforcement officer

11 license -- certificate.  Pardon me.  Certificate.

12 Q.  And what is the title -- What is the position you hold or

13 your title at Aledo ISD?

14 A.  I'm chief of police of Aledo.

15 Q.  How long have you been in law enforcement?

16 A.  Just over 20 years, ma'am.

17 Q.  What positions did you hold before you began your

18 employment with Aledo ISD?

19 A.  In law enforcement, ma'am?  I was the chief deputy in

20 Dallas County Constable Precinct 5.  I was retired as a deputy

21 chief from the Arlington Police Department.  I was a -- As a

22 lieutenant, I was the internal affairs commander, a bureau

23 commander.  As a sergeant I was a full sergeant, real

24 operations sergeant then and, of course, I was a patrol

25 officer as I worked my way up.

1    Q.   Have you served in the military?

2    A.   I have.

3    Q.   How long were you in the military?

4    A.   I was in the military for 5 years on active duty and 3

5    years in the active reserves.

6    Q.   What ranks and positions did you hold in the military?

7    A.   I left the military as an E-6, staff sergeant, in the Army

8    and my position was I was a special forces engineer sergeant

9    on an A team.

10        MR. DUNLEAVY:  Your Honor, I'm going to object to

11   anything further.  I mean, we will stipulate he was in the

12   Army.  I asked the question.  I don't see the relevance of

13   this.

14        THE COURT:  Okay.

15   BY MS. ROBINSON:

16   Q.   Did you rely on your law enforcement experience, training,

17   and expertise in recommending to Dr. Bohn a criminal trespass

18   warning be issued against Chad Cain?

19   A.   Yes, ma'am.

20   Q.   Do you agree with the issuance of the criminal trespass

21   warning against Chad Cain?

22   A.   Unequivocally.

23        MS. ROBINSON:  Pass the witness.

24        THE COURT:  Anything else?

25        MR. DUNLEAVY:  Just very briefly, Your Honor.

1                    <u>REDIRECT EXAMINATION</u>

2    BY MR. DUNLEAVY:

3    Q.  Mr. Collie, I just want to get to the post that's on 153.

4    A.  Thick book or little book, sir?

5    Q.  Defendant's Exhibit 3 in the little book.

6    A.  And which tab is it, sir?

7          THE COURT:  Tab 3.

8          THE WITNESS:  Tab 3.

9          THE COURT:  Page 153.

10   BY MR. DUNLEAVY:

11   Q.  I'm sorry.  It's Tab 2, page 153.

12         THE COURT:  Tab 2.  I'm sorry.  Yeah.  That's my

13   error.  Tab 2.

14   A.  I see Tab 2.  I am sorry, I don't see a page 153.

15         THE COURT:  Are you trying to get him into the posts?

16         THE WITNESS:  In the little book?

17         MR. DUNLEAVY:  Yes, sir.

18         THE WITNESS:  Okay.  Let look in the little book.

19   I'm sorry.  Okay.  I'm on page 153.  I am there now, sir.

20   BY MR. DUNLEAVY:

21   Q.  So Pat Murphy is making this post about an ass whooping;

22   correct?

23   A.  It appears so, sir.

24   Q.  And he's inciting violence; correct?

25   A.  Yes, sir.

1    Q.   Did he get a trespass warning?

2    A.   I don't even know who Pat Murphy is, sir.

3           MR. DUNLEAVY:  Objection.  Nonresponsive.

4    BY MR. DUNLEAVY:

5    Q.   Did he get a trespass warning?

6    A.   He did not.

7    Q.   Now, the bullying -- Remember, we talked in your

8    deposition, you aware of the Secret Service, the United States

9    Secret Service, has issued a study saying there's a

10   relationship between school shootings and bullying?

11   A.   Yes, sir.

12   Q.   So when Chad Cain posts about that relationship on

13   *Facebook*, he is just putting out information that the Secret

14   Service also has put out; correct?

15   A.   That's not the way he presented it.

16           MS. ROBINSON:  Objection to a conclusion.

17           THE COURT:  Overruled.

18   A.   That's not the way he presented it but, yes, that is

19   information that the Secret Service has put out.

20   Q.   Now, we talked about the -- the trespass warning or the

21   school district didn't kick Mr. Cain off *Facebook*.  You said

22   that in response to Ms. Robinson's question.  Do you remember

23   that?

24   A.   Yes, sir.

25   Q.   Do you understand the lawsuit is not about getting kicked

1    off *Facebook*; it's about the trespass warning.  Do you

2    understand that?

3    A.   That's not my understanding, sir.

4    Q.   Okay.

5    A.   But I'm happy for you to explain it to me.

6           THE COURT:  That's okay.  That's fine.  If you don't

7    understand, that's the case --

8    BY MR. DUNLEAVY:

9    Q.   Now, a lot of your commentary on the posts was you

10   saying you just didn't think it was appropriate for a police

11   officer to be saying those things on *Facebook*.  Agreed?

12   A.   Any -- I wouldn't say a lot, but I did say that about at

13   least one post.

14   Q.   So you're passing judgment on Mr. Cain's statements

15   whether as a person, a citizen, but particularly as a police

16   officer; correct?

17   A.   Yes, sir.

18   Q.   Now, let me direct your attention to your deposition

19   testimony, and specifically on page 68, line 3.  Let me see if

20   I can get it up on the screen in a way that you can --

21   A.   What tab, sir?

22   Q.   It's on the screen.

23          THE COURT:  Is your screen not working?

24          THE WITNESS:  I don't have a screen.

25          THE COURT:  I don't either.

1    **BY MR. DUNLEAVY:**

2    Q.  Your Honor, I have a copy, if I could --

3            **MR. DUNLEAVY:**  Your Honor, may I approach?

4            **THE COURT:**  Yes.

5    **BY MR. DUNLEAVY:**

6    Q.  These are two books and it just happens your deposition is

7    split between the two books.

8    A.  Okay.

9    Q.  But it starts there and the end of it is in the second

10   one.  So in the first half of that, in the first book, at page

11   67, which is in the upper right-hand corner --

12   A.  In the first book?

13   Q.  Yes, sir.  It will be -- the top of the page it's

14   saying -- the bigger letters -- page 155 of 273.  That's the

15   pages in the book.

16   A.  I'm sorry, sir.  The two pages that you referred me to

17   and -- Please help me, because I don't see a page 155 of 273.

18   Thank you.

19   Q.  So you are now at page 155 of 273, that streamer across

20   the top?

21   A.  Yes, sir.

22   Q.  Do you see how it's divided into four pages?

23   A.  Yes, sir.

24   Q.  The upper right-hand corner is page 67 of the deposition.

25   At line 20 I asked you at your deposition:  And did you

 1   consider that his posts, his behavior, the totality of the

 2   circumstances constituted an intentional or knowing threat to

 3   another of imminent bodily injury?  And your answer was:  No.

 4   Did I read that correctly?

 5   A.  Yes.

 6   Q.  And today you are saying, yes, there was a threat;

 7   correct?

 8   A.  I'm -- I probably misunderstood the statement.  It was an

 9   incredibly unpleasant afternoon, Mr. Dunleavy.

10   Q.  And whatever your explanation for your answer at your

11   deposition, today you are saying there was a threat; correct?

12   A.  Yes.

13   Q.  But that's not what you said at deposition; correct?

14   A.  Apparently.

15        MS. ROBINSON:  Objection, Your Honor.  It was a

16   different question --

17        THE COURT:  Overruled.

18        MS. ROBINSON:  -- about imminent.

19   BY MR. DUNLEAVY:

20   Q.  Now, following down at the bottom of page 67, I asked:

21   Are you familiar with 22.07 of the Penal Code.  Do you see

22   that?

23   A.  Yes.

24   Q.  And you said you were; correct?

25   A.  Yes.

1   Q.  And I said:  Do you believe that Mr. Cain's actions

2   interfered with a government operation there at the school

3   district?  And your answer was:  No.  Correct?

4   A.  As I understood the question, yes.

5   Q.  And today you're saying yes.  Correct?

6   A.  Again, as I understood the question, sir.

7   Q.  Today you are saying, yes, he disrupted and interfered

8   with a government operation; correct?

9   A.  I have a different understanding of the question, sir.

10        **MR. DUNLEAVY:**  I object.  Nonresponsive.

11        **THE COURT:**  Is that question "yes"?  With that

12   qualification today --

13        **THE WITNESS:**  Yes.

14        **THE COURT:**  -- today you're --

15        **THE WITNESS:**  Yes.

16   **BY MS. ROBINSON:**

17   Q.  So today you would be of the opinion that you could arrest

18   or cite Mr. Cain for disrupting a government operation, a

19   terroristic threat.  Isn't that what you are telling this

20   Court?

21   A.  I'm not telling the Court that I would arrest Mr. Cain nor

22   is that what needs to happen for a criminal trespass warning.

23   Q.  No, but that is the elements for terroristic threat;

24   correct?

25   A.  He wasn't charged with terroristic threat, sir.

1    Q.   Now, I'm going to ask you to turn to page 91 of the

2    deposition which is page 161 of 273.   Are you there at page

3    161 of 273?

4    A.   Yes, sir.

5    Q.   Okay.   And on that top right corner, again, page 161 of

6    the deposition, line 10, I asked you the question:   Are you

7    saying that the reference to mass school shooting, quote, the

8    census is that most, if not all mass school shootings, were

9    caused from bullying, end quote.   Are you saying that's a

10   threat, that sentence?   Did I read that correctly?

11   A.   What -- What line are you on, sir, please?

12   Q.   From page 91 of the deposition on page 161 of 273.   Top

13   right corner.   Line 10 through 14.

14   A.   Okay.

15   Q.   I'm just asking you if you see that question?

16   A.   Okay.

17   Q.   You do see that?

18   A.   I see the question and you stated it correctly.

19   Q.   Now, you make an answer at line 15; correct?

20   A.   Yes.

21   Q.   And I objected at line 24 that it was not responsive;

22   correct?

23   A.   Yes.

24   Q.   And then I repeated the same question at page 91, line 25;

25   correct?

1   A.  Yes, sir.

2   Q.  And then you said in answer:  That sentence isolated,

3   despite the grammatical error, isolated in itself, not

4   considering with everything else, again not considered with

5   everything else, would likely not be considered a threat.  I

6   read that correctly, didn't I?

7   A.  You did.

8   Q.  Are parents allowed to pick up their kids at school now

9   even if they are not allowed to go into buildings?

10  A.  Yes.

11  Q.  Do parents -- Are you having football games, say, at the

12  life school stadium now?  Are you planning for that?

13  A.  Yes.

14  Q.  Are you planning to have parents attend?

15  A.  Yes.

16  Q.  Even during this pandemic?

17  A.  Yes.  Given considerations.  I mean, I believe we're at

18  50% capacity masks and so forth.

19  Q.  The last little bit.  I want to go back to that e-mail

20  that we talked about.  And it's Defendant's Exhibit No. 19 in

21  the little book.  The little binder.

22  A.  Okay.

23  Q.  Okay.  Now, you see that e-mail from Joy Moore to me.  You

24  do understand the fact -- The second page of that docket is an

25  e-mail I sent to Ms. Moore.  Do you see that?

1    A.   Yes.

2    Q.   Okay.  And in that, looking at the very bottom; right

3    above where my name is, I asked Ms. Moore to consider that

4    Aledo ISD would agree to hear Chad Cain's grievance over the

5    trespass warning administratively at the superintendent level

6    within 10 calendar days; did I not?

7    A.   That's what you wrote, sir.

8    Q.   And I pointed out what you know from statute that a

9    superintendent at a school district is the direct supervisor

10   of the chief of police; correct?

11   A.   Yes, sir.

12   Q.   And so superintendent Bohn was your direct supervisor and

13   if there was a complaint to come in against you, she would be

14   the appropriate person to hear it; correct?

15   A.   Unless you delegated -- yes, sir.

16   Q.   Well, the policy, whether it's the CKE policy for

17   complaints against police officers or the FNG policy for

18   complaints from parents or the DTBA policy, which I don't

19   think it applies but we've talked about it, complaints from

20   employees, they all say a complaint, a grievance, you should

21   try to work it out at the lowest level with the appropriate

22   administrator; right?

23   A.   Yes.  Yes, sir.

24   Q.   And so the appropriate administrator to Mr. Cain's

25   complaints about the conduct of the police chief would be the

1   superintendent; right?

2   A.  Sir, once you use the word "grievance," I believe that

3   puts us into the grievance process within the school district

4   and then there's a specific process and, unfortunately, I'm

5   not aware of it, but I know that grievances -- or not fully

6   versed in it.

7   Q.  Let's do it this way, Chief Collie.  If someone makes a

8   complaint against one of your direct reports --

9   A.  Uh-huh.

10  Q.  -- you're the appropriate person because they're a direct

11  report to you to receive complaints about them?

12  A.  Yes.

13  Q.  Wouldn't you agree?  So if you're a direct report to the

14  superintendent, do you have any reason, based upon your

15  training in the Army, the leadership schools you've been to,

16  the police departments, that it's appropriate to report

17  complaints and try to resolve complaints against individuals

18  with their direct supervisor?

19  A.  That seems reasonable.

20       MR. DUNLEAVY:  Your Honor, I'm finished with this

21  witness.  I would like to address logistically the exhibits.

22       THE COURT:  We'll do that when we are done.  Why

23  don't you've go ahead and step down.

24       THE WITNESS:  Thank you, Your Honor.

25       THE COURT:  Call your next witness.

1          MR. DUNLEAVY:  Susan Bohn.

2          THE WITNESS:  May I ask:  Do I leave these books up

3     here?

4          THE COURT:  Yes, sir.

5          MR. DUNLEAVY:  Your Honor, I call Susan Bohn.

6          THE WITNESS:  Your Honor, may I step out before I

7     step back in?

8          THE COURT:  Yes.  Ma'am, would your raise your hand

9     and be sworn.

10         (Witness sworn.)

11              SUSAN BOHN, PLAINTIFF'S WITNESS, was sworn

12                   DIRECT EXAMINATION

13    BY MR. DUNLEAVY:

14    Q.  Ma'am, will you please state your name.

15    A.  Susan Bohn.

16    Q.  And you're the superintendent at Aledo ISD?

17    A.  I am.

18    Q.  And, like the police chief, as superintendent, you swore

19    an oath to uphold the law and support the Constitution, didn't

20    you?

21    A.  As a superintendent, we are required to follow the law,

22    yes.

23    Q.  You swore that in an oath under the Government Code;

24    correct, as an appointed official of the State of the Texas?

25    A.  I've sworn that oath as an attorney.  I haven't quite

1  stood up and sworn that oath as a superintendent.

2  Q.  You know the First Amendment is part of the Constitution

3  because you do have a law license, even though it is inactive;

4  correct?

5  A.  Yes.

6  Q.  And you know that protects free speech?

7  A.  Yes.

8  Q.  And as a government official your interests are served by

9  following the law correct?

10  A.  Yes.

11  Q.  And your interests are harmed when the law is not

12  followed; correct?

13  A.  Yes.

14  Q.  And the government's interests are harmed when the law is

15  not followed; correct?

16  A.  Yes.

17  Q.  And you would agree that if someone has their First

18  Amendment rights taken away, even for a small amount of time,

19  that is a harm?

20        THE COURT:  Let's just try to dial in.  I know what

21  the law says.  Let just try to dial in on the dispute here.

22  MR. DUNLEAVY:  Yes, sir.

23  BY MR. DUNLEAVY:

24  Q.  You made the decision to issue the trespass warning;

25  correct?

1   A.   Yes.

2   Q.   And when we talked about that at deposition, you didn't

3   have a definition for probable cause; correct?

4   A.   Correct.

5   Q.   And you didn't have a definition for reasonable suspicion;

6   correct?

7   A.   Right.  I did not define reasonable suspicion for you.

8   Q.   You said at Aledo ISD you tried to stop parents from

9   denigrating students on social media; correct?

10  A.   I'd probably have to read the deposition transcript to

11  know exactly what I said.

12  Q.   Okay.  Well, let's get away from what you said.  At Aledo

13  ISD you as a superintendent disapprove when parents of one

14  child are critical or denigrating another child; correct?

15  A.   So in my role as the superintendent and serving and

16  protecting children, I believe it's harmful to children to

17  attack them on social media.

18  Q.   And when it's children attacking other children on social

19  media or at school, you as a school official believe that's

20  within your power to regulate; correct?

21  A.   It depends.

22  Q.   If it's harmful, denigrating speech on campus, can you

23  regulate that?

24  A.   We have to do a legal analysis of whether that's

25  appropriate or not.

```
 1    Q.  Okay.  Well, in terms of the level analysis, are you
 2    allowed -- Do have you the power to regulate parent speech off
 3    campus?
 4    A.  No.
 5    Q.  Do you have the power to regulate parent speech on
 6    Facebook?
 7    A.  No.
 8    Q.  And Fred Collie said that after he meet with Chad Cain he
 9    met with you and said no need to take any action.  Do you
10    recall that?
11    A.  I vaguely recall a conversation with him about that.
12    Q.  And he also said that after that meeting he didn't see a
13    need to immediately after that meeting or at that meeting he
14    didn't see a need to issue a trespass warning.  Did he
15    communicate that to you after his meeting with Chad Cain?
16    A.  I don't know what exact words he used.  I don't know.  I
17    don't remember.
18    Q.  What serious --
19              THE COURT:  Did he communicate that to you,
20    regardless of what he --
21              THE WITNESS:  Certainly.  He communicated that
22    everything was okay.  He thought that -- that the -- I'm
23    trying to characterize it correctly.  That --
24              THE COURT:  Well, that's -- I think you have it.
25              THE WITNESS:  Okay.
```

1          THE COURT:  Ask Your next question.

2     BY MR. DUNLEAVY:

3     Q.  Ms. Bohn, what communication did Chad Cain make that you

4     considered to be a serious expression of an intent to commit

5     an act of unlawful violence?

6     A.  What communication did he make?

7     Q.  Yes, ma'am.

8     A.  So the final communication, but related to other things

9     that had occurred and were occurring in his behavior was the

10    final communication about school shootings that specifically

11    listed our school district and the discussion of school

12    shootings related to our district.

13    Q.  And I'm going to put that -- I think that's Defendant's

14    Exhibit 1 and Plaintiff's Exhibit 4.  You can pick whichever

15    book is easier to use.  But in the big book it's Exhibit 4.

16    In the little book it's Exhibit 1.  Maybe Exhibit 1 is easiest

17    to find.  I don't know.  Okay.  So the actual post.

18    Plaintiff's 4 or Defendant's 1; correct?

19    A.  That is that post.

20    Q.  What act of unlawful violence does Chad Cain express a

21    serious intent to commit?

22    A.  I can't speak to his intent.

23    Q.  But you did, ma'am.  You issued the trespass warning;

24    right?

25    A.  A tres --

1  Q.  You issued the trespass warning based upon your belief
2  that he had made a threat; correct?
3  A.  Yes.  I believe he made a threat, but that's not the
4  question you asked me.
5  Q.  I know it.  I'm asking you about what the definition of
6  what a threat is, and that is, as I understand it, a
7  communication of a serious expression of an intent to commit
8  an act of unlawful violence.  So I understand you believe
9  there was a threat --
10  A.  Yes.
11  Q.  We believe you're wrong by that definition so, if you're
12  right, we want to make sure that we know what under that
13  definition you can say is an expression of an intent to commit
14  an act of unlawful violence.  What -- What did he threaten?
15          MS. ROBINSON:  Objection.  Calls for a legal
16  conclusion.  That's not what is required for the issuance of a
17  criminal trespass warning.
18          THE COURT:  Forget what the law is.  What
19  communication did he make that expressed an intent to commit
20  violence?
21  A.  Sure.  He -- So this right here is a -- in the discussion
22  he says the census, meaning consensus, is that most, if not
23  all, mass school shootings were caused from bullying.  And
24  then he says will this happen here in Aledo.  He specifically
25  names our district.  If this school administration keeps

1   bullying the parents.  And so he's saying -- this is my

2   interpretation because I'm the one assessing the threat -- he

3   says that he's being bullied and that is this bullying going

4   to cause a mass shooting here in Aledo?  He was specific about

5   naming our district.  He spoke about mass school shootings and

6   I believe that to be threatening to the safety of our

7   district.

8   Q.  And he put a question mark at the end of it asking a

9   question; correct?

10  A.  I don't think it's a question.  I think he could have --

11  He put a question mark at the end.

12  Q.  What particular individual or group of individuals did

13  Mr. Cain direct his threat at?

14  A.  So in a series of events that involved actions and this

15  post, he was showing over time that he was incredibly upset

16  about a situation involving his child and another student.  We

17  know he specifically names that student on social media.  He

18  game in and he interrogating the receptionist at the front

19  office about that student and what was -- what would or should

20  be done to that student and then he was continuing to show

21  that he didn't believe what had happened to that student was

22  appropriate.  So he was representing a very specific anger

23  toward a student and then he also specifically talked about

24  his mother being a staff member and that that was unfair and

25  so he was just showing this very significant ire toward this

1    child and this family and we believed that to be increasing

2    over time and then on -- and then I see this post on the 24th

3    which is, essentially, the culminating event to all of that

4    and that and that's when I said the discussion of the

5    shooting, being very specific about Aledo.  To me, I had a --

6    I had a couple of -- I mean, it was a broad concern about the

7    safety of our schools, which is ultimately my ultimate

8    responsibility, but also a significant concern for the safety

9    of this particular family and especially this 12 or 13 year

10   old who was a 7th grader at the time.  My specific concern was

11   about the Everman of football game because I knew that

12   football was a very significant cause of this situation.

13   Mr. Cain was upset that the other student was permitted to

14   play and his child was not and so, to me, I was incredibly

15   concerned about the potential for violence at that football

16   game by Mr. Cain.

17   Q.  And I appreciate that information, ma'am.  But my question

18   was:  With regard to Defendant's Exhibit 1, this *Facebook* post

19   or Plaintiff's Exhibit 4, the same *Facebook* post, who are you

20   saying?  What individual or group of individuals did you

21   conclude this *Facebook* post directs that threat at?

22   A.  This, in and of itself, by itself, which is -- It's hard

23   to look at.  There's quite a bit of context leading up to

24   this.  But this, in and of itself, is more of a general --

25   caused me to have more of a general concern for the safety of

1   our campus.

2            MR. DUNLEAVY:  Now I will object.  Nonresponsive.

3            THE COURT:  Overruled.

4   BY MR. DUNLEAVY:

5   Q.  Ma'am, who is this -- Who are you -- Who did you conclude

6   that this *Facebook* post directs a threat toward?

7   A.  Sure.  Our students.  Our staff, our parents, and our

8   general communities around particularly Aledo Middle School.

9   Q.  Just everybody in the community?

10  A.  If they're physically present at our football games or

11  physically present on our campus then they would be

12  potentially part of that threat, so it just kind depends who

13  was there.

14  Q.  Ma'am, you've looked at the posts -- I'm sorry -- the

15  pictures off the website that we've identified, I think, as

16  exhibits 23, 24, and 25.  Have you seen those?  They're in the

17  big book.

18  A.  I'm sorry.  Can you say that again?  Did I see them when?

19  Q.  23 -- Exhibits 23, 24, and 25.  They are in the big book;

20  correct?

21  A.  I see them.

22  Q.  And so those pictures and names of students, those

23  children, are being praises by the district; correct?

24  A.  Yes.  They won awards.

25  Q.  And at Aledo ISD you publish good news about your

1  students; correct?

2  A.  We do publish directory information about our students

3  that can include awards.

4  Q.  And, for example, in publicizing the successes of students

5  in the districts, the football team is broadcast on tv; right?

6  A.  Occasionally.  It can't be this year due to COVID.

7  Q.  Last year they went to the state championship game and

8  they were on tv.

9  A.  That was not our broadcast.

10 Q.  Well --

11 A.  We had no control over that broadcast, but they were

12 broadcast.  Yes, sir.

13 Q.  But one thing you do have control of, you understand the

14 football team sends videotapes with the kids playing in the

15 game to the other teams; right?  They trade tapes?

16 A.  They do trade tapes.  Yes, sir.

17 Q.  So you all publicize the children and they're identified

18 by name probably on the back of their jersey in those

19 videotapes; aren't they?

20 A.  I don't know if they have names on their jersey.  But we

21 have football players in videotapes that are traded to other

22 teams.  Yes.

23 Q.  And you approve what's in that message.  You approve the

24 athletic department sending those videotapes out to other

25 schools?

1    A.  I don't object to that sharing.

2    Q.  Now, isn't it true that you try to dissuade parents from

3    publishing negative information about other children?

4    A.  If we -- Yes.  If we perceive that -- or if we see that a

5    -- that a student is being targeted in a negative way by a

6    parent, then we -- it's our practice to go talk to them and

7    just say, Would you consider not continuing to pursue a child

8    in a negative way on *Facebook*.

9    Q.  And that's what Chief Collie was doing when Chad Cain;

10   correct?

11   A.  Correct.

12   Q.  But Chad Cain then continued on *Facebook* and, in your

13   view, posted after he met with Chief Collie; correct?

14   A.  Correct.

15   Q.  Ms. Robinson mentioned the button to, I guess, Ask Susan

16   or some kind of connection with you.  Do you -- Can you --

17   That's some sort of hotline to you?

18   A.  It's an opportunity for anyone in the world to click on

19   that and e-mail me.  Yes.

20   Q.  And you get complaints and concerns by e-mail through that

21   system, don't you?

22   A.  Yes.

23   Q.  And you answer complaints and concerns through that

24   system; correct?

25   A.  Sometimes I answer them directly.  Sometimes -- Sometimes

1    someone else will answer them.  If it's a request for a

2    transcript or something like that, I get somebody else to take

3    care of that.

4    Q.  If it's a complaint or concern, somebody at the Aledo ISD

5    district has as part of their job a duty to respond; correct?

6    A.  To any complaint or concern?  Yes.

7    Q.  Yes.  So, basically, responding to these parents'

8    complaints and concerns about Mr. Cain on social media, that's

9    the school administrator's officials doing their job; correct?

10   A.  Typically, yes.

11   Q.  So it's not a distraction or disruption from your job;

12   it's you doing your job.  Wouldn't you agree?

13   A.  I would.  Yes.

14   Q.  I'm sorry?

15   A.  Yes.

16   Q.  And you understood when Chad Cain in Defendant's Exhibit

17   1, Plaintiff's Exhibit 4, is talking about the school

18   administration bullying the parents, you understood that was a

19   criticism of government officials; didn't you?

20   A.  You asked if I understood that?

21          THE COURT:  Let me --  Let me ask you --

22   A.  It didn't cross my mind at that time.  All I cared about

23   was the threats contained therein.

24   Q.  Well, let's put it on your mind now.  Can we agree that

25   this statement is a criticism of Aledo ISD?

 1   A.  I think it's critical of Aledo ISD.

 2   Q.  Don't you agree, if it's not a threat -- Now, I know we

 3   disagree it's a threat or not a threat.  But if it's not a

 4   threat and it is a criticism, can we agree that that

 5   criticism, if it's not a threat, is protected by the First

 6   Amendment?

 7          MS. ROBINSON:  Objection.  Calls for a legal

 8   conclusion.

 9          MR. DUNLEAVY:  She's a lawyer, Your Honor.

10          THE WITNESS:  Not practicing.

11          THE COURT:  I'm going to sustain -- Well, let me ask

12   you this:  Is it your understanding that if a person does not

13   make a threat and they criticize school officials that that

14   would be protected by the First Amendment?  Is that your

15   understanding?

16          THE WITNESS:  Yes.  That's my understanding.  And it

17   happens frequently.

18   BY MR. DUNLEAVY:

19   Q.  And people don't get punished for that?

20   A.  Correct.

21   Q.  And Chief Collie said Aledo High School is playing

22   football games this year.  So you know that; right?

23   A.  I do.

24   Q.  And you're letting the parents go to the games; aren't

25   you?  Some parents?

 1   A.   Right.  We have some restrictions, but yes.

 2   Q.   The restrictions are not individualized --

 3   A.   No.

 4   Q.   -- they are restrictions on numbers; correct?

 5   A.   Restrictions on numbers and type of parent.  It's -- It's

 6   a long story but, yes.

 7   Q.   Again, you were not here last week.  Ms. Robinson sort of

 8   suggested that Mr. Cain's complaints about not being allowed

 9   to go to the football games may be less than something

10   significant because it's just football and football at Aledo

11   ISD is important; correct?

12   A.   Football at Aledo ISD is important to some people.  Sure.

13   Q.   Okay.  Well, you have a football program because you

14   believe at Aledo ISD it's an important part of the educational

15   process; correct?

16   A.   I do.

17   Q.   And even during this pandemic you allow parents to attend

18   those football games because you believe it's important as

19   part of the educational process that parents get to

20   participate in their children's activities; being spectators

21   at football games; correct?

22   A.   Yes.

23   Q.   And band concerts; correct?

24   A.   Band concerts are a little different.  We're not having

25   them this year, but --

1  Q.  For those activities that you're having this year that

2  you're allowing parents to attend, you do so because it's

3  important to the educational process that parents attend their

4  children's activities; agreed?

5  A.  Yes.

6  Q.  And so for those activities last year, before the

7  pandemic, it was an important part of the educational process

8  without limitations by a pandemic for parents to attend;

9  correct?

10  A.  Yes.

11  Q.  And if you take that away, the child's interests are

12  harmed.  A child's education is somehow lessened; correct?

13  A.  It depends.

14  Q.  Well, depending on what it depends on, some maybe it won't

15  harm them, some of it will.  Would you agree?

16  A.  It might depend on the situation.

17  Q.  Okay.  Well, I'm not sure what your situations are, but

18  can we agree that for some kids the parents not attending

19  might be beneficial?

20  A.  For some kids the parents not attending might be

21  beneficial.  Yes, if there's situations of harm or the

22  parent's going to cause violence or something like that.

23  Q.  And for other children the parents attending their

24  activities will be beneficial; agreed?

25  A.  Yes.

1    Q.   Okay.  Let's stick with the ones whose parent's attendance

2    will be beneficial.  If their parents are denied the

3    opportunity to attend their school activities to participate

4    with their children in their education, the children who

5    benefit from parents' involvement, once that parent

6    involvement is taken away, they will be harmed; agreed?

7            **MS. ROBINSON:**  Objection.  Calls for a conclusion.

8            **THE COURT:**  Overruled.

9            **MS. ROBINSON:**  Speculative.

10   A.   It's hard for me to answer that unequivocally.  Maybe.

11   Q.   Now, dropping off your child at the front door of a school

12   may not be that big a difference from dropping off your child

13   150-200 feet away from the front door of a school across the

14   street on a beautiful 75 degree day in Aledo.  Can we agree?

15   A.   I guess it depends on the parent.

16   Q.   Well --

17   A.   Maybe.

18   Q.   If a parent has to drop his child across the street from

19   the school and the child has to walk 150-200 feet in the

20   weather when it's raining, we have the potential harm there

21   the child spends the first period or two periods in wet

22   clothing in school; correct?

23   A.   If a child walks in the rain the child will get wet and

24   their clothes could be wet.

25   Q.   Do you have a covered passageway for Chad Cain's son when

```
 1    he has to walk from across the street or from the street to
 2    the front door of his school?  Is that a covered pathway?
 3    A.  No.  There's no -- There are no covered pathways at Aledo
 4    High School.
 5    Q.  On those rainy days --
 6            THE COURT:  Well, let me just -- If we could just get
 7    back.  I understand that he is being treated different from
 8    other parents in this regard.
 9            THE WITNESS:  Can I say one thing about that?  No.
10            THE COURT:  He is not being treated --
11            THE WITNESS:  Many parents -- He is being prohibited
12    from that dropoff.
13            THE COURT:  Right.
14            THE WITNESS:  Many parents make the choice --
15            THE COURT:  No, I understand that.  I understand
16    that.  But he cannot make that choice?
17            THE WITNESS:  Absolutely.  Correct.
18            THE COURT:  And there are parents who can choose
19    to --
20            THE WITNESS:  Of course.  Yes.
21            THE COURT:  So I think that's undisputed.
22    BY MR. DUNLEAVY:
23    Q.  And, Ms. Bohn, in your statement to the Fort Worth police,
24    you told the police that one of the issues you had was that
25    Mr. Cain had never tried to contact you and talk about the
```

1    issues.  Do you remember that?

2    A.  I do.

3    Q.  And you got my letter on September 30th; correct?

4    A.  I'm sure I did.  I would have to go look at it but, yes.

5    Q.  And you saw the e-mail from Joy Moore or my e-mail to her

6    that was part of the Defendant's Exhibit 19 where on behalf of

7    Mr. Cain I asked that you hear the grievance; correct?

8    A.  I'm not looking at the letter.  But if you say that that's

9    what happened --

10   Q.  I would like you to look in -- in the little book; right

11   behind your right shoulder --

12   A.  Uh-huh.

13   Q.  -- Exhibit 19.  The second page of Exhibit 19.

14   A.  Okay.

15   Q.  And we asked -- I asked Ms. Moore to have you hear the

16   grievance back on October 1st, 2019.  Please have the

17   superintendent, the chief's direct supervisor, hear the

18   grievance; correct?

19   A.  I -- I'm sorry.  I don't see you asking that, but I see a

20   statement related to it.

21   Q.  Okay.  Go to the top of the second page of --

22   A.  You say at the bottom that I'm the appropriate person.  Is

23   that what you are talking about?

24   Q.  Well, right at the -- Right now I'm talking about the top

25   of the second page of Exhibit 19.

1  A.  Okay.

2  Q.  It says:  If it is helpful to bridge any potential gaps in

3  our client's respective positions, I can propose a potential

4  short term solution that will avoid a need for court

5  intervention as follows.  Do you see that?

6  A.  I see that.  Yes.

7  Q.  And then at the bottom:  Aledo ISD agrees to hear -- of

8  the trespass warning administratively at the superintendent

9  level within 10 days.  Did I read that correctly?

10 A.  Yes.

11 Q.  And on this issue Superintendent Bohn is -- direct

12 supervisor, so she is the appropriate level 1 administrator to

13 hear the grievance.  Did I read that correctly?

14 A.  Yes.

15 Q.  And you heard me talk about all the policies, CKE, FMG,

16 DTBA.  Every one of those policies says the appropriate

17 administrator should be the first person to hear the

18 grievance; right?

19 A.  In general, yes.

20 Q.  Okay.

21 A.  It probably says some other specific things, but --

22 Q.  And the answer was the district will hear your complaints

23 in accordance with board policy FMG local.

24 A.  I see that.

25 Q.  Now, Ms. McKinney heard all of the grievances; correct?

1  A.  She did.

2  Q.  And you heard none of the grievances; correct?

3  A.  She's my designee; correct, so I did not sit and have the

4  hearing; correct.

5  Q.  But on any one of those you could have taken the

6  opportunity to sit in and tell Mr. Cain that all he needed to

7  do was deescalate and give assurances.  That was possible;

8  right?

9  A.  It's not our practice.

10  Q.  Ma'am, I'm not asking you about your practice.  I'm just

11  asking you about possibility.  It was possible for you to do

12  that, isn't it true?

13  A.  It's always possible --

14  Q.  Okay.

15  A.  -- for me to contact anyone and say let's talk about

16  anything.  So, certainly, in the grievance context, as a

17  grievance officer, as a hearing officer, I would sit and

18  listen to the grievance and if there are any related parties

19  from the administration's side I would listen to them.  I

20  wouldn't engage with that -- in that kind of discussion in a

21  grievance with the grievant.

22  Q.  When Ms. Robinson said the district or she thought the

23  grievance should just have gone away if only Mr. Cain had

24  agreed to deescalate or give assurances, was that also your

25  thought?

1   A.  It's a little more complicated than that.

2   Q.  Okay.  When --

3   A.  So I can't say an unequivocal yes.

4   Q.  Okay.  So then -- I'm not quoting Ms. Robinson, but you

5   heard Chief Collie say he was looking for deescalation,

6   assurances, and reasonable conduct by Mr. Cain; correct?

7   A.  Eventually.  I don't know exactly what he said, but yes.

8   Q.  Okay.  When did you communicate to Chad Cain in any shape,

9   form, or fashion over the last year -- because we're here on

10  September 23rd, 2019 -- when in the last year before

11  Ms. Robinson said it on Friday, last Friday, when did Aledo

12  ISD communicate to Mr. Cain or to me that part of getting the

13  trespass warning lifted was deescalate, give assurances, act

14  reasonably?

15  A.  I never -- I have never had that communication with him.

16  Q.  And you know no one ever has; correct?

17  A.  I don't believe so.

18          MR. DUNLEAVY:  Your Honor, I pass the witness.

19                      CROSS-EXAMINATION

20  BY MS. ROBINSON:

21  Q.  Dr. Bohn, what's your full name?

22  A.  Susan Kolar Bohn.  Kolar is spelled K-O-L-A-R.

23  Q.  What is your educational background?

24  A.  I have a bachelors in plan 2 from the University of Texas

25  at Austin.  I have a masters in public affairs from the LBJ

1  School of Public Affairs.  I have a juris doctorate from the

2  University School of Law.  And I have doctorate in educational

3  administration from Texas Tech University.

4         **MR. DUNLEAVY:**  Your Honor, we'll stipulate that

5  Ms. Bohn is qualified to be a school superintendent.

6         **MS. ROBINSON:**  Your Honor, I think for purposes of

7  this proceeding --

8         **THE COURT:**  You can get -- but get -- Make it brief.

9  I mean, I take it that she is very qualified and certainly

10  educational qualified.

11  **BY MS. ROBINSON:**

12  Q.  What certifications and licenses do you hold?

13  A.  So I have a teacher's certification, I have a principal's

14  certification, and I have a superintendent's certification.  I

15  do have a license from the State Bar, but it's currently

16  inactive.  I took it inactive when I became a superintendent.

17  Q.  How long have you been an educator?

18  A.  I've been an educator about 16 years.

19  Q.  What positions have you held in the field of education?

20  A.  So I've been a teacher; I have been an assistant

21  superintendent; I've been a deputy superintendent; and I've

22  been a superintendent .

23  Q.  What are your job duties as superintendent at Aledo ISD?

24  A.  So I'm the general -- I'm in the leadership position that

25  oversees all operations of the district from teaching and

1   learning all the way through all of the operations and,

2   ultimately, everything that happens at the district is my

3   responsibility.

4   Q.  Have you been a superintendent at a school district prior

5   to Aledo ISD?

6   A.  I have.

7   Q.  As the leader of the district, do you ever receive

8   criticism from community members or parents?

9   A.  Yes.

10  Q.  What do you do about criticism that runs to your level?

11  A.  So sometimes -- Sometimes it's because we haven't

12  communicated something well.  So if someone brings me some

13  criticism, I might say, do we -- you know, do we need to get

14  in touch with them?  Have we not communicated well?  They are

15  having a misunderstanding of something we've done.  Sometimes

16  we don't do anything, which is probably most frequent with

17  social media.  We -- If we feel like there's a question that's

18  hanging out there that's really -- that is a very legitimate

19  question, it's not -- it's not rhetorical, then we might

20  answer it on social media, but with social media, the -- the

21  criticism is frequent.  It's been incredibly frequent, of

22  course, with COVID-19.  It is just part of this job.  It's --

23  it's -- it's expected.  So it is -- it -- Very seldom do I

24  even know about it, but when I do it -- we look to see if

25  there's something that we should do to respond to it for --

1    for the benefit, typically, of the poster but, typically, we

2    don't do anything.

3    Q.  Do you issue a criminal trespass warning if someone is

4    critical of a school official?

5    A.  No, not unless there's some other reason to issue that

6    critical trespass warning.

7    Q.  Have you been personally targeted by criticism by parents

8    or community members?

9    A.  I'm certain, yes.

10   Q.  On multiple occasions?

11   A.  Yes.  I mean, every -- All the years that I've been doing

12   this, absolutely, positively.

13   Q.  Have you issued a criminal trespass warning to any of

14   those people?

15   A.  I have not.

16   Q.  Would you issue a criminal trespass warning for criticism

17   of a school official?

18   A.  I would not.

19   Q.  You said that when you read Exhibit No. 1, Defendant's

20   Exhibit No. 1 in the small notebook, it didn't even cross your

21   mind that that was criticism of a school official at that

22   time.  Did I understand that?

23   A.  Right.  Correct.

24   Q.  Explain what you meant by that and how you did read

25   Exhibit No. 1.

1    A.   So what I meant was when I saw this post I was incredibly

2    alarmed by the discussion of school shootings and specifically

3    at our schools.  I, honestly, didn't even -- I mean, I know it

4    says that the school administration keeps schooling to

5    parents.  That was obviously relevant to the fact that I

6    believed that this parent thought he was being bullied and

7    that he thought that we were bullying him.  So I noticed that

8    that word was used, the "administration" word.  But, to me,

9    the -- the light shown on this post because of the discussion

10   of mass school shootings and it being specifically targeted to

11   our schools.

12   Q.   So how did you read that as being specifically targeted or

13   being a threat?

14   A.   He says will it happen here in Aledo if this school

15   administration keeps bullying the parents.  So it's very

16   specific about our parents, about our school, and actually

17   mentions our school district name.

18   Q.   You told Mr. Dunleavy that it was everything, including

19   the context leading up to Exhibit No. 1 that led you to think

20   there was a threat.  Will you explain what the context was and

21   why you thought that there was a true threat to an individual

22   or group of individuals?

23   A.   It was related to the -- Over a period of time, Mr. Cain

24   exhibited behavior and engaged in posts that show he was

25   targeting a specific child and specifically that child's

1   mother.  That was very clear in the posts.  I will say, I -- I

2   knew that ahead of time.  I also knew that there were -- there

3   was at least the one person responding to his posts that we

4   could see that wasn't pulled offline that was targeting

5   violence to the child and the child's parents and so that

6   was -- that really bothered me.  And so all of this

7   together -- In addition, he went to the school and he

8   videotaped the receptionist and other children, apparently,

9   but in -- in the conversation with the receptionist it was

10   much about what would happen and it was all related to the

11   discipline and the other student who's a 12 or 13 year old 7th

12   grader and that alarmed me.  So, over time, he showed that he

13   was incredibly angry.  I also knew that Mr. Collie -- that

14   Chief Collie had gone and spoken to him about this and so had

15   talked to him to try to reason with him about his continued

16   anger targeted to this child and his family, particularly his

17   mother, and so that alarmed me, too, that by the time this

18   happened that conversation had already happened with Chief

19   Collie and Mr. Cain and so that he thought it was appropriate

20   to -- to speak of mass school shootings in Aledo caused me

21   to -- to believe that to be a very threatening circumstance to

22   our district.  And as I mentioned before, I was incredibly

23   concerned about the football game that night and I -- and I

24   did believe that he had the propensity and potentially the

25   intent to -- to engage in violent behavior at that football

1   game, particularly with respect to these parents if he

2   couldn't get to the student, because the student was on the

3   field, that potentially the parents that -- a football game is

4   a very uncontrolled environment, as we all know, people are

5   coming and going, and I believe it's my responsibility as the

6   superintendent to, if I hear something that might cause me to

7   be able to avert an act of violence that could endanger

8   specific people in this instance but also bystanders,

9   potentially children, maybe even our students who are there to

10  watch the game and parents, I've never want to look back and

11  think I knew that and I let that happen and now I'm dealing

12  with mass devastation, potential death, and injury and I knew

13  something and I could have done something about it to keep

14  that from happening.

15  Q.  Why did you think Exhibit No. 1 was the culminating factor

16  that led you to the conclusion there was a true threat against

17  a specific person or group of people?

18  A.  I believed that this was the -- it really was how violent

19  this was, that he was discussing mass school shootings,

20  especially in the context of, you know, we -- I had gone to

21  hear the Santa Fe superintendent speak probably the summer

22  before this happened and so in the context of school shootings

23  being a real -- a real threat for us, we take it incredibly

24  seriously.  His discussion of mass school shootings

25  potentially on our campus was just -- it -- it pushed it over

1    the edge for me and I didn't feel like it was going to be a

2    safe environment, particularly for that game that night but

3    potentially in the future as well.

4    Q.  Why did you think it was not going to be a safe

5    environment that very night and potentially into the future?

6    A.  That very night had a lot to do with the situation that he

7    was upset about and he had showed that he was increasingly

8    more and more upset about it, and as I mentioned, Chief Collie

9    had spoken with me about it the night before, but even that

10   didn't seem to work; kind of that reasoning with him.  So I

11   was alarmed by his level of anger and that he was continuing

12   to express it.  This was going to be a football game.  This

13   was going to be a 7th grade -- these were going to be 7th

14   grade football games in Everman, not even on our property, and

15   I knew that he would be there, that he wanted to go.  Football

16   was incredibly important to him, much of the back story of

17   this is wrapped up in football, and I also knew that the other

18   parents, the other student was a football player.  I knew that

19   likely his parents were going to be there.  His parents had

20   obviously expressed concern to us about that game specifically

21   and so I just thought that it was a real -- it was a recipe

22   for that anger that he had, his potential -- his opportunity

23   to carry a gun, if he wanted to, or to cause some other kind

24   of violent altercation.  I thought it seemed very highly

25   likely at that game because he was so upset and then -- and

1    then found -- and then even went to -- started to discuss

2    school shootings at our schools.

3           THE COURT:  Okay.  Let me stop you there.  Why don't

4    we take about an hour break and then we will come back at one

5    o'clock.

6       (Recess.)

7    BY MS. ROBINSON:

8    Q.  Dr. Bohn, we were talking about Defendant's Exhibit No. 1

9    in the smaller notebook, not an isolated post or communication

10   from Mr. Cain, but being in the context of many more things

11   that had occurred.  If you look at Exhibits 2 and 3.  Do

12   Exhibits 2 and 3 reflect the context about which you were

13   speaking?

14   A.  In general, yes.

15   Q.  Looking at Exhibit 2 on page 153, Defendant's 153, where

16   another individual posted back to Chad Cain:  To meet the

17   bully after school, bend him off, and give him -- apologies

18   for profanity -- ass whooping he needs, and his parents

19   interfere give them -- apologies for the profanity -- ass

20   whopping as well.  Then posted explanation point.  Why did

21   that particular e-mail, in your opinion, reflect on Chad Cain?

22   A.  So that post --

23   Q.  Excuse me.  That post.

24   A.  Sorry.  Yeah.

25   Q.  If I might correct my question.  Why did that social media

 1    post back to Chad Cain, following one of his posts, reflect in
 2    your mind and play into the context of what was happening with
 3    Chad Cain?
 4    A.  So that post really reflects a -- I don't think it's a
 5    reasonable response, but it is evidence of a response from
 6    someone who, too, the -- to the post that Mr. Cain was
 7    posting, and so, obviously, it's discussing violence.  Is it
 8    specific about the child, the 13 -- 12-13 year old 7th grader
 9    and his parents, and so it was very specific about -- I mean,
10    it just -- it just mirrored that Mr. Cain had been talking
11    very specifically about this particular child and the family
12    and -- and it added to the environment.
13    Q.  Did Mr. Cain in any way disagree with that post?
14    A.  Not that I know of.
15    Q.  Did he ask the poster to remove those comments?
16    A.  Not that I know of.
17    Q.  Did he say anything about, Hey, don't misread my posts.
18    I'm not really advocating for violence against this 7th grade
19    middle school student and his parent?
20    A.  Not that I know of.
21    Q.  Did he say, I'm not specifically targeting them and I'm
22    not going to go out there and give them the whooping he
23    referenced in your post in response to mine?
24    A.  Not that I know of.
25    Q.  Was this one of the posts that was reported to you as

1    concerning individuals?

2    A.  I do remember this one specifically.

3    Q.  If you look at the following page 155, was that one of the

4    posts in which Chad Cain included the 7th grade middle

5    student's name?

6    A.  Yes.  It looks like it.

7    Q.  And he had removed the name and then posted it again,

8    according to his own posts?  If you'll look at the --

9    A.  Given what he says, yes.  Blank is a name my son mentioned

10   to me and that name is nowhere in this post.

11   Q.  But it had been in other posts; correct?

12   A.  I'm certain that it was.  I can't see them in front of me,

13   but I think that's what this was all about.

14   Q.  And if you look at the response to him posting the name

15   yet again, what did the individual below say in response to

16   his post?

17   A.  Looks likes Joe Ann Speers says, He posted the name again.

18   He should be banned.

19   Q.  If you look at page 161 where Mr. Cain posted that the

20   Cowboys lost and Aledo still had him in *Facebook* jail with all

21   of these smiling to the point of tears emojis, how did that

22   concern you?

23   A.  I was very concerned about this.  I actually put this in

24   my statement to the Fort Worth Police Department investigator

25   who asked me to write a statement.  I -- I don't think school

1   violence is funny.  To me, what this showed after the fact of

2   us issuing the criminal trespass warning is that Mr. Cain

3   thinks this is funny and I thought his -- I thought his

4   targeting a child was very serious, especially for a police

5   officer, not enough to issue a criminal trespass warning, but

6   then his posting about school shootings and if they would

7   happen in Aledo was not funny and I don't find anything funny

8   about any of this.  I take it incredibly seriously and all of

9   these emojis caused me to believe that he thought this was

10  somehow funny, a fun exercise, or something like that, and

11  that he wasn't taking seriously his discussion of violence to

12  our schools.

13  Q.  Is Aledo ISD the entity that banned Mr. Cain's *Facebook*

14  posts?

15  A.  No.  We don't have any control over *Facebook* posts.  We

16  would never do that, we can't do that lawfully, and we just,

17  honestly, don't have the opportunity or authority to do that.

18  Q.  If you look at Defendant's Exhibit 3.  Are those e-mail

19  communications and copies of Mr. Cain's posts some of the

20  communications that were sent to you and other staff members

21  complaining about Mr. Cain's actions saying they were afraid

22  and that they thought there could be violence?

23  A.  In general, yes; without me looking at every single one of

24  them.

25  Q.  Did you speak with any of the individuals who were

1    concerned or had fears?

2    A.  I -- I didn't know any of -- No.  I didn't know any of

3    these people.  And only -- The only correspondence I had with

4    them was -- were reply e-mails.  I -- I don't think I even had

5    a phone conversation with one of these folks.  But I certainly

6    had not talked to them ahead of -- I mean -- The answer is no.

7    I didn't speak with them.  I did reply to some of them in

8    e-mails, I think.

9    Q.  Were you the recipient of some of those e-mails and

10   communicated with them in e-mail format or otherwise?

11   A.  Yes.  I was the recipient of some of them directly from

12   the concerned community member or parent and then some of them

13   I received after they had been sent in to another staff

14   member.

15   Q.  Did the other staff members bring some of those to your

16   attention as well?

17   A.  They did.  So some of them, I -- I can't remember exactly

18   how I got all of the information, but some of them I know I

19   received an e-mail.  I can see that.  I remember those

20   e-mails.  I received -- We have a Bearcat Watch Tip Line, so I

21   received a Bearcat Watch tip that went directly to me.  I saw

22   that one.  I definitely saw on that day, the 24th, a couple of

23   other e-mails, and they are in the record and we can talk

24   about them, if that's relevant.  And then I also just got

25   information from Mandy Musselwhite, who's the Aledo Middle

1  School principle, about -- students were kind of saying things

2  to her about it.  I can't be specific about what they were,

3  but it definitely was a discussion on campus and then she was

4  also hearing from parents, that they had been calling her, and

5  that she had received some e-mails, too.

6  Q.  Did other individuals, in addition to Mandy Musselwhite,

7  the principal, report to you that they had received concerns

8  or statements regarding fear of potential violence?

9  A.  Yes.  She called me and probably when McKinney, who's our

10 deputy superintendent -- I mean, I know that she was copied on

11 an e-mail that was sent to Mr. -- to Chief Collie also.  So

12 Chief Collie gave me some information about people -- for that

13 he had been hearing concerns from other individuals.

14 Q.  Did any of the people who reported to you say, Hey, I know

15 that we're hearing concerns and fears about Mr. Cain

16 potentially engaging in violence, but I don't think we need to

17 do anything about it because he's probably not serious and

18 it's probably not going to happen or that no action was

19 warranted under the circumstances?

20 A.  No.  In fact, they expressed significant concern.  Some of

21 them, I have to go back and read them specifically, but some

22 of them asked us to keep a eye on them.  Some of them asked us

23 what are you doing about this.  I had one parent even after

24 the CPW, it's in the record, where she followed up with me and

25 she said I need you to confirm that the police are involved in

1  this.  So they expressed concern.  Not one of them said just

2  let me know but don't worry about it.  They all expected that

3  we would do something to keep our school safe because they

4  expressed very specifically fear for their own children on

5  campus and their activities.

6  Q.  Did you think those concerns and fear for their own

7  children on campus were warranted under the circumstances?

8  A.  I did, because I had the same fears, same concerns.

9  Q.  And you also thought that it was a true threat of

10  potential violence?

11  A.  I did think it was a true threat of potential violence.

12  Q.  In addiction to the 7th grade middle school boy who was

13  engaged in the altercation with his son and that boy's

14  parents, did you think there was potential for violence

15  against others?

16  A.  I did.  I did.

17  Q.  Why did you think that?

18  A.  Well, it was -- This specifically was related to the

19  football game and I was just -- I would imagine in my mind

20  what might play out at the football if there were an

21  altercation and there were people around and people are

22  walking and it's very uncontrolled and so that specifically

23  concerned me that there might be bystanders or there's an

24  altercation and other people choose to get involved and that

25  was something that was a -- of a significant concern to me and

1   I thought that in that uncontrolled environment that was a --

2   especially concerning and then with just sort of unfettered

3   access that he has to our campuses as a police officer, he

4   could be in uniform, certainly could carry a gun any time he

5   wanted to.  That caused me another level of concern.

6   Obviously, he's very well trained with firearms and ammunition

7   because of the jobs that he does and so that -- that added to

8   the level of concern.

9   Q.  Do you think in this day and age that it is warranted that

10  school superintendents be concerned about the potential and

11  even the likelihood of mass school shootings?

12  A.  Certainly.  And I take it as my responsibility to do

13  anything I can to keep that from happening and sometimes

14  that's out of our control.  But when we have a level of

15  control over something that we perceive to be, with our

16  experience and with the entirety of the situation, a real

17  threat to the safety of our facilities, of our students,

18  parents, staff, and other community members, it's definitely

19  our obligation to do that.  I also believe that's the

20  expectation of my community.  My community would expect no

21  less of me than to try to keep our facilities, kids, staff,

22  parents, and community as safe as I possibly can.  It's

23  certainly the expectation of my bosses, the school board, and

24  so all of that combined, you know, requires me and all

25  superintendents to make sure that that's our absolute number

 1    one priority, bar none.  It has to be.  Especially -- And with

 2    COVID I think that the -- the fear of school shootings has

 3    waned a little bit because we just simply haven't had any or

 4    many because schools have been closed and kids aren't there

 5    and so the opportunity for it to happen isn't there, but it's

 6    incredibly real, and for somebody like me, like I said, I had

 7    heard prior to this the Santa Fe ISD superintendent talking

 8    about the aftermath of that situation.  It's incredibly real

 9    for us, it's an incredibly significant situation, and if we

10    get information, from my perspective as a leader and as --

11    responsible for every single thing that happens at our

12    schools, if I take information that I thought that I believe

13    is a true threat that, in fact, others are objectively

14    agreeing with me that it's a true threat and I don't do

15    anything about it, I think that is basically a dereliction of

16    my duty.  It's my responsibility to take that action.

17    Q.  When you talk about speaking with the Santa Fe ISD

18    superintendent, you are talking about the superintendent of

19    the Santa Fe, Texas, or the Santa Fe ISD in Texas where there

20    was a school shooting?

21    A.  Yes, ma'am.

22    Q.  And that's just one of the mass school shootings, but that

23    was one here in Texas?

24    A.  Yes, ma'am.  Very close to home.

25    Q.  If you look at Exhibit 2, Defendant's, page 160.  One of

1    the individuals who responded to Mr. Cain's post about mass

2    school shootings asked:  Have you contacted Dr. Bohn.  So even

3    other people were suggesting that Mr. Cain contact you.  Did

4    Mr. Cain contact you?

5    A.  He did not.

6    Q.  Did he contact you after the criminal trespass warning was

7    issued?

8    A.  He has not.

9    Q.  If you look at Exhibit 18, the criminal trespass warning

10   itself, it specifically mentioned that meetings could be

11   scheduled through administrators; correct?

12   A.  It does.

13   Q.  Did Mr. Cain attempt to schedule a meeting through an

14   administrator to talk to you about the fact that he wasn't

15   really going to go up to the football game and specifically

16   target by shooting or other type of violence either the middle

17   school student or his parents or other individuals?

18   A.  He did not; hasn't to this day.

19   Q.  Did Mr. Cain press the Ask Student button where

20   communications go straight to you to say, Hey, let talk about

21   this.  I think there has been a misunderstanding?

22   A.  He did not.

23   Q.  During his grievance proceedings did Mr. Cain say, I am

24   not going to engage in violence.  I think that has been

25   misunderstood.  I wasn't threatening anyone?

1    A.   He never did and neither did his lawyer.

2    Q.   Did he say anything about that?

3    A.   Never.

4    Q.   When he went to the first school board meeting that he

5    attended after the criminal trespass warning was issued, did

6    Mr. Cain say anything about not intending to engage in

7    violence and target this boy, his parents, or anyone else?

8    A.   He did not.   He spoke in public comment to the full school

9    board and I was physically present and I -- of course, I was

10   physically present in the grievance before the school board,

11   too, and he never mentioned that.

12   Q.   What was Mr. Cain's demeanor at that school board meeting?

13   A.   He was upset.   He appeared to be agitated, from my

14   perspective.   He was agitated and he didn't ever -- ever speak

15   to not meaning for this to be a threat or that we

16   misinterpreted what he was doing or anything to that effect at

17   all.

18   Q.   When he went to the second school board meeting at which

19   he and his attorney were present, did Mr. Cain say anything

20   about not intending to engage in violence against that middle

21   school student, his parents, or anyone else?

22   A.   Never.

23   Q.   Did he say anything about the fact that he wasn't trying

24   to threat anyone?

25   A.   No.

1  Q.  Did he say anything about the fact that he wasn't going to

2  engage in violence?

3  A.  No.

4  Q.  Did he have an opportunity to say anything he wanted

5  during the grievance proceeding with Lynn McKinney?

6  A.  Yes.

7  Q.  Similarly, did Mr. Cain have an opportunity to say

8  anything he wanted during the first school board meeting?

9  A.  He did.  He had three minutes to say anything he wanted to

10  say.

11  Q.  During the second school board meeting Mr. Cain attended

12  at which there was an appeal of his grievance, did Mr. Cain

13  have an opportunity to say anything he wanted?

14  A.  He did.  He and his representative were allotted time and

15  he didn't take that opportunity.

16      THE COURT:  Can I just ask you:  If the statements

17  are a true threat, it really doesn't matter whether he says

18  something or didn't say something.

19      MS. ROBINSON:  That's --

20      THE COURT:  And if they're not, if they are -- If the

21  statements are protected speech, it really doesn't matter

22  whether he said something or didn't say something.  Is that

23  not correct?

24      MS. ROBINSON:  Well, Your Honor, I think it

25  depends --

 1          THE COURT:  Isn't that issue?  I mean, the issue here
 2     is:  Is he being banned or trespassed as a result of his
 3     protected speech and so whether he complains that you're
 4     violating my First Amendment or complains you're
 5     misinterpreting my speech, I don't mean to shoot up the Aledo
 6     School District, doesn't really matter if the speech is
 7     protected.
 8          MS. ROBINSON:  However, in deciding whether the
 9     speech is protected, Your Honor, we look at whether a
10     reasonable person and then at also reasonable school officials
11     would believe that he is making a true threat --
12          THE COURT:  Correct.
13          MS. ROBINSON:  -- playing into that --
14          THE COURT:  And you ask her and she has testified
15     exhaustively as to why she perceived it and what she perceives
16     her duty to be to the school districts, given her interaction
17     with the Santa Fe School District and Everman School District;
18     or whatever.  So I understand that.  But I don't understand
19     what the relevance is that the Plaintiff in this case came in
20     and said, Hey, you are misinterpreting me.
21          MS. ROBINSON:  Well, or didn't say that.
22          THE COURT:  Or didn't say that.  Correct.
23          MS. ROBINSON:  It goes to two issues, Your Honor:
24     Number one, is the reasonable -- reasonableness of the
25     conclusion that it was a true threat and violence was

1  anticipated; and, number two, because he didn't say you are

2  misinterpreting and give us cause, the second reason is

3  completely relevant because it goes to the issue regarding the

4  preliminary injunction itself, which we are here on today, and

5  whether we should be enjoined from enforcing that and whether

6  we should be enjoined from enforcing the criminal trespass

7  warning in any other way which they argued in their reply even

8  though it wasn't in their motion, the motion --

9          THE COURT:  Why is it pertinent?  I mean, I don't

10  need this long explanation.  Either it's protected or it's not

11  protected.  Your witness is saying it's not protected because

12  for all the reasons she has testified to she took it to be a

13  true threat.  And it doesn't matter if it's a true threat --

14  if she took it to be a true threat and if I conclude she's

15  right, it doesn't matter how often he came up to the school

16  and said, Hey, you are misinterpreting me, if it's a true

17  threat.

18          MS. ROBINSON:  If he has said that.  But it goes to

19  the issue of reasonableness of the conclusion that it's a true

20  threat and, of course, one of the elements they have to show

21  is that it not only was a true threat or wasn't a true threat

22  in their opinion the criminal trespass warning should be

23  rescinded, it also goes to the issue, Your Honor, of the

24  micromanagement of school officials.  And as you know, as we

25  briefed in our response to the motion for preliminary

 1    injunction, this Court does not sit as a super administrator

 2    to make it's own rulings.

 3         THE COURT:  Well, let me stop you there, because I

 4    have no desire to micromanage them.  Zero desire to do that.

 5    My only desire is to hear evidence to determine whether their

 6    conclusion that this was a sufficient enough threat is

 7    unprotected by the First Amendment.  That's what I think the

 8    issue is.  I told you on the last hearing, and that's why I

 9    didn't like that he's going through all those other elements.

10    It seems to me that if this speech is protected threat, the

11    other temporary injunction elements weigh in his favor.  I

12    believe that today.  So I don't know why we're spending time

13    on that.  I don't know why we're spending time on anything

14    other than evidence related to whether he expressed an intent

15    to harm a specific group or individual.

16         MS. ROBINSON:  And I'll certainly move on, Your

17    Honor.  But just to conclude the conversation in response to

18    your inquiry in that regard, it's because it does go to the

19    reasonableness of the conclusion that it was a true threat,

20    not just in a vacuum, but looking at everything at a time when

21    we could have withdrawn it from the trespass point earlier had

22    their been some expression and therefore avoided all of --

23         THE COURT:  Okay.  Let me stop you.  You are going to

24    wear me out with all your talk.  Let's do this:  Can we

25    stipulate that he's never done that.

1          MR. DUNLEAVY:  Yes.

2          MS. ROBINSON:  We can.

3          THE COURT:  He's never gone and made this

4    deescalation statement, because your officer testified to that

5    and she, essentially, has testified to it.  You feel the need

6    to walk her through, as you say, at each individual level.

7    Why don't we just cut to the chase and say he never came out

8    and said you guys are misinterpreting my posts.  Because he

9    didn't.  He feels he doesn't need to.  But, regardless of his

10   motivation, did he ever say you guys are misinterpreting my

11   posts.

12         MR. DUNLEAVY:  But, Your Honor, in that stipulation

13   we want to stipulate that we have repeatedly gone and asked to

14   speak to Ms. Bohn.

15         THE COURT:  It's in there.  I've got it all.  Okay.

16   So we've got a stipulation.  So ask your next question.

17         MS. ROBINSON:  And, Your Honor, this is the last

18   question I have regarding it.

19   BY MS. ROBINSON:

20   Q.  But if you will look at Defendant's Exhibit 2, page 147.

21   He stated in his post to one of the complaining parents that

22   he has no excuses.  He made a mistake.  Did he ever

23   communicate anything like that to the school district?

24   A.  No.

25   Q.  Dr. Bohn, when you were making the decision about whether

1    to direct Chief Collie to issue the criminal trespass warning,

2    on what side did you want to err if there was any even implied

3    disagreement about how the school district should respond to

4    all of these concerns, posts, and e-mails that we see in

5    Exhibits 1, 2, and 3.

6    A.  As I mentioned before, I believed I had information that

7    constituted a true, real threat to -- of violence against

8    particular people, against our students, staff, parents,

9    community in general, and so I want to err on the side of

10   keeping that from happening, if I believe that I have

11   information that that's likely to happen and I believe I did.

12   So I never want to look back and I've got dead students,

13   injured student, parents, parents in the hospital, kids in the

14   hospital, a massive destruction that's violent which I knew

15   and I -- I think that's -- so many others expressed concern

16   and it was the same concern that I was having and so, to me,

17   at that time it would have been unreasonable to do nothing.

18   It would have been unreasonable to let that football game,

19   particularly, and events after that within his level of anger

20   and his targeting of this particular kid and his family to

21   proceed as normal, particularly because he really as a police

22   officer has a special right of access pretty much anywhere.

23           THE COURT:  And so let me just ask you.

24           THE WITNESS:  Sure.

25           THE COURT:  When you've made the decision to issue

 1    the criminal trespass warning, at that point you determined

 2    that it was a true threat?

 3            THE WITNESS:  Absolutely.

 4            THE COURT:  So it doesn't matter what happened

 5    afterwards, at least at that point.  You determined it to be a

 6    true threat at that moment and banned him from the property?

 7            THE WITNESS:  Absolutely I did, but what happened

 8    past that was related to whether we would have pulled the CTW

 9    back or not.

10            THE COURT:  I understand.

11            THE WITNESS:  So, yeah.

12            THE COURT:  Okay.

13    BY MS. ROBINSON:

14    Q.  Even though you avoided disruption and potential violence

15    at the football game that night by issuance of the criminal

16    trespass warning, had there been prior disruption on campus?

17    A.  So he had been -- It hadn't be violent, but he had been

18    physically present, he had video recorded some students.  He

19    had been -- He had surreptitiously video recorded.  So that

20    was somewhat disruptive.  A lot of it was disruptive because

21    he posted it on *Facebook* and parents were very concerned about

22    that.  And so that's the extent to the disruption that he had

23    engaged in on campus.

24    Q.  Was there inappropriate questioning of the middle school

25    receptionist or comments to middle school receptionist?

A.   Yes.  I mean, he was asking questions related to a
situation involving another student, this particular child he
was targeting, and was asking, you know, how that situation
should be handled.  It was inappropriate because he was
talking about another child.  It was also inappropriate
because the receptionist is unable to answer questions related
to the discipline of another child and so she was -- she was
engaging him, but -- but telling him that she didn't know and
he was continuing to press her and then, of course -- and then
posted her -- posted that interaction on *Facebook*.  And also,
while it's not illegal, it -- it's -- it's not my preference
that adults come on campus and video record students on campus
and then post that.  Video record at all.
Q.   And, certainly, it would be your preference that video
recordings of other minor students not be posted on social
media, as Mr. Cain did?
A.   It would be in the context that he was doing it,
certainly.  I mean, if you're a parent and you're videotaping
the dance competition for something, you know -- you know,
that probably happens.  I don't know.  But in this instance,
this -- this was objectively very concerning to the parents of
the kids who were posted.
Q.   Does the fact that the school district is authorized to
disclose directory information, including names of individuals
or students who receive awards and honors also mean the school

1    district is entitled to release information regarding

2    disciplinary consequences or altercations on school district

3    campuses?

4    A.  No.  I mean, we are -- They're entirely different things

5    that -- You cannot compare the two.  We are -- Both state and

6    federal laws prohibit us from disclosing confidential or just

7    information about students and educational records and said

8    discipline records would be those.  Certainly, that's

9    prohibited.  It's also just unethical.  It is unreasonable,

10   unethical, and absolutely unacceptable.  With respect to the

11   directory information of students for celebrations, it's all

12   stipulated in --

13          THE COURT:  Let me stop you there.  I -- I think I

14   follow the point.  Go ahead and ask your next question.

15   BY MS. ROBINSON:

16   Q.  So the fact that Mr. Dunleavy showed you Plaintiff's

17   Exhibits 23 and 24 with student names and images, does that

18   have any relationship to whether the school district or anyone

19   else could release information about the student involved in

20   the altercation with Mr. Cain's son or disciplinary records or

21   educational information regarding that child?

22   A.  I don't see the relevance of it at all.  It's a totally

23   different consideration --

24          THE COURT:  Yes.  Let me -- Let's go to another

25   subject.  I follow this.

```
1   BY MS. ROBINSON:

2   Q.  Tell us about the dropoff and pickup keys left at the

3   school, Dr. Bohn.

4   A.  So we have drop off --

5           THE COURT:  Let me just ask you:  How does this

6   relate to the decision to ban or prohibit him from getting on

7   the home campus?  Right?  What does this go to.  Why don't you

8   just tell me that.

9           MS. ROBINSON:  Although it was not in his motion for

10  preliminary injunction when he said he has to have a

11  preliminary injunction to attend a football game at the

12  hearing on Friday, Mr. Dunleavy represented that, no, it's not

13  just football games, it's also pick up and drop off.

14          THE COURT:  Right.  So let me stop you there.  Let me

15  just stop you there.  And so tell me if I'm not looking at

16  this correctly.  If they -- If the school unlawfully banned

17  him because of speech, does it matter what they specifically

18  are not letting him do?  In other words, if they are treating

19  him differently from any other student because of the speech,

20  does it matter how they are treating him differently?

21          MS. ROBINSON:  Well, it's not being treated

22  differently, Your Honor, because there are already two --

23          THE COURT:  Hold on.  Hold on.  Because your earlier

24  witness said, or maybe I asked this witness, but they said

25  that the two cue lines are optional.  That the parents can
```

1   choose to do one versus the other and he cannot.

2        MS. ROBINSON:  But, Your Honor, he's still not being

3   treated differently in that he's still in the cue line to

4   which other people --

5        THE COURT:  He is not given the choice.  Is he being

6   treated differently as to who has the -- who can make the

7   choice on how they can drop off his son?  Is he at least being

8   treated differently that way?

9        MS. ROBINSON:  Regarding the choice, other than other

10  people who go in the street cue line all the time --

11       THE COURT:  Other than that.  So tell me what you

12  mean by "other than that."  So he can't choose, but other than

13  not being able to choose, he is treated the same.  Is that

14  your argument?

15       MS. ROBINSON:  Well, other people may be assigned or

16  go to the second cue line without a criminal trespass warning,

17  so it's a division of the lines, Your Honor, even without a

18  criminal trespass warning.  But it also goes to the issue of

19  --

20       THE COURT:  So there are some people -- So they force

21  some people who have no criminal trespass warning to go to the

22  other line and not come on to the school.  That's what you're

23  telling me?

24       MS. ROBINSON:  I would not characterize it as force,

25  Your Honor, but that's the reason I was asking Dr. Bohn --

1          THE COURT:  Let me ask you about this.  Stop.  Is

2     there anyone else, other than Mr. Cain, who cannot choose

3     which line they go to drop off their kids?

4          THE WITNESS:  Not that I know of.

5          THE COURT:  Okay.  Now, that -- That what's the

6     superintendent of the schools says and you disagree with her.

7     So explain how it is you disagree with her.

8          MS. ROBINSON:  No, Your Honor.  That's what I wanted

9     to discuss with her and about the other people --

10         THE COURT:  Well, hold on.  What is there to discuss?

11         MS. ROBINSON:  Your Honor, there are a multitude of

12    other individuals who go in that second cue line, but --

13         THE COURT:  Stop.  Stop.  If they are treating him

14    differently because of his speech, they are not giving him

15    that choice, it doesn't matter why other people who have that

16    choice choose to do it one way or the other.

17         MS. ROBINSON:  Yes, Your Honor.  The only other thing

18    I wanted to mention regarding that is because we have extend

19    an offer to reach all the issues in the preliminary injunction

20    that included his ability to drop off and pick up in the other

21    cue line as -- if he chose and attend those football games,

22    that makes the issues at the preliminary injunction stage for

23    which they sought a preliminary injunction moot.

24         THE COURT:  Right.  If you take the position -- If

25    you take the position that this sort of halfway offer is an

1    acceptable mitigation to violating a person's First Amendment

2    right.  I mean, that's what you are saying; right?  I'm not

3    saying that -- I'm not saying that you have.  I've got to hear

4    the rest of her testimony and his testimony.  But if I

5    conclude that you have violated or you have retaliated against

6    him because of his First Amendment protected speech, you are

7    saying that I should not, even in an injunctive fashion, lift

8    the trespass warning because even if I find that you're

9    infringing on his First Amendment rights, you've given him

10   some way to mitigate infringing on his rights.  Now, is

11   that -- Is that the law?

12          **MS. ROBINSON:**  No, Your Honor.

13          **THE COURT:**  Isn't the law -- isn't the law -- Isn't

14   the law the contrary?  If you are violating someone's first

15   amended rights, even on one occasion, even in a minimal

16   fashion, that you are mostly in most instances committing

17   irreparable harm?  Isn't that the law?

18          **MS. ROBINSON:**  Well, depending on the circumstances,

19   Your Honor, and the delays we discussed the last time --

20          **THE COURT:**  Well, but it's irreparable harm because

21   he can't adequately compensate him; right?  I mean, that's the

22   reason behind those cases.

23          **MS. ROBINSON:**  That, Your Honor, is the reason that

24   the issues at the preliminary injunction we argued were moot

25   in the response because the only relief he seeks as a

1    preliminary matter, not a final trial of the merits, hasn't

2    been offered and that was the other issue that I wanted to

3    relate to the Court through the testimony of Dr. Bohn because

4    the only issue he raised in the motion were attendance at

5    football games, which has been offered, as well as his

6    attorney's representation on Friday that the other issue was

7    pick up and drop off.  Due to COVID procedures, there are no

8    other events that he could attend anyway and even within the

9    criminal trespass warning completely in place --

10        **THE COURT:**  Right.  I'm with you.  I understand what

11   you're saying.  I don't think you understand what I'm saying

12   and -- because what I'm saying is, or at least the way I'm

13   looking at this is, if you are treating him differently, you

14   are singling him out for action based upon the exercise of his

15   First Amendment rights, then it seems to me that irreparable

16   harm, the balancing between the two, and then the balancing of

17   the public right flow to him, as I told you at our last

18   hearing, and that's why I don't understand why you guys are

19   talking about all these other things when it seems to me that

20   the issue is, is it protected or is it not protected.  Now,

21   she has very -- been very articulate as to why she believes

22   they are not -- She didn't opine legally, but basically, she

23   has articulated why she believes it's not protected and I

24   think that's the issue.

25        **MS. ROBINSON:**  I agree, Your Honor, and I understand

1    your position.  I just think that the Court has the

2    discretion, should you choose, to evaluate the issue and

3    that's the reason I raised it and was bringing that up --

4            THE COURT:  Okay.  Well, I think I understand all of

5    that.  So let's just get on with the case and whatever else is

6    pertinent to these -- to the First Amendment issue and then to

7    the injunction factors, let's go ahead and get that out on the

8    record so I can make a decision.

9            MS. ROBINSON:  Yes, Your Honor.

10   BY MS. ROBINSON:

11   Q.  Dr. Bohn, have you rescinded criminal trespass warnings in

12   the past?

13   A.  I have.

14   Q.  Is that true that you've rescinded criminal trespass

15   warnings even if they would have otherwise been in effect,

16   more or less, permanently until rescinded?

17   A.  Yes.

18   Q.  So is the fact that the criminal trespass warning is, in

19   effect, until rescinded of any relevance to whether you would

20   rescind a criminal trespass warning?

21   A.  It's not.

22           MS. ROBINSON:  Pass the witness.

23           MR. DUNLEAVY:  Your Honor, I am mindful of what the

24   Court has said in the last ten minutes.  I have two videos,

25   Your Honor.  I don't --

1          THE COURT:  Of what?

2          MR. DUNLEAVY:  The interaction between Chief Collie

3  and my client and the receptionist that Ms. Bohn has just

4  referred to.  I don't want to play them, but I would like to

5  offer them.  They're videos that came from the Defendants in

6  production.  I would -- I would like the Court to consider

7  them, but I don't --

8          THE COURT:  What do they show?

9          MR. DUNLEAVY:  They show this interaction Ms. Bohn

10 has discussed where she says he was disrupting the

11 receptionist; that he was interrogating the receptionist.  We

12 don't think it shows that.

13         THE COURT:  Okay.  How long is that video?

14         MR. DUNLEAVY:  One of them is three minutes.  One of

15 them is fifteen minutes.

16         THE COURT:  Both of those are the receptionist?  Both

17 video --

18         MR. DUNLEAVY:  I think it's three minutes with the

19 receptionist.

20         THE COURT:  Okay.  Go ahead and play it.

21         MR. DUNLEAVY:  Okay.  Well, I can -- It's not

22 working, Your Honor.  I'm going to move on.

23         THE COURT:  You can put it in evidence and I will

24 listen to it.

25                   __REDIRECT EXAMINATION__

1    BY MR. DUNLEAVY:

2    Q.  Ms. Bohn, other than the one post we've looked at, the

3    *Facebook* post, is there anything in any of the other posts

4    that you have talked about with Ms. Robinson that you say is a

5    true threat?

6    A.  In and of itself, no.  Other than the one post.

7    Q.  Other than the video or the interaction with the

8    receptionist, is there anything else that you're claiming is a

9    disruption?

10   A.  Okay.  Can we clarify on this last question?  So are you

11   saying other than the one exhibit, that is exhibit --

12   Q.  Defendant's Exhibit 1.

13   A.  The school shootings post?

14   Q.  Yes, ma'am.  Defendant's Exhibit 1, Plaintiff's Exhibit 4.

15   A.  Okay.  Yes.  Not in and of itself.

16   Q.  Okay.  Other than the interaction with the receptionist,

17   is there anything you are claiming is a disruption?

18   A.  I think the only thing would be -- but it's minimal.

19   So -- it -- It would just be that when students on campus are

20   talking about threatened violence to the campus, that can be

21   disruptive to the operation of the campus.  That can be

22   significant, but I can't testify how significant that was at

23   that time.

24   Q.  And because of the environment in Texas and the country in

25   September of 2019, you're telling the Court that the mere

1    mention of school shootings, mass shootings, that is kind of

2    the third rail, you can't even say it because people are going

3    to get scared?

4            MS. ROBINSON:  Objection.  Mischaracterization of her

5    testimony.

6            THE COURT:  Overruled.  She can answer.

7    A.  That's not really what I'm saying.

8    Q.  So is mere mention of school shootings or mass shootings,

9    that's not a threat either; agreed?

10   A.  I didn't say that.

11   Q.  I'm asking.  Do you agree mere mentions of school shooting

12   is not a threat?

13   A.  How would he be mentioning that.  It would depend.

14   Q.  In the post, ma'am.

15   A.  Oh, in the post?  No, I think it's a threat in his post;

16   correct.  Mass school shootings.

17           MR. DUNLEAVY:  Pass the witness.

18                    **RECROSS EXAMINATION**

19   BY MS. ROBINSON:

20   Q.  Dr. Bohn, explain what the context was in which you felt

21   the mass school shootings post was a true threat?

22   A.  Sure.  So it was related to everything that had happened

23   up to then, that he had -- his anger had grown, it had been

24   very specific toward a 13 year old -- 12/13 year old and his

25   family and that he was asserting that he was being bullied by

1    the administration, that mass school shootings are caused by

2    bulling and so he was, in my mind, making a link.  He also

3    very specifically listed Aledo and he asked in a rhetorical

4    fashion, in my opinion, is this school -- is this going to

5    happen in Aledo.  He tied school shootings, mass school

6    shootings, to our schools and with everything else that had

7    been occurring I believed him to be a danger.

8    Q.  Did you take Exhibit No. 1, Defendant's Exhibit No. 1, the

9    mass school shootings post, in a vacuum and look at it in an

10   isolated fashion and issue the criminal trespass warning or

11   direct it to be issued based solely on that post?

12   A.  Most likely, no.  It was -- it was -- There was so much

13   more going on and it was -- It wasn't just general.  It was

14   specific.  It was about a very specific situation.  It was

15   very specific to football.  It was a very specific child.  It

16   was a very specific teacher, some of our staff members.  So I

17   thought it was incredibly, narrowly tailored to our situation,

18   to Aledo, to a student, to his mother in particular who,

19   obviously, was a staff member of ours.  So, in and of itself,

20   if it had been someone else who just posted something about

21   mass school shootings, didn't tie it to Aledo, didn't have the

22   background of expressing his ire over-and-over again about a

23   particular kid and his parents, if there wasn't a football

24   situation involved in all of this, then -- you know, all of

25   that together, if that hadn't happened, I can't say for

1    certain that mostly likely I wouldn't have seen this like an

2    actual true threat, something that could actually happen on

3    our campuses, that violence could happen at a football game or

4    on our campus.  You know, the other thing is, I remember

5    specifically thinking about this because we had a conversation

6    because Mr. Dunleavy wanted to be able to pick up his child

7    and he demanded that we pick up and drop off and we encouraged

8    him to do that.  I mean, I specifically thought about what if

9    he runs into those parents in that pick up or drop off line.

10   What might happen right there or what if he sees the other

11   child walking out to the parent's car.  And I really believed

12   that because he was so angry and continued to express that

13   anger that we had a really serious situation at drop off and

14   pick up, potentially.

15   Q.  The other posts that are contained in Defendant's Exhibits

16   2 and 3 that occurred prior to the mass school shootings post,

17   did they link you to issue the criminal trespass at that

18   point?

19   A.  They didn't.  You know, a parent naming another student is

20   not enough to issue a criminal trespass warning.  We don't

21   have any authority over what parents post on *Facebook*.  We

22   don't have any authority to squelch their speech.  We don't.

23   The authority that we have is to make sure that they can't be

24   on our campuses to cause a violent disruption and potentially

25   really harm somebody.  So prior to -- Yeah, he had been saying

1    the kid's name.  He put it all together with the threatening

2    post on the 24th.  It's a really threatening situation.  Prior

3    to that, I wouldn't have issued it.  I think that there's a

4    strong likelihood that if he hadn't -- hadn't posted that --

5    that one on the 24th, unless he had posted something else or

6    taken some other action, which I think he was perfectly

7    capable of doing, we probably wouldn't have issued the -- we

8    wouldn't have issued the criminal trespass warning.  There was

9    nothing else that was causing me to believe that our students,

10   staff, parents, community were in imminent danger at that

11   time.  It wasn't that there wasn't nothing.  There were some

12   things.  But a parent posting a student's name, although I

13   don't like, I like to protect students.  I think they are

14   children and I don't think it's right to target them to their

15   entire community.  It's not something that I can regulate.  I

16   can't regulate what they say.  So, to me, even what I can do

17   and what I think is my responsibility and what I think the

18   community and the board hired me to do is to protect the

19   safety and security of the place, so I can do that and in

20   doing that I'm not -- I'm not stopping the person from

21   speaking, I'm simply stopping the person from being on our

22   campus where they might be able to do violence.

23   Q.  Did you think the mass school shootings post demonstrated

24   that Mr. Cain's anger and propensity to violence was

25   escalating or deescalating?

 1  A.  Certainly escalating.  Certainly.

 2  Q.  Dr. Bohn, did you direct the issuance of a criminal

 3  trespass warning against Chad Cain for any reason other than

 4  you felt he was making a true threat of violence toward an

 5  individual or group of individuals?

 6  A.  No.

 7         MS. ROBINSON:  Pass the witness.

 8         MR. DUNLEAVY:  No questions, Your Honor.  We call

 9  Chad Cain.

10     (Witness sworn.)

11         **CHARLES CHAD CAIN, PLAINTIFF,** was sworn

12              **DIRECT EXAMINATION**

13  BY MR. DUNLEAVY:

14  Q.  Mr. Cain, will you please state your name.

15  A.  Yes, sir.  I'm sorry.  My name is Charles Chad Cain.

16  Q.  Did you make any threats directed at anybody at Aledo ISD?

17  A.  No.

18  Q.  Did you disrupt any Aledo ISD activity?

19  A.  No, sir.

20  Q.  Did you disrupt any Aledo ISD school event?

21  A.  No, sir.

22  Q.  Did you ever take a gun to school?

23  A.  No, sir.  Not that I can recall.

24  Q.  If you took a gun to school, would that have been part of

25  when you were working?

```
 1    A.   It would have been just as I had gotten off work or had to
 2    go to work.
 3    Q.   Do you know what a threat is?
 4    A.   Yes, sir.
 5    Q.   What's a threat?
 6    A.   It's a communication to inflict harm on somebody or some
 7    thing.
 8    Q.   Did you threaten anybody on school property?
 9    A.   No, I did not.
10    Q.   Did you disrupt any activity on school property?
11    A.   No, sir.  I did not.
12    Q.   Were you harmed by the considers warning?
13    A.   Yes, sir.
14    Q.   Is the half remedy or half measure of lifting it
15    yesterday, does that render all of your issues gone?
16    A.   No, sir.
17    Q.   Are you deploying next month to the United States
18    Air Force?
19    A.   Yes, sir.  I am.
20    Q.   Do you want to see your son play football before you
21    leave?
22    A.   I would like to see him play football and watch his
23    practices.
24    Q.   Do you think the First Amendment protects your speech --
25    A.   Yes.
```

1    Q.   -- in this case?

2            MR. DUNLEAVY:   Pass the witness, Your Honor.

3                       CROSS-EXAMINATION

4    BY MS. ROBINSON:

5    Q.   Mr. Cain, why would you admit to a parent who responded to

6    one of your posts that you made a mistake and you had no

7    excuses and not tell the school that you knew that you had

8    made a mistake in escalating these posts and writing about

9    mass school shootings?

10   A.   Can you refer to the post that you are speaking of?

11   Q.   If you look in Defendant's Exhibit notebook which is the

12   before you on --

13           THE COURT:   You are talking about that -- the one

14   post about the whoop ass?

15           MS. ROBINSON:   No, Your Honor.  I'm talking about the

16   one on Defendant's Exhibit 2, page 147, in which you responded

17   to someone that you agreed and then quote, I was just so mad

18   earlier because the information I found out how the school is

19   protecting this kid as a punishment based on his mom and

20   football.  No excuses.  I made a mistake.

21   A.   Ms. Robinson, you know, I know I'm a police officer and

22   I'm a parent as well and --

23           THE COURT:   Well, hold on.  What is the question?

24   Did he make this post or what -- What is the question?

25   BY MS. ROBINSON:

1   Q.  Why would you -- or admit to a parent that you made a

2   mistake and had no excuses when you wouldn't say a word about

3   it to the school district indicating you knew you had made a

4   mistake.

5        THE COURT:  Well, let me just ask this:  Why did you

6   admit to this person here -- the name is blacked out on mine.

7   Why did you admit that had made a mistake?

8        THE WITNESS:  Yes, sir.  I knew that -- Hindsight is

9   20/20.  I knew I made a mistake by listing the child's name

10  whenever the parent asked me who the child was that assaulted

11  my son and I immediately took it out whenever I've realized,

12  hey, I'm going to let --

13       THE COURT:  So the mistake was posting the

14  juvenile -- the juvenile child -- the juvenile's name?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  That's the mistake you are referring to?

17       THE WITNESS:  Yes, sir.  Somebody asked me who the

18  child was and I told them who it was and then I realized, Hey,

19  that's not --

20  BY MS. ROBINSON:

21  Q.  Then if you look at Exhibit 2, page 155.  After you

22  removed the child's name you then promptly reposted the

23  child's name with a post saying this is a name my son

24  mentioned to me; and that name is nowhere in this post;

25  correct?

1    A.  Ma'am, I believe I listed the name twice and the first

2    time I listed his name was on Friday.  The second time I

3    listed his name was on Saturday whenever one of the child's

4    parent's friends was trying to fight me online and calling me

5    names online and I was trying to deescalate the situation and

6    I tell him, Look, I'll pray for him.

7           THE COURT:  So I guess her question is:  If you

8    admitted that posting the juvenile's name was a mistake, why

9    did you subsequently post the juvenile's name.  Is that the

10   question?

11          MS. ROBINSON:  Close enough, Your Honor.

12          THE WITNESS:  Because the -- the parent -- Well,

13   there was a date between and there were many more posts and

14   there was a parent that was calling me names and I was able to

15   verify that it was one of the parents of the kid -- of the

16   juvenile's parents -- one of their friends, that was

17   intentionally trying to get me to say something that I didn't

18   need to say and he was calling me names such as the "P" word,

19   calling my son names.  I bet your son is all this.  So I was

20   trying to deescalate the situation.  Then he started talking

21   about the child and so I thought, Well, you know, if you are

22   going to sit there and talk about the child, then who are we

23   referring to?  Do I need to verify that's who we're talking

24   about?  So --

25          THE COURT:  Okay.

1    BY MS. ROBINSON:

2    Q.  There aren't any posts that you are claiming you received

3    in that regard in Exhibit 2; are there?

4    A.  I'm sorry, ma'am?

5    Q.  These intervening posts that you claim caused you to post

6    the child's name a second time, even though it had initially

7    been deleted, are nowhere in Plaintiff's document production

8    and are certainly not posts that anyone else ever saw

9    introduced, as you can see, in Defendant's Exhibits 2 and 3.

10   Is that correct?

11        MR. DUNLEAVY:  Objection, Your Honor.  Calls for

12   speculation as to what anybody else has.

13        THE COURT:  Okay.  Overruled.  Do you know whether

14   these posts, these intervening posts as you described them,

15   are in either of the exhibit folders?

16        THE WITNESS:  No, sir.

17        THE COURT:  And if you would just project into that

18   microphone, it would help us to hear.  We have the

19   air-conditioning blowing at our ears and it makes it hard to

20   hear.

21        MS. ROBINSON:  Yes, Your Honor.  If it might help, I

22   could remove my mask and perhaps speak into a speaker that

23   hasn't had so many people breathing --

24        THE COURT:  Whatever you're comfortable doing.

25        MS. ROBINSON:  If this speaker also --

```
 1            THE COURT:  Whatever you are comfortable of doing.  I
 2   won't make you do anything you're not comfortable with.
 3   BY MS. ROBINSON:
 4   Q.  Mr. Cain, you are trained in deescalation of violent
 5   behaviors; aren't you, sir?
 6   A.  Yes, ma'am.
 7   Q.  As a matter of fact, as a police officer you are required
 8   to show that you can deescalate behaviors when people are
 9   acting in anger; correct?
10   A.  Yes, ma'am.
11   Q.  And you know that a way to avoid a situation getting out
12   of control and people engaging in violence is to deescalate a
13   situation rather than escalate it; don't you, sir?
14   A.  I would prefer to deescalate something, yes.
15   Q.  But in this case, even though you are receiving negative
16   feedback and individuals who were telling you that your posts
17   were inappropriate, you escalated the behavior and, in fact,
18   made a post regarding mass school shootings, as shown in
19   Defendant's Exhibit No. 1; correct, Mr. Cain?
20   A.  Ma'am, I had -- There were many posts and I -- I had a lot
21   of support on my posts.  The ones that were complaining were
22   the parent's friends that the father worked for and I don't
23   believe -- I was concerned as a parent, as a father of a child
24   that attends that school, I was concerned about what the
25   school had done to my child.  I thought it was very wrong.
```

1    I -- I was concerned for my child's safety.  I was concerned

2    for other parents, their children's safety.  I -- what -- What

3    the school did to my child was not good.  My child was -- he

4    could have -- he could have suffered very -- he could have

5    been injured very, very bad.  Very bad.  And --

6    Q.   The school --

7    A.   -- so, yes, I was concerned about that.

8    Q.   The school district imposed disciplinary consequences on

9    the other student who was involved in the altercation with

10   your son; correct, Mr. Cain?

11   A.   I'm sorry?

12   Q.   The school district imposed disciplinary consequences on

13   the other student; didn't they?

14   A.   That's what they told me.

15   Q.   And you knew -- you were advised that disciplinary

16   consequences had been imposed; correct?

17   A.   That's what they told me.

18   Q.   In addition to posting the minor child's name twice in

19   different posts, you also included witness statements about

20   the investigation the school district conducted before it

21   imposed disciplinary consequences against the other student;

22   correct?

23   A.   Ma'am, the names were redacted and I don't remember when I

24   posted the witness statements.  I just remember that -- The

25   children didn't write statements.  It almost seemed like the

```
 1    statements --
 2              THE COURT:  The question is did you post it?
 3              THE WITNESS:  Yes.
 4              THE COURT:  That was the question.
 5              THE WITNESS:  Yes, ma'am.
 6    BY MS. ROBINSON:
 7    Q.  And you did post those witness statements; correct?
 8    A.  I believe so.  I don't know for sure.  I don't recall.
 9    Q.  Did you ever offer to forego carrying weapons to the
10    school?
11    A.  I'm sorry?
12    Q.  Did you offer to forego or not carry weapons up to the
13    school?
14    A.  No, I wasn't asked to.  As a matter of fact, Chief Collie
15    told me that I could answer calls at the school.
16    Q.  The videos that your attorney attempted to reflect or play
17    earlier were videos you took; correct?
18    A.  It was a video that I took.
19    Q.  And then you edited that as you chose before you posted
20    it; correct?
21    A.  Negative, ma'am.
22    Q.  You posted all of the portion you took?
23    A.  Yes, ma'am.
24    Q.  So in your admissions, responses to admissions, in which
25    you were asked whether you recorded either audio or video
```

1    recordings of meetings, communications, or conversations with
2    district employees related to allegations in this matter, you
3    denied that you had made the recording; correct?
4    A.   Ma'am, I don't know what my attorney gave you.
5            MS. ROBINSON:  May I approach, Your Honor?
6            THE COURT:  Yes.
7            MS. ROBINSON:  May I provide a copy for the Court as
8    well, Your Honor?
9    BY MS. ROBINSON:
10   Q.   Mr. Cain, do you have in front of you Plaintiff's
11   Objections and Responses to Request For Admissions from the
12   Defendant Aledo ISD?
13   A.   Yes, ma'am.
14   Q.   Will you please turn to page 4.  Request for admission
15   No. 2.
16   A.   Yes, ma'am.
17   Q.   Do you see the request for admission asking whether you,
18   meaning Mr. Cain, recorded parenthesis (audio or video
19   recordings) close parenthesis, meetings or communications or
20   conversations with district employees related to your
21   allegation in this matter.  And the response was you deny that
22   you had engaged in that behavior.  Did I read that correctly?
23   A.   Ma'am, I believe he is denying answering the question.
24   Q.   Well, first, sir, did I read correctly that you denied
25   that you had made recordings?

1    A.  I never denied it.

2    Q.  Do you see the response to the Request For Admission

3    No. 2?

4    A.  Yes, ma'am.

5    Q.  What is the word following response to request for

6    admission No. 2?

7    A.  It says denied.

8    Q.  But you did, in fact, make recordings, including both

9    audio and video recordings, of conversations with district

10   employees; didn't you, Mr. Cain?

11   A.  Yes, ma'am.  I did.

12   Q.  If you turn to the following page, page No. 5.  On Request

13   For Admission No. 9 you were asked to admit that you

14   referenced school shootings on social media in a post you made

15   in the group Aledo class of 2025 and then there is an

16   objection and following the objection it says, Subject to this

17   objection, Plaintiff states he does not have access to social

18   media posts referenced by Defendant and he has insufficient

19   information to admit or deny this request.  Did I read that

20   correctly, Mr. Cain?

21   A.  Okay.  Can you repeat --

22        THE COURT:  Did she read that correctly is all she

23   asked.

24   A.  I believe you did.

25   Q.  Mr. Cain, you do have access to your social media posts;

1  correct?

2  A.  No, ma'am.  I do not.

3  Q.  You know that you made a post that referenced mass school

4  shootings; don't you, Mr. Cain?

5  A.  Ma'am, if you are talking about the one that's submitted

6  into evidence, yes, I did make that post, but it was brought

7  up by --

8          THE COURT:  Okay.  Just stay -- Just stay a little

9  bit back from that microphone.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Okay.  He made the post.

12  BY MS. ROBINSON:

13  Q.  If you look at Defendant's Exhibit No. 1 in the smaller

14  exhibit book in front of you, that is a post that you made in

15  which you wrote about mass school shootings; correct,

16  Mr. Cain?

17  A.  Which book is it?  I'm so sorry.

18  Q.  Defendant's Exhibits.

19          THE COURT:  The smaller notebook.  The skinnier

20  notebook.

21          THE WITNESS:  My goodness.  I think I may be missing

22  one.  This one.  Okay.  Exhibit No. 1.  Yes.  That is my post.

23  BY MS. ROBINSON:

24  Q.  And you did reference mass school shootings in that post;

25  didn't you, Mr. Cain?

1    A.  Yes, because there's a relationship between school

2    shootings and bullying, according to --

3              THE COURT:  Well, she just asked did you make that

4    post?

5              THE WITNESS:  Yes, sir.

6    BY MS. ROBINSON:

7    Q.  And you also said, Will it happen here in Aledo; didn't

8    you, Mr. Cain?

9    A.  I did ask that.  I was concerned.

10             THE COURT:  Okay.  Your lawyer might follow up with

11   you.  Just let her ask the next question.

12   BY MS. ROBINSON:

13   Q.  By the way, although you said that you were concerned

14   about your son, you didn't pick him up from school the day of

15   the altercation and take him to the doctor; did you?

16   A.   I wasn't given all the accurate information about what

17   happened to my son.

18   Q.  Did you speak with your son after the nurse evaluated him?

19   A.  Yes, but she did not give me all the facts.

20   Q.  Well, I know that's your contention; inaccurately so, but

21   my question, Mr. Cain, is a very simple one:  Did you speak

22   with the nurse who examined your son following the altercation

23   which he was involved with the other child?

24   A.  And I said yes.  She the not give me all the facts.

25   Q.  You also spoke with your son after he had been evaluated

 1    by the nurse; didn't you, Mr. Cain?

 2    A.  I did.

 3    Q.  And he told you everything that happened; correct?

 4    A.  No.

 5    Q.  And he told you that he had been examined and he was okay;

 6    correct?

 7    A.  I don't believe so.  I believe that I asked him if he

 8    could make it through this rest of the day because he

 9    struggles in school, he's dyslexic, and we were on a path to

10    doing really good with this school and I didn't want -- if he

11    could make it through school because he struggles so dang bad

12    I didn't want to have to pull him out of school if I didn't

13    have to because his grades are terrible.  And I'm so sorry.

14    So that's -- So I was trying to evaluate whether it was okay

15    to leave him at school, whether he could get through the rest

16    of the day.  I am a police officer, so I do see injuries, and

17    I wanted to evaluate -- my goal was to evaluate whether it was

18    beneficial to remove him from school and him get further

19    behind on his grades or keep him at school and get him through

20    the rest of the day and then evaluate it from there.

21    Q.  After speaking with both the nurse and your son, you

22    decided to leave him at school and not pick him up that day;

23    correct?

24    A.  Yes.

25    Q.  And after you spoke with your son, you spoke with the

1    nurse again and told her you were not going to pick him up;

2    correct?

3    A.   Yes.   The nurse said that he was going to -- she was going

4    to evaluate him and that if -- you know, she -- for about

5    twenty minutes, and that if nothing changes or if something

6    changes she would call and communicate that with me and that

7    would factor into the determination on whether I was going to

8    go get my son.

9    Q.   So you did not pick him up that day early from school?

10   A.   No, I did not.

11   Q.   And you didn't take him to the doctor, did you?

12   A.   Eventually, yes, I did.

13   Q.   But not for some time; correct?

14   A.   I'm sorry?

15   Q.   Not that day or the following day; correct?

16   A.   No, I didn't.   Again, I wasn't given all the facts.

17   Q.   If you look at the document in front of you, your

18   responses to the admissions from the school district also on

19   page 5.   Request No. 10.   Request for Admission No. 10 asked

20   you to admit that your son was not picked up from school or

21   taken to the doctor the day of the incident alleged in this

22   lawsuit with the other student at issue.   Then on the

23   following page at the top, your response, Mr. Cain, was that

24   you denied that.   Did I read the word "deny" correctly on your

25   response at the top of page 6?

```
1    A.  Ma'am, my attorney filled this out --

2           THE COURT:  Is that correct?  Well, it is.  I see it

3    here.

4           THE WITNESS:  Yes.  It is correct.

5    BY MS. ROBINSON:

6    Q.  That's not accurate though, is it?

7    A.  I think he was denying to respond to the question.

8    Q.  Mr. Cain, when you denied this written discovery request,

9    you inaccurately denied that you had not picked up your son

10   and taken him to the doctor; correct?

11   A.  Ma'am, again, he was denying to respond to the question.

12   Q.  We read the question on page 5; didn't we, Mr. Cain?

13          THE COURT:  Well, I mean, you were notified of the

14   incident on the day it happened.  Is that right?

15          THE WITNESS:  Yes, sir.

16   BY MS. ROBINSON:

17   Q.  When you said that you deny that he was not picked up --

18   picked up and taken top the doctor that day, that was

19   inaccurate, wasn't it, Mr. Cain?

20   A.  I didn't say denied.  My attorney wrote denied.  But, yes,

21   it would be inaccurate.

22   Q.  Mr. Cain, tell me what firearms you own.

23   A.  Ma'am, I was -- I own -- I have a department issued

24   firearm, handgun.  I have a backup handgun.  And then a second

25   backup handgun.  And then a rifle.
```

1   Q.  In addition to all of those handguns and long guns that

2   you own, what weapons do you have access to, Mr. Cain?  Do you

3   have access to all of the Fort Worth -- At that time, in

4   September 2019, as a Fort Worth police officer, did you have

5   access to the firearms and other weapons provided to officers

6   of the Fort Worth Police Department?

7   A.  Yes, I did.

8   Q.  Can you tell us what some of those weapons are, all of the

9   weapons that you can just recall off the top of your head,

10  that the police department allows access by its officers.

11  A.  Okay.  I'm so sorry.  I'm confused by your question.  I

12  have four weapons.  I have four handguns -- three handguns,

13  one rifle.  One is my duty weapon.  One is my backup weapon.

14  Another backup weapon whenever I was --

15          THE COURT:  The question is:  Besides those guns you

16  have just now identified, do you have access to any other

17  guns?

18          THE WITNESS:  Oh, no, sir.

19          THE COURT:  From -- through the Fort Worth Police

20  Department?

21          THE WITNESS:  No, sir.

22  BY MS. ROBINSON:

23  Q.  Doesn't the Fort Worth Police Department allow you access

24  to other handguns as well as other long guns, including both

25  rifles and shotguns?

1  A.  Well, I wouldn't know where to get a shotgun from because

2  I don't carry one on duty.

3  Q.  If you wanted to access one from the police department

4  though, you would be allowed to do so because you work, at

5  least in September of 2019, a Fort Worth police; correct,

6  Mr. Cain?

7  A.  Yes.

8  Q.  And the department has multiple other handguns and long

9  guns, including both rifles and shotguns.  Is that correct,

10 Mr. Cain?

11 A.  Yes.  I would presume so.

12 Q.  And you have ammunition for your three handguns and your

13 rifle; correct, Mr. Cain?

14 A.  I believe so.  I'm not sure if I have all the ammunition

15 for my guns.  I'm -- I'm not -- I'm not a gun person.

16 Q.  You had ammunition in September 2019 for your three

17 handguns and your rifle; correct, Mr. Cain?

18 A.  I know I did for my duty weapon and I know I did for my

19 rifle, but the other two I don't -- I don't recall.

20 Q.  What is your duty weapon?

21 A.  It's a Glock 9mm.

22 Q.  How many rounds can you hold or are held in the magazine?

23 A.  45 -- 45 I think.  45?  Between all three --

24         THE COURT:  45 rounds?

25         THE WITNESS:  15.  15.  I'm sorry.  45 between all

 1    three.  I'm so sorry.
 2    BY MS. ROBINSON:
 3    Q.  So with your three weapons, your three handguns that is,
 4    you have magazines that hold 45 rounds plus another one in the
 5    chamber of each of those weapons.  Is that correct?
 6              THE COURT:  No.  He said it does not hold 45 rounds.
 7              MS. ROBINSON:  I'm sorry.  I'm -- I misunderstood.
 8              THE COURT:  That's what I asked.  I would like to see
 9    that.  How many rounds does your duty --
10              THE WITNESS:  One magazine contains 15 rounds and I
11    believe that you can put one in the chamber as well, which
12    would make it 16 if you loaded another round in the chamber.
13    BY MS. ROBINSON:
14    Q.  So just with your three handguns you have 48 rounds just
15    in those 3 handguns; correct, Mr. Cain?
16    A.  The most would be 46.  Approximately.  Between all three
17    magazines --
18    Q.  Well, with --
19    A.  -- and my duty weapon.
20    Q.  With 45 rounds in the three magazines plus one in the
21    chamber of each one, wouldn't that be 48 rounds for your three
22    handguns?
23    A.  No, because the other two only carries 15, I think.  It's
24    been a while since I've looked at a magazine.
25    Q.  But you estimate that with your three handguns you would

 1   have 46 live rounds without reloading; correct, Mr. Cain?

 2   A.  No.  16 rounds at the most with the first magazine and

 3   then I would have to reload after that.

 4   Q.  Right.  But if you had all three of your handguns on your

 5   person with the magazine --

 6            THE COURT:  Okay.  I think I get the point.

 7   BY MS. ROBINSON:

 8   Q.  And there is also ammunition available for the weapons at

 9   the Fort Worth Police Department.  Is that correct, Mr. Cain?

10   A.  At the range, yes.  But I don't think that the range was

11   open.  I -- I don't know.

12            THE COURT:  That's all right.  I get the point.

13   BY MS. ROBINSON:

14   Q.  If you checked out the weapons and asked to be provided

15   ammunition for them, you would be; correct, Mr. Cain?

16   A.  I'm sorry, ma'am?

17   Q.  If you checked out additional weapons from the police

18   department and asked to be provided ammunition for those

19   weapons --

20            THE COURT:  I mean, I get all of the gun and the

21   rounds point, so let's go to another subject.  You are worried

22   and they're worried that because he's a police officer he has

23   four personal guns, access perhaps to -- to Fort Worth P.D. to

24   ask for additional guns plus ammunition and that played a role

25   in your concerns.  I'm with you.

1          MS. ROBINSON:  May I approach, Your Honor, and

2     provide a copy of another document to the Cain and a courtesy

3     copy to the Court, if you would like, Your Honor?

4     BY MS. ROBINSON:

5     Q.  Mr. Cain, do you have in front of you Plaintiff's

6     Objections and Responses to Requests For Admissions From the

7     Defendant Fred Collie?

8     A.  Yes, ma'am.

9     Q.  Mr. Cain, will you please turn to page 4, Request for

10    Admission No. 4.  You were asked to admit that you own and/or

11    have access to firearms.  There was an objection and then it

12    states:  Subject to the objection for the purpose of avoiding

13    any deemed admission, Plaintiff states denied.

14          MR. DUNLEAVY:  Your Honor --

15    BY MS. ROBINSON:

16    Q.  Is that correct, Mr. Cain?

17          MR. DUNLEAVY:  Your Honor, I object to the question.

18    We will stipulate that he has weapons, Your Honor.  We made a

19    discovery objection early in the case and mea culpa I haven't

20    supplemented timely.  My bad.

21          THE COURT:  Okay.  You read it correctly.  He read it

22    correctly.  He's got four firearms in that -- To avoid any

23    deemed admission language deny should not be in there; it

24    should be admitted.

25    BY MS. ROBINSON:

```
1    Q.  It is incorrect that you didn't have access to firearms;

2    isn't it, Mr. Cain?

3            THE COURT:  Right.  Right.

4    BY MS. ROBINSON:

5    Q.  And even when asked whether you posted the name of the

6    other student who was involved with the incident involving

7    your son, you wouldn't even admit that.  You just said you

8    exercised your free speech rights, on page 5 in response to

9    request to admission No. 6; correct, Mr. Cain?

10           MR. DUNLEAVY:  Your Honor, we'll Object.  Again, we

11   made a discovery answer.  We've -- we'll stimulate, since he's

12   already admitted, he posted the name twice.

13           MS. ROBINSON:  Your Honor, discovery responses are

14   supposed to be --

15           THE COURT:  Let me just stop you there.  He has

16   testified that he named the student, named him twice, and I

17   don't think that is inconsistent, necessarily, with his

18   response here.

19   BY MS. ROBINSON:

20   Q.  Mr. Cain, it is not appropriate for a law enforcement

21   officer to post statements that incite violence against

22   children and their families; is it?

23   A.  Ma'am, I wasn't inciting violence towards anybody.

24   Q.  I understand that's your position, Mr. Cain --

25           THE COURT:  Don't argue with him.  Just ask the
```

1    question.

2    **BY MS. ROBINSON:**

3    Q.  You agree that it is inappropriate as a police officer,

4    especially, but even as a parent and human being, to post

5    information that incites violence against children and their

6    families.  Do you at least agree to that --

7    A.  Ma'am, I didn't incite violence.

8         **THE COURT:**  But you agree it's inappropriate to

9    incite violence against anyone?

10        **THE WITNESS:**  Yes, sir.  I do.

11   **BY MS. ROBINSON:**

12   Q.  If you look at Defendant's Exhibit 2, page 153.  In the

13   notebook of Defendants exhibits, the smaller notebook.  When

14   another individual told you to meet the bully, as you

15   characterize the other child, after school, bend him over and

16   give him the -- apology for the profanity -- ass whooping he

17   needs, if his parents interfere give them -- an apology for

18   the profanity -- an ass whooping as well then post it, you did

19   not respond and ask that poster to remove the post; did you,

20   Mr. Cain?

21   A.  Ma'am, I don't know what I responded with.  I know what I

22   responded with.  I know that I told everybody that was saying

23   that I would -- The bottom it says it's not the answer and I

24   support what my son did by not fighting the kid or anything of

25   that nature.  But I don't have the post how I responded to

1    that, so -- I know that I advocated for people not to fight,

2    that violence wasn't the answer.  I know I did that.  And I

3    know whenever people would tell me, Hey, you know -- whenever

4    they -- like, for example, whenever Lindsey Flowers was saying

5    I should teach my kid how to fight.  I said, Look, violence

6    isn't the answer.  I will pray for you.  You know, I didn't

7    advocate for violence.  I was actually -- I was very against

8    it.

9    Q.  If you actually made a post in which you advocated against

10   violence, do you have any explanation for why there is not one

11   single post that has been provided to us in discovery or that

12   is shown in any of your posts in Exhibits No. 1, 2, or 3 of

13   Defendant's Exhibits in which you disagreed with the notion

14   that violence against that child and his parents was the

15   appropriate response?

16   A.  Ma'am, you're missing a lot of posts.  You are missing a

17   lot of posts, and you --

18   Q.  And we have asked --

19   A.  You --

20   Q.  You know that we asked you to provide all of your posts;

21   correct, Mr. Cain?

22   A.  I do.  I know that there's been some problems with

23   discovery in deposition and that's what --

24   Q.  Are you aware, Mr. Cain, that your attorney did produce,

25   ultimately, after we sought and obtained an order compelling

1    you to produce your own posts, produce your posts --

2    A.  I don't know what my attorney produced to you and what he

3    didn't produce to you.

4    Q.  Well, if you look at the production documents that were

5    supplied to us and all that were received from other sources

6    and Defendant's Exhibits 1, 2, and 3, can you find a single

7    reference to you saying violence is not appropriate and I

8    disagree with those of you who are telling me to go up there

9    and engage in violence against this child and his parents?

10   A.  Ma'am, I -- I can't find one, but --

11   Q.  And I've not seen one, Mr. Cain.

12   A.  Can you ask the question one more time?

13   Q.  Yes, sir.  Can you point to any post that's been produced

14   in discovery by anyone, including your own attorney, in any of

15   the exhibits that shows you ever said one word telling people

16   not to engage in violence and that you were not going to

17   engage in violence against this child and his parents?

18   A.  No, I haven't.  And all of these posts are not from the

19   original website I was on.  I got kicked off of that original

20   website.  So whenever I got kicked off, it deleted everything.

21   Q.  You are aware that it was your duty and your

22   responsibility, in fact, there was a court order entered

23   compelling you to produce all of your posts; correct?

24   A.  I produced everything to my attorney.

25   Q.  And of those documents produced, as we sit here today, you

1   can't point to one single response inciting violence saying

2   violence isn't the answer and I'm not going to engage in

3   violence against this middle school child and his parents; can

4   you, Mr. Cain?

5   A.  I never incited violence.  Never.

6   Q.  My question, Mr. Cain, can you point to one single post

7   you claim you sent out where you disagreed with the notion

8   that you should engage in violence against this minor child

9   and his parents?

10   A.  No.

11        MS. ROBINSON:  Pass the witness.

12              REDIRECT EXAMINATION

13   BY MR. DUNLEAVY:

14   Q.  Mr. Cain, you talked briefly about discipline imposed on

15   another child.  Did anybody tell what you that discipline was?

16   A.  No, sir.

17   Q.  Did you see that other child playing football?

18   A.  I don't -- I didn't.

19   Q.  Was he at the football games while your son was still

20   under the concussion protocol?

21   A.  From what I've heard, yes.

22   Q.  Do you have all of your social media posts from that time

23   period?

24   A.  No.

25   Q.  Have you produced what you have?

1   A.  I did.

2   Q.  Are you the *Facebook* police?

3   A.  No, sir.

4   Q.  Do you have some obligation to police other people on

5   *Facebook*?

6   A.  No.

7   Q.  You're a police officer in Fort Worth?

8   A.  Yes.

9   Q.  Does that keep you pretty busy?

10  A.  Yes, sir.

11  Q.  Why did you post on *Facebook*?

12  A.  Why did I post on *Facebook*?

13  Q.  Yes, sir.

14  A.  I was concerned about my child.  I was trying to let other

15  parents know what the school district has done, such as put my

16  child in a game with a concussion.

17  Q.  Do you think that because you're a police officer you have

18  some lesser right to post on *Facebook*?

19  A.  I shouldn't.

20  Q.  Have you refrained from posting since you got the trespass

21  warning?

22  A.  Absolutely.

23  Q.  Why?

24  A.  Because I'm afraid that the school will retaliate against

25  me and my son as they humiliated us both.

1          MR. DUNLEAVY:  Pass the witness, Your Honor.

2                    RECROSS EXAMINATION

3    BY MS. ROBINSON:

4    Q.  Mr. Cain, will you turn to Defendant's Exhibit 5 in the

5    smaller book, please.  Is that a letter you wrote to a school

6    administrator?

7          MR. DUNLEAVY:  Your Honor, I don't think this is the

8    subject of my --

9          THE COURT:  Overruled.  Overruled.

10         MS. ROBINSON:  It is --

11   BY MS. ROBINSON:

12   Q.  Do you understand the question, Mr. Cain?

13   A.  I'm reading what I wrote.

14   Q.  My question is:  Is this an e-mail you sent to a school

15   administrator?

16   A.  Yes.  It appears to be.

17   Q.  And in Exhibit No. 5, you -- your concern was that there

18   be more punishment for the other student; correct?

19   A.  Ma'am, my son was being humiliated by having to serve

20   water and hand jerseys to the kid that assaulted him; so yes.

21   Q.  There's not a single sentence in Defendant's Exhibit No. 5

22   where you talk about concern for your child.  You instead

23   spent four paragraphs talking about how you thought the other

24   child should have greater disciplinary consequences; correct,

25   Mr. Cain?

```
1    A.  Ma'am, again, my son was picking up his jersey --
2          THE COURT:  Is that right?
3          THE WITNESS:  Yes.
4    BY MS. ROBINSON:
5    Q.  And, in fact, as you see in Exhibit No. 6, following your
6    meeting with one of the coaches in which you stated --
7          MS. ROBINSON:  Strike that, please.
8    BY MS. ROBINSON:
9    Q.  After you sent Exhibit No. 5, you did have a meeting in
10   which you told one of the administrators that you would not
11   pursue criminal charges against the other child if there were
12   just more consequences imposed against him as far as his
13   participation in athletics; didn't you, Mr. Cain?
14   A.  Ma'am, I didn't want to talk a 13 year old child.  That's
15   the last thing that I wanted to do.  I wanted the school to
16   take appropriate action--
17         THE COURT:  The question though is:  Did you make the
18   statement that you would not pursue criminal charges if they
19   added the punishment?
20         THE WITNESS:  Yes, sir.
21   A.  Yes, ma'am.
22   Q.  And the additional punishment you wanted had to do with
23   more punishment for athletics; correct, Mr. Cain?
24   A.  Yes, ma'am.
25   Q.  If you look at Defendant's Exhibit No. 7.  The
```

1    administrator with whom you spoke responded to your concerns

2    by saying he had not proposed additional punishment.  It was

3    you who said you would not pursue criminal charges if there

4    were additional consequences for participation in athletics;

5    correct, Mr. Cain?

6    A.  Yes.  He called me on his cell phone and whenever I talked

7    to him on his cell phone that's the reason why I want to get

8    an e-mail back from him confirming that I did speak with him

9    on his cell phone; that way he could not deny it, so that's

10   why I brought up that issue.

11   Q.  But you knew that they told you that consequences had

12   already been imposed even if they could not share all the

13   specifics of the consequences --

14   A.  Ma'am --

15   Q.  -- correct, Mr. Cain?

16   A.  Ma'am, he told me that he knew that this child was getting

17   worse is what he told me.  He said he knew that this child was

18   getting worse and that life wasn't fair.  He knew -- He spoke

19   his mind and that life was not fair.  That's exactly what he

20   told me and then he said that he would take my idea and

21   propose it to the other parents and then he never called me

22   back.

23          MS. ROBINSON:  Objection.  Nonresponsive.  Hearsay.

24          THE COURT:  Overruled.

25   BY MS. ROBINSON:

1   Q.  Well, Mr. Wood did clarify with you that that was your

2   proposal, not his, as reflected in Exhibit No. 7; correct,

3   Mr. Cain?

4          MR. DUNLEAVY:  Your Honor, at this point I'm confused

5   as to how any of this is relevant to the issues before the

6   Court today.

7          THE COURT:  Overruled.

8   A.  I do not deny that it was my idea.  I don't deny it.

9   Again, I wanted to get an e-mail back from him confirming that

10  he called me, that way he couldn't lie about it, especially

11  after his response to me.  I don't think that as a police

12  officer I would look at a victim and tell them life wasn't

13  fair.

14         MS. ROBINSON:  Objection.  Nonresponsive.

15         THE COURT:  Overruled.

16  BY MS. ROBINSON:

17  Q.  And your concern, as shown in Exhibit No. 5, had to do

18  with there being more consequences; correct, Mr. Cain?

19  A.  Yes, ma'am.

20  Q.  And just so we're crystal clear.  You had been advised

21  that the other child was subjected to disciplinary

22  consequences as a result of the altercation with your son;

23  correct, sir?

24  A.  I was told that, but I was also lied to.

25         MS. ROBINSON:  Pass the witness.

1        **MR. DUNLEAVY:**  Nothing further, Your Honor.

2        **THE COURT:**  Okay.  You can step down.

3        **THE WITNESS:**  Thank you, Your Honor.

4        **THE COURT:**  Anybody else?

5        **MR. DUNLEAVY:**  No witnesses, Your Honor.

6        **THE COURT:**  Any other witnesses?

7        **MS. ROBINSON:**  No other, Your Honor.

8        **THE COURT:**  Okay.  Very good.  You all may make a

9   final argument.

10       **MR. DUNLEAVY:**  Yes, Your Honor.

11       **MS. ROBINSON:**  Your Honor, before we reach closing

12   arguments should we just engage in a housekeeping of offering

13   Defendant's Exhibits as well as the admissions on the -- on

14   the prior inconsistent statements?

15       **THE COURT:**  Yes.  What exhibit numbers do you want

16   admitted?

17       **MS. ROBINSON:**  The exhibits provided in the exhibit

18   notebook are Defendant's Exhibits 1 through 19 and then the

19   responses to the admissions from Aledo ISD would be

20   Defendant's Exhibit 20 and the response to the admissions by

21   Fred Collie would be Defendant's Exhibit 21 which are

22   admissible as prior inconsistent statements of the --

23       **THE COURT:**  All right.  Those are admitted.

24       (Admitted in Evidence as Defendant's Exhibits 1 through

25   19, 20, and 21.

1              MR. DUNLEAVY:   Your Honor, I would offer all of the

2     Plaintiff's Exhibits.  Plaintiff's Exhibit 1, the criminal

3     trespass.   2, the e-mail, the Joy Moore e-mail.  The post.

4     That's Exhibit 4.  The trespass warning to Randy Dixon.  The

5     number -- which was No. 5.  The affidavit of Fred Collie,

6     which is No. 7.  The Aledo ISD policy CKE is No. 8.  The FMG

7     policy, No. 9.  I would offer Fred Collie body cam video from

8     Chad Cain's video.  The interrogatory answers from Mr. Collie

9     13, 14, and 15.  The statements by Susan Bohn, Heather -- just

10    by Susan Bohn, Number 16.  23, 24, 25, the pictures.  26, the

11    trespass warning to Aaron Smith.  And then No. 32, which is

12    the letter I sent to Susan Bohn.  Number 35, the letter to

13    Fred Collie.  Number 45, which we didn't talk about except in

14    passing, Your Honor, the offer from Ms. -- Ms. Robinson to

15    lift the trespass warning.

16              THE COURT:  Okay.  Is there anything between Exhibit

17    9 and 13?

18              MR. DUNLEAVY:  Your Honor, I'm sorry.  I didn't give

19    the number.  11 and 12 are the two videos.

20              THE COURT:  Okay.  All right.  Those will be

21    admitted.

22              MS. ROBINSON:  Your Honor, if I may, we were not

23    provided a copy of 11 or 12.  Just for the record, the

24    responses to discover that are Defendant's -- pardon me --

25    Plaintiff's Exhibits 13, 14, and 15 are not prior inconsistent

1   statements.  I don't believe they are admissible as consistent

2   statements in this setting --

3            THE COURT:  Okay.

4            MS. ROBINSON:  That's just an objection for the

5   record.

6            THE COURT:  I will conditionally admit it and if I

7   need to use them, I will give you notice.  If not, I will not

8   consider them.

9        (Admitted in Evidence as Plaintiff's Exhibits 1, 2 4, 5,

10   7, 8, 9, 11, 23, 13, 14, 15, 16, 23, 24, 25, 26, 32, 35, and

11   45.

12            MS. ROBINSON:  And if I may just get a copy of the

13   videos.

14            THE COURT:  Yes.  You are entitled to a copy of both

15   videos.  So that's 11 and 12.

16            MR. DUNLEAVY:  Your Honor, those are -- they produced

17   them to us.  They are their exhibits.

18            THE COURT:  Well, you all get together, look at the

19   videos, and make sure you all have the videos.

20            MR. DUNLEAVY:  Your Honor, the issue before the

21   Court, as you focused on, is whether the true threat

22   encompasses statements where a speaker means to communicate a

23   serious expression of an intent to commit an act of unlawful

24   violence to a particular individual or group of individuals.

25   That comes from *Virginia v. Black* and the Fifth Circuit just

1   last year addressed that in the *Monroe v. Houston ISD*.  So

2   that's the first issue the Court's got, Your Honor.  And what

3   the Court, I believe, needs to do is look at the posts.  We've

4   heard one post.  And it's not a true threat.  But we've heard

5   lots of information about what everybody perceived.  And, Your

6   Honor, what the Fifth Circuit said last year, November 25,

7   2019, is when conducting the true threat analysis, the

8   district court must exercise its own judgment.  A police

9   officer's testimony, like Mr. Collie, quote, "that he felt

10  plaintiff's threats at the April 11th meeting were concerning

11  from a law enforcement perspective does not suffice.  Many

12  statements that are concerning from a law enforcement

13  perspective are not true threats."

14         Additionally, the Court said, "In doing this true

15  threat analysis, it must be limited to whether the speaker,

16  Mr. -- the Plaintiff here, Mr. Cain -- meant to communicate

17  the serious expression, attempt to commit an act of unlawful

18  violence.

19         This is important, because this is the whole case for

20  the Defendants.  Whatever harm the target of the purported

21  threat received is irrelevant.

22         **THE COURT:**  As is -- As is the intent of the --

23         **MR. DUNLEAVY:**  As is the intent.

24         **THE COURT:**  -- of your client.

25         **MR. DUNLEAVY:**  You've said this three or four times

1    since last Friday, Your Honor.  If it's a threat, it's a

2    threat.  If it's not, it's not.  And everybody's perception of

3    it doesn't matter today except yours.  You're going to make

4    the call on whether Exhibit 1 from the Plaintiff's Exhibit 4

5    from the defendants -- I'm sorry -- I get them reversed.  1

6    from the Defendants, 4 from the Plaintiffs is a threat.  It's

7    just not.  If that's the conditional statement, like I talked

8    about last week, the Supreme Court talks about shooting LBJ.

9    If I get a gun in my hands, it's not a threat.  Nothing -- You

10   asked.  I asked.  I asked for her six hours of two different

11   depositions.  Please give me the posts instead of threats.

12   We've never seen them.  There is none.

13        So, Your Honor, the Court makes that determination.

14   Because it just doesn't matter what is going on elsewhere.

15   The Court looks at the post.  That's all the Court does.  Yes,

16   bad things happen in the world.  Yes, he's a police officer.

17   Yes, he has weapons.  The state court said we are in Texas,

18   everybody has got weapons.  So that doesn't matter, either.

19   It's not a reasonableness standard.  It's an objective

20   standard.

21        So then you get to the substantial likelihood of

22   success on the merits.  That's the first point.  And, Your

23   Honor, I belabored the other points.  I agree with your

24   analysis.  If we win on the first point in a First Amendment

25   case because a little longer than a year ago, eleven years

1    ago, in *Palmer v. Waxahachie Independent School District*, the

2    Fifth Circuit said, and we agree with this, a loss of First

3    Amendment freedoms for even minimal periods of time

4    constitutes irreparable injury justifying the granting of a

5    preliminary injunction.

6           So you got it exactly right, Your Honor.  What they

7    did yesterday, they said, Hey, we'll let you go.  We'll let

8    you get on school.  Give us a copy of the deployment orders.

9    We did fine.  Operational security.  United States Air Force.

10   He's going to deploy.  That didn't get covered, but he is

11   going to deploy.  We told the Court that.  But they don't need

12   to know that.  We're not asking other parents for deployment

13   orders and they not telling other parents which line they can

14   go in and they're not telling other parents, like they did

15   that game, You can watch your kid play, but you can't stick

16   around, to sit with him to watch his friends play in the B

17   game or the A game.  You can go back out to your car in the

18   parking lot.  We'll let you stay there for that.

19          Your Honor, it's irreparable injury.  The balance is

20   in favor of the Plaintiffs because, even though I may be

21   improperly asking -- I don't think it -- asking questions that

22   touch on the questions of law, if Aledo ISD's interest is in

23   following the law, supporting and defending he Constitution,

24   so is Susan Bohn, so is Fred Collie.  Their interests are not

25   served.  In fact, their interests are harmed when they

1    violated law and that is what they have done and they just

2    don't see that.  They just don't understand my client has a

3    free speech right.  So that's why we're here.  He doesn't have

4    to deescalate because he didn't do anything wrong.  He wishes

5    he hadn't posted the kid's name.  It's wrong, immoral,

6    unethical.  Fred Collie had all sorts of opinions on that

7    subject.  This Court has to look at illegal, not immoral, not

8    unethical; illegal.  They are not the speech police and to the

9    extent this Court is the speech police, it's narrowly limited

10   to the few exceptions of speech that are impermissible, a

11   threat, a destruction.  Fred Collie said in his deposition no

12   disruption.  All of this disruption stuff, if you look at the

13   posts and the e-mails and the communications, it's all the

14   lawyers after the fact.  Fred Collie knows how to say when

15   somebody makes a threat you have two examples of trespass

16   warnings, people who apparently made threats.  Chad Cain

17   didn't.  They knew he didn't.  Fred Collie testified, I

18   couldn't give him a citation.  I couldn't arrest him.  What do

19   they do?  Give him a trespass warning.  That is not typically

20   subject to judicial review.  If he arrested him, he gets to go

21   to court; criminal court.  If he cites him, he gets to go to

22   court; maybe criminal court, maybe municipal court.  But he

23   gets to challenge that and say, Hey, just like the kid in

24   Washington in 1967 who got convicted of a threat, it's not a

25   threat.

1          So this is purposeful.  They do this.  They claim

2     people threaten.  We've got Dixon.  We've got Smith.  Smith

3     just three days before.  We don't know what Mr. Smith did, but

4     they say he made a threat.

5          So their interest is served in following the law.

6     They suffer no harm if you make them follow the law.  The

7     public's interest is served in making the government follow

8     the law and the public's interest is not harmed at all by

9     making the government follow the law.

10          This is all about retaliation.  You heard on Friday,

11     you heard today inferences, totality of the circumstances.

12     What you didn't hear was facts.  What you didn't hear was

13     anything that was articulable other than one post, which is

14     clearly not a threat.  You heard testimony, begrudging, from

15     Mr. Collie, it's in his deposition, which he sometimes backed

16     away from, that nothing Chad Cain said was illegal.  Nothing

17     he did was illegal.  None of things posts were illegal.  And

18     the only post they claim is a threat is the one post that

19     we've talked about ad nauseum.

20          If they're concerned -- Ms. Bohn testified today, as

21     you said, very articulately, eloquently.  I was a little

22     frustrated; not always responsive to my questions, but, hey,

23     she did what she needed to do.  But she's so concerned about

24     that football game and that's her sole concern -- not her sole

25     concern -- that's her big concern.  Why does he have a

1    trespass warning a year later?  There are multitudes of

2    correspondence.  We asked specifically to sit down with her.

3    She refused.  The policies you will see show she is the

4    appropriate administrator.  Nope.  I'm going to hang him

5    because he didn't try to talk to me, but when he -- he has a

6    lawyer ask to talk to me, I'm going to decline because that's

7    not my role.  I would just like to listen.  But she didn't

8    even listen.  She had her assistant superintendent listen.

9    Ms. Robinson said, that's right.  The first time we heard it.

10   All you needed to do was deescalate.  Apologize, even though

11   he did nothing wrong.

12           I read a book before by got married and one of the

13   chapters was -- it was *Married Like a Man*.  How to Admit That

14   You're Wrong When You're Right.  That was a chapter.  Okay?

15   That's what they're asking you to do.  Say you did something

16   wrong, say you don't have those First Amendment rights, and

17   then we'll let you back in.  We'll take those First Amendment

18   rights from you.  That's what they're doing.  That's

19   retaliation.  It's illegal.  There is no threat.  There's

20   certainly nor true threat.  There is no expression of intent

21   to commit violence.  They have impaired my client's First

22   Amendment rights.  He will suffer harm in the future.  He said

23   he is refraining from posting to avoid punishment in

24   retaliation.  We ask the Court issue the preliminary

25   injunction.

1          MS. ROBINSON:  Your Honor, imagine a school

2     administrator in the 21st century.  It's a world of violence

3     and violence not limited to the world, but also taking place

4     on school campuses.  We have multiple school shootings every

5     school year now other than perhaps during COVID because

6     campuses are locked down.

7          We had in the school year at issue over 30 school

8     shootings in one school year of which police Chief Collie was

9     personally aware.  We had one just down the road in Santa Fe,

10    Texas, where students and staff were slaughtered, left dead,

11    dying, and permanently injured.

12         And now you have in September 2019 in that

13    environment a situation in which a parent disagrees with the

14    disciplinary consequences given to a middle school student.

15    It is terribly unfortunate, Your Honor, that there was an

16    altercation between Mr. Cain's son and another student.  But,

17    hey, it is middle school.  They are 7th grade students.  It is

18    not as though it's unexpected that there might be an

19    altercation.  It is though crystal clear that just because you

20    don't think the other kid got enough disciplinary punishment

21    that you should be able to make posts and issue threats and in

22    this environment there were multiple posts shown in Exhibits 2

23    and 3 of Defendant's Exhibits in which not only reasonable

24    school administrators were given pause and had great concerns

25    about the propensity to violence by a parent who disagreed

1    with consequences for a middle school altercation, but by

2    other members of the community coming in and saying, There's a

3    problem here.  This person is unhinged.  This person is

4    disgruntled.  I am afraid there is going to be violence.

5          Did the administration just jump to its feet and

6    issue a criminal trespass warning to keep that individual, who

7    multiple people, school administrators and community members,

8    believed had a propensity to violence and certainly the method

9    to carry out violence, from coming to the school?  Absolutely

10   not.

11         Your Honor, you've heard ample, uncontradicted

12   testimony that this situation showed an escalation of the

13   propensity to violence and it occurred over several days; in

14   fact, more than a week.  It was not a situation where a parent

15   who didn't think middle school students were punished enough

16   got over it.  It was exactly the opposite.  It was a situation

17   in which an armed and trained with weapons parent continued to

18   escalate his behavior to the point that the very day that

19   there was to be a football game in which his son and the other

20   student about whom he had been posting were going to be in

21   attendance as well as the other student's parents, that the

22   parent, Mr. Cain, escalated his behavior to make reference to

23   mass school shootings here in Aledo.

24         You heard uncontradicted testimony from Dr. Bohn that

25   she did not at the time think anything in that post was a

1 criticism of school officials.  She thought it was a true

2 threat and she thought it was a true threat not only for the

3 general reasons, but we had had weeks or at least days, more

4 than a week, building up to this threat of a mass school

5 shooting and we had multiple people who had expressed

6 concerns, other administrators, other parents, other citizens.

7 On that day with the post right in front of her and a flood of

8 new concerns -- in fact, she testified even anonymous concerns

9 coming in over the tip line about, Hey, this is a problem.

10 You need to watch this guy.  And people calling the police

11 chief saying we need extra security.  You need to hire extra

12 armed individuals.  There is about to be violence.  It was

13 only at that point with the culmination of all of these posts,

14 all of these events, the disruption on campus from going over

15 there, interrogating a poor receptionist at the middle school

16 to try to get her to release information that anyone knows she

17 can't release.  Before the school district took the step of

18 issuing a criminal trespass warning and you heard

19 uncontradicted sworn testimony that the only reason that

20 trespass warning was issued was because of the threat of

21 violence and the possibility of violence at the football game

22 that night.  Absolutely the administrators, not just Chief

23 Collie and Dr. Bohn to whom you listened, but the other

24 administrators who Dr. Bohn described coming to her said this

25 is a true threat.  It was not only a reasonable assessment

1    that this culminating post that finally on top of everything
2    else that had occurred and all the escalating behavior led to
3    the criminal trespass warning was objectively reasonable, it
4    was consistently held by every single person who came to
5    report that they felt this was a true threat.

6            I understand today, a year later, you may have a
7    different opinion, Your Honor.  But the question isn't whether
8    we would have a different opinion today.  The question is on
9    September 24th, 2019, did Dr. Bohn have a sufficient reason to
10   believe that there was a true threat against an individual or
11   group of individuals.  And she described that true threat to
12   you, Your Honor.  She said a football game is an uncontrolled
13   environment.  Both Mr. Cain's son and the other child were
14   going to be on the field with his parents in attendance.  She
15   didn't know in that environment whether he was going to target
16   the child or he couldn't get to the child because he was on
17   the football field with parents and where other individuals
18   might be in -- get caught in violence that was erupting from
19   Mr. Cain.

20           She also told you that she had a grave concern about
21   the pickup line.  In reading this latest post regarding mass
22   school shootings, on top of everything else he had done and
23   his escalating behavior which had not deescalated, despite his
24   training regarding deescalation techniques and, again, despite
25   the fact that this is a middle school fight between two boys,

1    that he would get out of his car at the pickup line if he saw

2    that child's parent who worked at the school district or that

3    child's father and start engaging in either a vitriolic

4    discussion that turned violent or just initiated violence.

5    Those were not unreasonable concerns and those were not

6    concerns that were drawn only by Dr. Bohn.  They were concerns

7    shared by everyone.  It clearly shows it was objectively

8    reasonable for the superintendent under those circumstances to

9    issue a criminal trespass warning.

10           Now, did that criminal trespass warning and its

11   issuance stop a blood bath from happening at the football game

12   on September 24, 2019?  We don't know.  Thank God we will

13   never know.  But the law does not require that the person who

14   is engaging in this behavior actually intends to carry out

15   those threats.  Even if he tells you today he didn't intend to

16   carry out those threats, that is irrelevant to the issue of

17   whether -- because school safety has to be the

18   superintendent's number one concern.  She was reasonable in

19   issuing the criminal trespass warning in September 2019 under

20   the totality of the circumstances with a continuing escalation

21   of behavior.  The answer to that, Your Honor, based on the

22   uncontradicted testimony, is absolutely.

23           We believe that the other elements are also not met,

24   but it is clear, Your Honor, that Plaintiffs cannot satisfy

25   the requirement that they proved a substantial likelihood of

1    success on the merits.

2           For that reason, as well as the fact that the issues

3    in the preliminary injunction, as pled by Plaintiff are moot

4    and the reasons briefed in our response to their preliminary

5    injunction, we respectfully request that the Court deny

6    Plaintiff's motion for preliminary injunction.

7           THE COURT:  Let me ask you.  You say that we may look

8    at what was said today and think it was not as -- When they

9    think it's not objectively reasonable today to conclude that

10   they acted appropriately in characterizing this as a threat,

11   but what matters was on that September day a year ago, given

12   the proximity of the escalation, the escalation to that --

13   this *Facebook* post that we've been talking about, but if that

14   is true, why doesn't it matter?  In other words, if -- if --

15   Is it the case that we would say that this threat was a true

16   threat in September of 2019 such that the trespass order was

17   appropriate on that day in advance of that football game, but

18   we look at it today and we say, well, it's not even

19   objectively reasonable that it's a true threat today.  If we

20   are able to alter or evolve in our perception of that, then

21   why is this trespass order still in place?

22          MS. ROBINSON:  Your Honor, for the reasons that we

23   discussed earlier about the fact that there has never been

24   deescalation --

25          THE COURT:  No, I understand that.  The deescalation

1   you keep talking to is what was his subjective intent.  You

2   just told me subjective intent does not matter; it's his

3   objective words.

4          MS. ROBINSON:  Well, it doesn't matter if he didn't

5   actually intend to engage in the violence as long as we

6   believe it was a true threat and certainly the uncontradicted

7   testimony establishes that it was and why --

8          THE COURT:  I'm not sure that's true.  But let --

9   What you told me was that if I stand in the shoes of the

10  superintendent on that September day, given the escalations,

11  given the anger that she described, and given that post,

12  seemingly precipitating post, on *Facebook* that she acted

13  appropriately in determining it's a true threat, even -- so

14  standing in her shoes that she acted appropriately, even if

15  standing here today we would conclude it's not objectively

16  reasonable.  That's what you said.  And I'm asking you -- I'm

17  asking you what is the legal analysis that says it can be a

18  true threat a year ago, it's not a true threat -- it's not

19  objectively reasonable to be characterized as a true threat

20  today and the law allows us to make that change, okay, but if

21  that is the case, then why is the criminal trespass order

22  still in place?

23         MS. ROBINSON:  I think I understand your question,

24  Your Honor, and let me see if deal with the response.  What I

25  was trying to indicate is reasonable minds may differ and they

1    certainly might differ today because we are not in the

2    position that we were in September 2019 with the football game

3    to be played that night, having just gone through weeks of

4    escalating behavior and posts of mass school shootings that

5    very day and we are required to look back and say what was the

6    superintendent thinking on that day.  Was it a true threat

7    that day?  We are required to.  Today it's hard to put

8    ourselves that very heated situation because we're not in that

9    heated situation.  But you have to remember that Dr. Bohn was

10    in that heated situation with a person going to the pickup

11    line where the other child was and his parents that very day

12    and going to the football game that night.

13           THE COURT:  No, I totally understand.  And I totally

14    understand what he she is saying.  She is saying look at the

15    position I was in.  He's angry.  His anger is escalating.  He

16    is making all these comments on the *Facebook* page and he's

17    angry at the perceived or lack of appropriate discipline and

18    he's going to go to this football game and encounter all of

19    these people who have angered him and so I -- I totally

20    understand what she is saying.  I totally understand what your

21    argument is.  But I'm asking -- But you said we may not today

22    look at it in that same fashion and time has -- time perhaps

23    has healed some of the anger and undermined some of the

24    intensity involved in this.  And so what I'm asking you then,

25    given all of that, is why is it still in place?

1        **MS. ROBINSON:**  And I apologize, Your Honor.  I didn't

2   mean to imply that time had healed the -- What I meant to

3   imply and what I was trying to state is it is difficult today

4   to understand how crucial it was that the criminal trespass

5   warning be issued on that day.

6        **THE COURT:**  Right.

7        **MS. ROBINSON:**  And whether we would disagree with it

8   just because we are not in that position today or even if we

9   had disagreed with it on that day, if reasonable minds can

10  differ then the tie goes to the school district because this

11  Court does not sit as a super manager of the school district.

12        As a matter of fact, anything even close to a tie

13  goes to the school district because, as you know, Plaintiff

14  has the burden of proof and he just didn't meet it.  That's

15  what I was intending to convey that, yes, we might have

16  reached a different decision, but there's no indication that

17  anyone would have reached a different decision.  In fact,

18  everyone reached exactly the same conclusion in September 2019

19  that Mr. Cain had made a true threat and he had the means and

20  ability to institute violence against Mary Neil, her son, and

21  the son's father; that child and his parents on that day.

22        So even if you think perhaps there is somebody out

23  there who might have made a different decision, it doesn't

24  matter because it is -- it was objectively reasonable for

25  Dr. Bohn, Chief Collie, Assistant Superintendent

1    Lynn McKinney, Campus Principal Many Musselwhite, and scores
2    of community members, parents, and other individuals to reach
3    the conclusion that this was a true threat and that there was
4    an intent to harm that child and his parents and potentially
5    anyone else who was in the way when violence broke out either
6    at that football game or in the pickup line.

7         THE COURT:  In terms of that, your exhibit here from
8    Ms. Neil says that she's concerned when she reads the post,
9    although there is no direct threat from the post.

10        MS. ROBINSON:  Yes, Your Honor.  But a direct threat
11   is not the same as a true threat.  In other words, he was
12   careful.  He's a police officer.  He was careful not to say,
13   I'm going to go shoot this child and his parents.  But it's
14   still a true threat taken cumulatively.  You cannot, as
15   plaintiff's attorney have you do, parse every word or every
16   sentence and say, Well, if there's not a direct threat in this
17   sentence, you can't issue a criminal trespass warning.  If
18   there is not a direct threat in this sentence, you cannot
19   issue a criminal trespass warning, because it doesn't have to
20   be a direct threat to be a true threat.

21        In the context, as Dr. Bohn and Jeff Collie
22   explained, of all of the other posts, including that child's
23   name being posted not just once but twice, despite even
24   comments from the community that it wasn't appropriate,
25   despite his training and his position and the fact that he was

1   continuing to get angrier and angrier over a middle school

2   disciplinary case, give a true threat.  And it only has to be

3   a true threat.  It doesn't have to be a direct threat when he

4   says I'm going after these people.  The question is:  Do we

5   know that he was targeting certain individuals?  And both

6   Dr. Bohn and Chief Collie told you, Yes, we do.  We know under

7   the totality of the circumstances, in the context in which all

8   of these posts and all of these conversations occurred, he was

9   targeting that middle school student and his parents.

10          THE COURT:  For violence.

11          MS. ROBINSON:  Yes, Your Honor.  And it is a

12   reasonable conclusion, based on that post about mass school

13   shootings and the parents feeling bullied and him feeling

14   bullied that it would happen here in Aledo.

15          THE COURT:  Let me ask you this:  Before the *Facebook*

16   post that prompted this warning, when he just posted the

17   juvenile's name and then the juvenile parents' name, was that

18   a true threat of violence against them; without the *Facebook*

19   post?

20          MS. ROBINSON:  Well, Your Honor, we don't have to

21   reach that question.

22          THE COURT:  Well, no, but I'm asking you though.

23   Would it have been a true threat against the -- of violence

24   directed at the juvenile and/or violence directed at the

25   juvenile's parents?

1    **MS. ROBINSON:**  I think that's a closer call, Your

2    Honor.  But Dr. Bohn testified that that, in and of itself,

3    was not enough to issue the criminal trespass warning and she

4    would not have done it had there not been a continued

5    escalation.

6        **THE COURT:**  No, I understand that.  So your answer is

7    your client's answer to my question is no.

8        **MS. ROBINSON:**  Well, we know she would not have done

9    it.

10       **THE COURT:**  She -- In other words, the way -- You

11   don't want to say no, but you're telling me that she would

12   have issued a trespass warning if she determined it was a true

13   threat.

14       **MS. ROBINSON:**  Correct.

15       **THE COURT:**  Okay.

16       **MS. ROBINSON:**  And she said to that point earlier

17   that she wasn't going to issue a criminal trespass warning --

18       **THE COURT:**  And so that's the answer to my question

19   is:  Him simply posting the name of the juvenile in all of

20   this context and him simply posting the name of the juvenile's

21   parents pre this final *Facebook* post was not a threat of

22   violence communicated and directed at them and so if that is

23   the case then -- Well, let me back up.  So your client said

24   that the target was the juvenile, the juvenile's parents, and

25   then anyone at the school, basically, either -- at a school

1  day or at an event.  And so it's your position that when he

2  made the *Facebook* post and said bullying has prompted all of

3  these mass shootings, whatever it said, it is reasonable to

4  conclude from that that he -- that he, Mr. Cain, was going to

5  go and carry out a mass shooting.  Objectively reasonable to

6  conclude that's what he was going to do of Aledo -- of an

7  Aledo school or these three people.  Is that -- That's what

8  you're saying; right?

9          **MS. ROBINSON:**  Objectively reasonable.  Yes, Your

10  Honor.

11          **THE COURT:**  That Chad Cain, Charles Cain, would go

12  carry out the mass shooting?

13          **MS. ROBINSON:**  Yes, Your Honor.  Targeting them

14  specifically and potentially other individuals because the

15  post makes clear that he's saying mass school shootings caused

16  from bullying -- If administration keeps bullying the parents

17  by pulling out the broom for the bullies, will it happen here

18  in Aledo --

19          **THE COURT:**  So that -- You're saying that that,

20  coupled with these other posts, is Mr. -- Mr. Cain's

21  expression that this act of violence -- that he will commit

22  this act of violence.  It's not he is saying that -- hoping to

23  incite someone else to do it.  Your position is he is saying

24  he's going to go do it.

25          **MS. ROBINSON:**  Absolutely, Your Honor.

1          THE COURT:  All right.

2          MS. ROBINSON:  As taken in the context --

3          THE COURT:  All right.  All right.  And so my -- And

4   so, in that regard, in your closing arguments you said he has

5   a propensity to violence.  What is the evidence that you have

6   that Mr. Cain -- that supports your argument or your statement

7   you just made that he has a propensity to violence?

8          MS. ROBINSON:  Your Honor, I was trying to make clear

9   that because of the escalation shown in these posts and even

10  following the conversation with Chief Collie where he is

11  continuing to become more and more --

12         THE COURT:  Angry.  Yeah.  No, I totally understand.

13  But then -- Hold on.  You've said he has a propensity to

14  violence.  I wrote it down.  That's a quote from you.  I

15  didn't -- I'm not -- I'm not even characterizing what you

16  said.  You said he has a propensity to violence and because of

17  that your client was justified in acting.  And my question to

18  you is what evidence do you have that he has as propensity to

19  violence.  Not to anger, to violence.

20         MS. ROBINSON:  Your Honor, the fact that there were

21  *Facebook* postings about him delivering -- excuse the word --

22  quote, "Ass whoopings" both to the minor child and to the

23  parents --

24         THE COURT:  He said that he was going to do that?

25         MS. ROBINSON:  Another individual --

1        THE COURT:  Right.

2        MS. ROBINSON:  -- told him that he should and he did

3   not disagree with that, Your Honor.

4        THE COURT:  And so my question to you -- So you're

5   saying that he didn't disagree with the other person making

6   that comment that that is evidence that Charles Cain has a

7   propensity to violence.  You have accused him of having a

8   propensity to violence and all I'm asking you is what evidence

9   do you have of that?  If he has a propensity to be an angry or

10  if his anger was escalating, as you describe, then that's one

11  thing.  But you just told me that he had a propensity to

12  violence and I'm asking you, since you made that allegation

13  against him, what factual basis do you have that shows he has

14  a propensity to violence?  I assume you want me to consider

15  that, that he has a propensity to violence or you wouldn't

16  have said it.  What evidence do you have that he's prone to

17  violence?

18        MS. ROBINSON:  Your Honor, I believe that that is a

19  reasonable inference from the fact that he refused to disagree

20  with or correct --

21        THE COURT:  What does "propensity" mean to you?

22        MS. ROBINSON:  That there is some degree of ability

23  for that --

24        THE COURT:  Really?  Do I have a propensity to

25  violence?  I'm sure if -- I carry a firearm.  There's a

1  degree -- so there's some -- I get mad.  So I assume there's

2  some degree as a -- as a firearms carrying individual then

3  that I have a propensity for violence?  Or does "propensity"

4  mean you have a history, you have a likelihood of committing

5  violence?  I don't know.  Maybe I'm wrong.  I can *Google* it

6  real quick.  But I'm relying on what you told me and you told

7  me that I need to find in favor of your clients because when I

8  consider what they were looking at, one of the things they

9  were looking at was he has a propensity to violence.

10        **MS. ROBINSON:**  Your Honor, I did not mean that in

11  terms of a history because, as you know, we've been unable to

12  depose Mr. Cain, so I -- and none of the --

13        **THE COURT:**  So you have no evidence that he has a

14  propensity to violence?  He might, but have you no evidence of

15  it.

16        **MS. ROBINSON:**  We have evidence in front of us that

17  there was a continued escalation that included comments

18  regarding violence that he did not correct that he --

19        **THE COURT:**  I haven't corrected it, either.  So that

20  makes me -- And I've been angry before.  I've been angry about

21  this case, okay?  That means I have a propensity to violence?

22        **MS. ROBINSON:**  Your Honor --

23        **THE COURT:**  I mean, I'm just concerned that you made

24  a statement that lacks evidentiary support and you want me to

25  consider that.

1      MS. ROBINSON:  Well, let me withdraw that statement

2  and try to explain what I meant, Your Honor.

3      THE COURT:  Well, I -- Is what you meant that his

4  anger was escalating and that fact caused your client to be

5  concerned that it may lead to violence?

6      MS. ROBINSON:  It was not only that the anger was

7  escalating, Your Honor, it was also that there were multiple

8  posts prior to the mass school shooting post that mentions not

9  only the student and then the name being deleted and reposted

10  and the comments about the ass whooping of both that student

11  and his parent with which he didn't disagree or correct --

12      THE COURT:  Right.  But I asked you -- I asked you is

13  your -- was your concern on the threat that he would commit

14  violence, not that this fellow who said the kid needs an ass

15  whipping would go do it or encourage other people to do go do

16  it.

17      MS. ROBINSON:  Correct, Your Honor.  That's because

18  the culminating fact of Defendant's Exhibit No. 1, the mass

19  school shootings post, in concert with his other posts about

20  him feeling like that the other student did not receive

21  significant enough disciplinary consequences, which is the

22  entire crux of his complaint, that that continued to escalate

23  to the point that even after the fisticuffs deescalated he is

24  saying that mass school shootings are caused by bullying and

25  if the administration is bullying the parents, which he has

1    already made clear in the other posts, he feels that he's not

2    being listened to because there weren't more disciplinary

3    consequences so he feels bullied, that this was him saying

4    that he himself could engage in behavior such as a mass school

5    shooting.  That would be violent behavior and this, Your

6    Honor, is certainly a true threat.  Again, it doesn't have to

7    be a direct threat or name the individuals when, in

8    culmination with the other documents, we already know the

9    individuals who are being targeted.  It's the other student

10   and his parents.  But that doesn't mean violence would be

11   limited to them and that's the situation in September 2019.

12            THE COURT:  And how do you distinguish these facts

13   from the facts in the *Watts v. U.S.* case?

14            MS. ROBINSON:  Well, Your Honor, in this case you

15   have an individual who has access to the campus, has access to

16   weapons, despite his assertions to the contrary, we know about

17   it, has training and issues a post about mass school shootings

18   in an environment in which there are mass school shootings

19   much too often and that follows significantly several days of

20   building and escalating behavior, rather than deescalating

21   behavior.  It's certainly not one event on one day.  It's a

22   culmination of all of these day's behavior.

23            THE COURT:  And -- Okay.  And that's different from

24   the *Watts* case in that, what, the training and the access is

25   different, in your view?

1      **MS. ROBINSON:**  And also the pattern of the escalating

2    behavior culminating in this type of true threat, Your Honor.

3      **THE COURT:**  And the proximity, I guess, as well?

4      **MS. ROBINSON:**  Yes, Your Honor.  And the access to

5    this other student and his parents both in the pickup line

6    that day and at the football game that night.

7      **THE COURT:**  And then am I right in that the standard

8    articulated in *Virginia v. Black* is the standard I need to

9    apply here?  The true threat standard?

10      **MS. ROBINSON:**  Well, the Fifth Circuit didn't adopt

11    the true threat standard until following the issuance of the

12    criminal trespass warning in September 2019 but I think

13    because *Monroe* --

14      **THE COURT:**  I'm sorry.  Say that again.  Start over

15    again.

16      **MS. ROBINSON:**  It wasn't adopted until November of

17    2019 in the Fifth Circuit.  But even if you apply that

18    standard, it's still met in this particular case, Your Honor.

19      **THE COURT:**  I'm just asking is that the standard for

20    me to apply?

21      **MS. ROBINSON:**  I certainly think that is the standard

22    that can be applied.  Do I think it has to be because the --

23    because *Monroe* was not decided until November 2019, no, Your

24    Honor; but we win either way.

25      **THE COURT:**  What standard do I need to apply.  Let me

1    ask you that.

2        **MS. ROBINSON:**  Your Honor, you have discussed the

3    true threat standard and I think that that is the standard

4    that has clearly been met in this case.  If you look at the

5    prior cases that did not discuss their being a true threat

6    against a specific individual or group of individuals, they

7    dealt with whether it was objectively reasonable for someone

8    to issue a criminal trespass warning, not an arrest, not any

9    type of a criminal complaint, but just a criminal trespass

10   warning just to prevent possible harm and certainly under that

11   standard the school district more than met that standard.

12       **THE COURT:**  Go ahead and -- I'm a little confused.

13   So articulate the standard I need to apply in deciding this

14   case -- in deciding this issue.

15       **MS. ROBINSON:**  Your Honor, again, if you apply the

16   *Monroe* standard from November 2019, which was two months after

17   this criminal trespass warning was issued, I believe

18   Defendants still prevail because this was a true threat.  It

19   was a true threat at the time.  Again, it doesn't have to be a

20   direct threat.  It doesn't have to name the individual.

21       **THE COURT:**  I understand that.

22       **MS. ROBINSON:**  We just have to know who they were;

23   and we did.

24       **THE COURT:**  So the true threat standard applies.  Or

25   what other standard applies if it's not.  Let me ask it -- I'm

1    not trying to trick you.  I'm trying to get from you the

2    standard you believe I need to apply in this case.  I,

3    obviously, have been talking about the true threat standard

4    and you are saying if that standard applies you prevail.  I

5    take your point on that.  My question to you -- You said if it

6    does.  My question to you is:  If it does not, what standard

7    applies?

8         MS. ROBINSON:  If it does not, then we easily prevail

9    because the prior articulation of the standard, Your Honor, is

10   if it was objectively reasonable for a criminal trespass

11   warning to be issued to prevent the possibility of harm and

12   that standard was well met.  But the *Monroe* standard is also

13   met in this case, Your Honor.  We know why it was --

14        THE COURT:  Okay.  That -- I'm with you on your

15   argument.  I'm following you.  I just am looking for the legal

16   rule.  Do I look to and apply *Tinker* to this case or no?

17        MS. ROBINSON:  Well, *Tinker*, of course, dealt with

18   the student's expression of free speech, not a parent.  I

19   think the cases that are more applicable are the cases cited

20   in our response to Plaintiff's motion for what he calls

21   temporary injunction, but actually preliminary injunction in

22   this court, regarding the Court's role in not second guessing

23   decisions of administrators.  It's not a student's speech with

24   which we are dealing with in this case, Your Honor.

25        THE COURT:  Right.  It's an adult -- It's a

1  non-student's speech.

2  　　　　MS. ROBINSON:  Correct.

3  　　　　THE COURT:  And *Tinker* only applies to student

4  speech, so I guess it would not apply here?

5  　　　　MS. ROBINSON:  Well, that was the context of the

6  *Tinker* ruling, Your Honor.  I believe that there is some dicta

7  that could potentially apply to this speech.  But in this case

8  where you have a witness testifying that when I issued the

9  criminal trespass warning in September 2019 I did not believe

10  this one culminating event, this post that was the straw that

11  broke the camel's back, so to speak, on top of all of the

12  other posts and all of the other activities as having to do

13  with criticism of the administration.

14  　　　　THE COURT:  No, I -- I'm with you on the facts.  And

15  I'll will let you argue some more if you don't think I'm

16  letting you argue on the facts.  I'm just trying to nail down

17  what your position is on the legal rules.

18  　　　　Has there been any cases that you're aware of that

19  applies the *Tinker* standards to non-students off campus?

20  　　　　MS. ROBINSON:  Not in this context of which I'm

21  aware.  I think the cases that are applicable to this

22  particular case, Your Honor, are those that are cited in our

23  response to Plaintiff's Motion For Temporary Injunction and I

24  believe the holdings in those cases the Court should also deny

25  Plaintiff's Motion For Preliminary Injunction.

1          THE COURT:  Okay.  Anything else that I'm not giving

2     you time or allowed you to say that you feel needs to be said?

3          MS. ROBINSON:  Only if you have additional questions,

4     Your Honor.

5          THE COURT:  No.  Thank you.

6          MS. ROBINSON:  Yes, Your Honor.

7          THE COURT:  Any final assumption?  Yes?

8          MR. DUNLEAVY:  May it please the Court.  Your Honor,

9     I would like to answer a couple of questions.  Propensity, I

10     believe, a history tendency to a certain trait.  There's no

11     evidence.  Inference.  I looked that up.  Inference is a

12     conclusion supported by facts and evidence.  We don't have

13     that, either.  We're not drawing inferences here, Your Honor.

14     And the --

15          THE COURT:  Can you draw -- Is it proper for them to

16     reasonably draw an inference from what is said, spoken,

17     written to conclude that there is a direct communication,

18     direct expression of violence against a person?  In other

19     words, does it have to be, I plan to go shoot the juvenile and

20     his parents and the whole school; or can they -- I know you

21     don't agree that it applies here.  But are they able to,

22     hypothetically, in a hypothetical case, draw that inference?

23     Are there -- Are there words and posts that would be

24     sufficiently expressive to make this communication that the

25     conclusion would be drawn by inference?

1          **MR. DUNLEAVY:**  Absolutely not, Your Honor.  You only

2     look at the words.  They don't get to inferences.  That's why

3     the Fifth Circuit -- and I want to talk -- The *Monroe* case,

4     counsel I think said the Fifth Circuit didn't adopt or -- the

5     standard or the true threat standard until *Monroe*, November

6     2009.  I don't believe that's correct.  I don't think the

7     Fifth Circuit gets to decide that the *Virginia v. Black*

8     decision in 2003 --

9          **THE COURT:**  No, I'm with you.  The Supreme Court,

10    that controls.  I understand.

11         **MR. DUNLEAVY:**  So 2003, that became a standard.  The

12    Fifth Circuit talked about it November 25, 2009.  I may

13    disagree with you about the impact of qualified immunity after

14    November 25, 2009, where we are, is an issue of qualified

15    immunity.  But we're not talking about qualified immunity.  We

16    are talking about injunctiontive relief --

17         **THE COURT:**  But under qualified immunity.  In other

18    words, all of her arguments about putting myself in the

19    superintendent's shoes would be, seems to me, to support the

20    idea that the superintendent would be entitled to qualified

21    immunity.  There's not a -- There's not a case that tells her

22    that drawing this inference or reaching this conclusion in

23    this heightened emotional atmosphere would have told her she

24    was clearly wrong and I can't and should not be able to second

25    guess her when she has to make those decisions on the ground

1   at the moment and so that's why she should, in my view, not be

2   on the hook for her personal assets and liability.

3        But as it relates to the standard here, the standard

4   is the standard as relates to the official capacity claims and

5   the official body, the school district as a body, and they are

6   not entitled to qualified immunity.

7        MR. DUNLEAVY:  Your Honor, the last four days I've

8   come to recognize you kind of like direct answers, so I will

9   say:  You are correct, Your Honor.  There is not a case right

10  on point, and so with respect to the qualified immunity, I

11  will simply say, though I disagree, there's not a case on

12  point.  So the standard -- But I also -- I do agree with you

13  when you just said the standard is the standard and the

14  standard that the Fifth Circuit told us November 25, 2009, is

15  the true threat determination must be limited to whether

16  *Monroe*, quote:  "Meant to communicate a serious expression of

17  an intent to commit an act of unlawful violence through a

18  particular individual or group of individuals."  That's the

19  standard.

20       Now, you can look at that post and you can see that

21  there's no intent and there's no expression of violence.

22  Questions about the relationship between bullying and school

23  shootings, that's not an expression, an intent to commit

24  serious violence.

25       And continuing from *Monroe*, "Whatever harm the target

1   of the purported threat received is irrelevant." So all of

2   her analysis, all of her inference is irrelevant.  The

3   decision is yours.  Now, if you look at the post, it's not a

4   threat.  So trying to answer your questions --

5           THE COURT:  And that's because it can't be an

6   inference; right?

7           MR. DUNLEAVY:  Right.

8           THE COURT:  I mean, your -- your colleague here is

9   suggesting that all of the community feedback that the

10  superintendent and the police chief received shows that it was

11  objectively reasonable to conclude that he intended to kill

12  these three people or shoot up the school.

13          MR. DUNLEAVY:  Yes, Your Honor.  The Court feels that

14  what they think doesn't matter is irrelevant; and this makes

15  sense.  Since a statement can be a true threat, even when the

16  speaker does not intend to carry out the threat.  That's the

17  subject of intent that Ms. Robinson kind of talked about, but

18  it's an objective issue and I analogize it to kind of like the

19  discrimination cases.  You have direct evidence of

20  discrimination or do have you to infer discrimination, some

21  sort of balancing.  Here, this test, there's no inference

22  test.  There's no balancing test.  There is simply look at the

23  speech and see if it's a threat.  This is not a threat.  So

24  the Fifth Circuit standard is the *Virginia v. Black* standard.

25          In terms of the Court's question about can we think

1    about what we're thinking now compared to what we thought a

2    year ago, I think that's an important consideration --

3         THE COURT:  Let me stop you here.  That's what your

4    colleague suggested.  I'm not saying that that's the proper

5    way to look at this.

6         MR. DUNLEAVY:  Well, I think if you look at this post

7    under the proper standard, is it a threat, then the question

8    to ask now is why did they lift it?  Because they lifted it

9    yesterday in part.  Why?

10        THE COURT:  They offered to lift it.

11        MR. DUNLEAVY:  Well, I understood -- They just said

12   it's lifted.  They -- Maybe it's an offer.  Maybe I

13   misunderstood.  But why lift it now.  So if it's a threat,

14   it's a threat.  And there hasn't been a deescalation.  He

15   doesn't think he has to.  So why is it now?  Because now

16   they're looking at, Gee, the words are not a threat.

17        So school shootings are bad.  Avoiding blood baths,

18   certainly, that's good.  Criminal trespass going to Chad Cain

19   ain't going to get us there.  It just has nothing to do with

20   this case.  It has to do with what they're trying to paint the

21   picture of my client, He's got a propensity to violence, he's

22   a gun nut, he's unhinged, he's crazed.  These are things I've

23   heard and most of them you heard today.  None of them are

24   true.  None of them -- You asked the question that I've been

25   asking for a year:  What's your evidence?  You phrase it as

1   what's your evidence and you never got an answer.  You didn't

2   get an answer on Friday.  You didn't get an answer today.  I

3   did six hours of deposition with Fred Collie.  I didn't get an

4   answer to the question what are your articulable facts.  I did

5   six hours of deposition with Susan Bohn.  I asked the same

6   question.  What are your facts?  No answer.  I did not hear an

7   answer to the question what's the threat, other than the posts

8   combined with everything else that was happening in the

9   community.  That's what it was.  And that's not right.

10          So we do not -- We didn't contradict anybody that --

11  We didn't contradict the evidence that people complained.

12  People complained.  They didn't like his speech.  The district

13  didn't like his speech.  The people who complained are not the

14  speech police.  The district is not the speech police.  They

15  don't get to say.  Because the case that applies that I think

16  makes it the clear case where you don't need the specific

17  facts is the *R.A.V.* case.  The government can't punish speech

18  even that they disapprove of.  That's what they did.  The

19  First Amendment says they can't.  You asked, Judge, isn't this

20  criticism of the Government?  It took about 30 minutes for her

21  finally to agree, well, yeah, maybe there's criticism.

22  Ms. Bohn said, no, I don't see it as criticism.  I think

23  that's what she said today.  I just see it as a threat.  It's

24  criticism, it's First Amendment protected peach.

25          We didn't contradict the people complaining because

1    people did complain; okay?  It doesn't matter, but that's our

2    argument, because the Fifth Circuit said that it's irrelevant.

3    Chad Cain spoke on social media.  The post is not a threat.

4          Chad Cain, like all of the defendants, he's in the

5    service, he's a police officer, swore to protect and support

6    the Constitution.  He would like some of the benefit of that

7    First Amendment protection of his speech, because the district

8    has taken it away from him.

9          Even parts of his speech that they disagree with that

10   they disapprove of, if it's not one of the narrow exceptions,

11   then they don't get to regulate it.  They don't get to punish

12   it.

13         What's the evidence?  That's the question of the day.

14   It's the question of the year.  The answer is none.

15         Your Honor, I went over the four elements because I

16   understood from the Fifth Circuit that I had to cover all

17   four, even if I -- I feel really strongly about number one.

18   So I belabored some of those points, but I think we win easily

19   on number one.

20         The last thing I will talk about, Your Honor, is the

21   student speech cases.  The student speech cases don't apply

22   for several reasons.  One, he is not a student.  Two, he

23   didn't speak on campus.  Three, he didn't direct his speech to

24   campus.  If you have any of those issues where maybe they have

25   a right to control their property and maybe they can limit

1    student speech, potentially some court could say, and

2    honestly, I think *Monroe* did say, that if that parent comes

3    into this board meeting and starts pointing his finger and

4    saying I'm going to get you, frankly, I was surprised reading

5    this and Ms. Robinson said that -- when I went back to the

6    district court -- that they said it wasn't.  I haven't seen

7    that decision.  But I read some of that.  I said I like the

8    test because it says clearly my client did nothing wrong.  I'm

9    wondering how they made it to the Fifth Circuit here if he's

10   pointing his finger and saying I'm going to get you people at

11   a school board meeting.  That doesn't sound like the *Watts*

12   case.  That doesn't sound like *Virginia v. Black*.  That sounds

13   like somebody who might be expressing an intent toward

14   violence.  That's not this case.

15         So the student speech cases, maybe they could apply

16   if Mr. Cain had done something off campus.  If he had directed

17   his speech to campus.  If he had disrupted campus.  You have

18   Fred Collie's testimony there was no disruption on campus.

19         You have Ms. Bohn's testimony.  Her job includes

20   answering complaints.  You've got a few pages of complaints.

21   I'll grant you that.  I think she's doing her job.  So her job

22   wasn't disruptive.  She wasn't distracted.  He didn't

23   interfere with a governmental operation.  Fred Collie said so.

24         They can't meet the elements of the offense.  What we

25   have is speech they disagree with, plain and simple.  She said

1    that.  She said we don't like it when parents are talking bad

2    about kids.  Fred Collie said it, It's just not appropriate

3    for a police officer to say those things, do those things.

4    It's pure speech.  It's protected by the First Amendment to

5    the United States Constitution.  It's protected by the Texas

6    Constitution.  There is a statute, State Statue, 551, you

7    can't punish people for a speech critical of the government.

8    That went into effect September 1, 2019.  It's clear you can't

9    do that.

10           So I don't mean to belabor the point.  I respectfully

11   disagree with the qualified immunity.  But this case was

12   always about an injunction.  We didn't even sue for damages in

13   state court.  What are we talking about damages?  $500.  He

14   wasn't allowed to work at Jerry World, his regular security

15   job on Saturdays, when Aledo ISD was playing in the state

16   championship game.  So Fred Collie said, Well, it would okay

17   if he was on the other side of the stadium.  We wouldn't have

18   trespassed him for that.  He didn't know.

19           So this case is about the injunction and we are

20   entitled to an injunction, Judge.  We ask that you issue the

21   preliminary injunction and request that you lift the trespass

22   warning.

23           THE COURT:  Okay.  I've got all of the paper

24   exhibits, so what am I going to do about these audio?

25           MR. DUNLEAVY:  Your Honor, I've got a thumb drive for

1    counsel and for the Court.

2            THE COURT:  Very good.  We will take that from you.

3    So it's Exhibit 11 and 12 on the same --

4            MR. DUNLEAVY:  Yes, Your Honor.  Two videos.

5            THE COURT:  Okay.  I will take this all under

6    advisement and get a ruling out as soon as I can.

7            MR. DUNLEAVY:  Thank you, Your Honor.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     I, **DENVER B. RODEN**, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Fort Worth Division, hereby certify that the above

4    and foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6     **WITNESS MY HAND** on this 8th day of November, 2021.

7

8

9                    /s/ Denver B. Roden

10               **DENVER B. RODEN, RMR**
*United States Court Reporter*

11               5124 Breezewind Lane
Fort Worth, Tx 76123-6012

12               *drodenrmr@sbcglobal.net*
**Phone:** (214) 907-0760

13

14

15

16

17

18

19

20

21

22

23

24

25